**WRONA LAW FIRM, P.C.**
Joseph E. Wrona (#8746)
wrona@wasatchlaw.com
Todd D. Wakefield (#6354)
wakefield@wasatchlaw.com
Jared C. Bowman (#11199)
bowman@wasatchlaw.com
1745 Sidewinder Drive
Park City, Utah 84060
Telephone: (435) 649-2525
Facsimile:  (435) 649-5959
Attorneys for Plaintiff, The Joni R. Boulware Trust

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| JONI R. BOULWARE and THE JONI R. BOULWARE TRUST,<br><br>         Plaintiff,<br><br>v.<br><br>DWIGHT SHANE BALDWIN, an individual; MARK STAPLES, an individual; SILVERLEAF FINANCIAL, LLC, a Utah limited liability company; SILVERLEAF VENTURES, LLC, a Utah limited liability company; SILVERLEAF FINANCIAL 5, LLC, a Utah limited liability company; SILVERLEAF FINANCIAL 17, LLC, a Utah limited liability company; and 1333 BON VIEW CORPORATION, a California corporation;<br><br>         Defendants. | **COMPLAINT**<br>**And**<br>**JURY DEMAND**<br><br>Case No.: 2:11-cv-00762-DN<br><br>Magistrate Judge David O. Nuffer |

Plaintiff, The Joni R. Boulware Trust, by and through its counsel, Wrona Law Firm, P.C., hereby complains and alleges against Defendants Dwight Shane Baldwin, Mark Staples, 1333 Bon View Corporation, Silverleaf Financial, LLC, Silverleaf Ventures, LLC; Silverleaf Financial 5, LLC, and Silverleaf 17, LLC as follows:

## PARTIES

1.    Plaintiff, The Joni R. Boulware Trust, created on the 21st day of November 2006, by Joni R. Boulware, Settler (the "Trust") is a trust created under the laws of the State of Arizona.

2.    Plaintiff Joni R. Boulware ("Boulware") is an individual resident of the State of Utah.

3.    Defendant Dwight Shane Baldwin ("Baldwin") is an individual resident of the State of Utah.

4.    Defendant Mark Staples ("Staples") is an individual resident of the State of Utah.

5.    Defendant 1333 Bon View Corporation ("BVC") is a California corporation doing business within the State of Utah.

6.    Defendant Silverleaf Financial, LLC ("Silverleaf Financial") is a Utah limited liability company.

7.    Defendant Silverleaf Ventures, LLC ("Silverleaf Ventures") is a Utah limited liability company.

8.    Defendant Silverleaf Financial 5, LLC ("SF5") is a Utah limited liability company.

2

9.     Defendant Silverleaf Financial 17, LLC ("SF17") is a Utah limited liability company.

<strong><u>JURISDICTION AND VENUE</u></strong>

10.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1331, 28 U.S.C. § 1367, 28 U.S.C. § 1332 and the agreements that are at issue in this Case.

11.     Venue is proper pursuant to 28 U.S.C. § 1391(b) and the agreements that are at issue in this Case.

<strong><u>GENERAL ALLEGATIONS</u></strong>

12.     The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

**I.     SILVERLEAF FINANCIAL 5, LLC.**

**A.     Structure and Business Plan.**

13.     Baldwin, through Silverleaf Financial and Silverleaf Ventures, caused the creation of SF5.

14.     The manager of SF5 was to be Silverleaf Financial by its manager, Silverleaf Ventures, whose manager was Baldwin.

15.     Baldwin owns 100% of Silverleaf Ventures and 51% of Silverleaf Financial.

16.     SF5's business plan, as related to the Trust by Baldwin, was that SF5 would purchase a group of loans secured with real property located in Illinois, Arizona, Ohio, and Indiana from Marshall & Isley Bank ("M&I Bank") via an auction conducted by Mission Capital Investors ("MCI") (the "Loans").

3

17.     SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin would then seek to add value to the investment by selling the loans, working out acceptable terms with the borrowers, attracting new tenants, as well as foreclosing on the secured real property and then selling the property.

18.     In order to purchase the Loans SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin sought outside investors, such as the Trust and BVC, to contribute approximately 57.4% of the purchase price of the Loans.

19.     SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin represented to the Trust that SF5, as the "Lead Lender", would be contributing the remainder of the purchase price for the Loans beyond what was provided by outside investors like the Trust.

20.     However, SF5 Silverleaf Financial, Silverleaf Ventures and Baldwin never intended to, and never did, lend any of their funds toward the purchase of the Loans. Instead, they obtained the funds they said SF5 would contribute to the purchase by simply borrowing those funds from a third party, Lincolnshire Associates II, Ltd. ("Lincolnshire"), using the Loans themselves as collateral.

21.     SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin further concealed that the terms of the Lincolnshire Loan required SF5 to use the Loans' proceeds to pay off the Lincolnshire Loan, and that their intent was to prioritize such repayment ahead of any other distributions of cash from SF5.

22.     SF5 ultimately borrowed $3,188,750.00 from Lincolnshire to finance the purchase of its share of the Loans from M&I Bank (the "Lincolnshire Loan").

4

### B.    Baldwin Recruits the Trust.

23.    In or about September of 2009, SF5, Silverleaf Financial, Silverleaf Ventures, and Baldwin engaged with the Trust by speaking with its trustee, Joni R. Boulware ("Boulware").

24.    SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin told Boulware that for $500,000, the Trust could have a 7.4079% interest in the Loans, with SF5 having whatever interest remained after contributions from the Trust and any other similar investors.

25.    As a result, Baldwin, SF5, Silverleaf Financial, and Silverleaf Ventures, convinced the Trust to contribute $500,000.00 toward the purchase of the Loans from M&I Bank.

26.    On September 24, 2009, SF5 entered into the Loan Participation Agreement for SF5 (the "Participation Agreement"). *See* Participation Agreement at 14 (Ex. A).

27.    The Participation Agreement states that the Trust's purchase price for participating in the Loans is $500,000.00. *See id.* at § 1.3.

28.    The Participation Agreement also makes it clear that the Trust is a participant in a group investing in the Loans, and not in SF5, Silverleaf Financial, or Silverleaf Ventures. *See id.* at § 1.4.

29.    The Participation Agreement established a *de facto* general partnership consisting of the entities investing in the Loans

30.    The Participation Agreement further makes it clear that the Trust has a 7.4079% interest in the Loans. *See id.* at § 1.5.

31.     Ultimately, SF5 ended up with a 42.5921% interest in the Loans, and BVC held

the remaining 50% interest in the Loans.

32.     The Participation Agreement additionally states regarding the Trust's

Participation Interest:

> The Participation Interest is an undivided fractional interest in the Loans that are
> owned by Participant and that is of equal rank and pari passu with the participation
> interests of all other Participants in the Loans, and no undivided fractional interest
> shall have preference or priority over any other undivided fractional interest.

*Id.* at § 2.2.

33.     The Participation Agreement later confirms the pari passu nature of the Trust's

interest in the Loans:

> Participant understands and agrees that the Participation Interest, when duly purchased
> and owned by Participant, will be subject to payment **on a pari passu basis with all**
> **other participation interests sold by Lead Lender and with Lead Lender's own**
> **ownership interests in the Loans**.

*Id.* at § 7.17 (emphasis supplied).

34.     The Participation Agreement also details the manner in which the Trust will

receive a return of its investment.

> Participant shall receive a return of the Participation Amount, pro rata and pari
> passu with the return of investment amounts in the Loans by other Participants
> based on their relative ownership interests in the Loans, with Participant's share
> equal to the Participation Percentage. The return of the investment amounts of all
> Participants shall be shared only after payment and reimbursement of all costs and
> expenses arising out of the Loans.

*Id.* at § 2.3(a).

6

35.     The Participation Agreement next provides that after a return of the Trust's investment, the parties will share in the profits, with 30% of the profits to SF5, and the remainder divided between the Trust and BVC on a pro rata basis. *See id.* at § 2.3(b).

36.     Sections 3.2 and 3.3 of the Participation Agreement gave SF5 sole and absolute discretion on how to manage the Loans. *See id.* at §§ 3.2 *and* 3.3.

37.     Section 4.2 of the Participation Agreement obligated SF5 to make copies available to the Trust of all documents related to the Loans except the participation agreements of other participants. *See id.* at § 4.2.

38.     Section 12.8 of the Participation Agreement requires that the Participation Agreement "be governed by and construed and enforced in accordance with, the laws of the State of Utah without giving effect to its conflict of laws." *Id.* at § 12.8.

**C.     SF5 Causes Distributions to Itself and BVC, but Not to the Trust.**

   **i. The Martin Loan.**

39.     Among the Loans, was a loan to Martin Capital, LLC (the "Martin Loan") in the amount of $3,077,133.00. *See* Bid Summary Sheet (Ex. B).

40.     From the time SF5 acquired the Martin Loan on September 29, 2009 until the time SF5 sold the Martin Loan on June 10, 2010, the Martin Loan borrower made interest payments totaling $118,431.77

41.     During this time, SF5 never caused any distribution of any of those proceeds to be made to the Trust.

7

42.     Nevertheless, during this same time (and unbeknownst to the Trust) SF5 did cause distributions to be made to BVC and to SF5, which it used to pay down the Lincolnshire Loan.

43.     On June 10, 2010, SF5 sold the Martin Loan to H&H Golden Corral, LLC, which is managed by CCG Management, Inc., which is managed by Alan Cottle ("Cottle") for a net sale of $1,767,225.00.

44.     The borrowed for the Martin Loan, Ashley Martin, was never given an opportunity to try to outbid Cottle's bid for the loan.

45.     In addition to being the purchasing entity, Cottle also served as the SF5's sales broker for the sale of the Martin Loan, and thus not only obtained the Martin Loan at a substantial discount, but also received a commission on the sale of $232,000.00.

46.     SF5 caused no distributions to be made to the Trust from the proceeds of that sale, but, unbeknownst to the Trust, did cause distributions to SF5, and potentially to BVC as well. *See* Silverleaf Financial 5, Statement of Cash Flows, January through June 2010 (Ex. C).

47.     SF5 also again used the proceeds from the sale of the Martin Loan to pay down the Lincolnshire Loan.

48.     The Trust's share of the proceeds from the Martin Loan totals at least $139,687.57.

      ii.     **The Parry Loans.**

49.     The Loans that SF5 purchased from M&I Bank also included a number of loans made to Mark Parry and his various companies, which loans were secured by his personal guarantees (the "Parry Loans").

50.     The Parry Loans were secured by a number of vacant parcels and apartment complexes in Arizona (collectively, the "Parry Loans Properties").

51.     On February 13, 2010, SF5 obtained all of the Parry Loans Properties through deeds in lieu of foreclosure and by paying $10,000.00 to get a release on a second deed of trust.

52.     SF5 retained the managers of the properties and captured the cash flows generated by the Parry Loans Properties and used a portion of these cash flows to further pay down the Lincolnshire Loan without the Trust's knowledge or consent.

53.     SF5, however, failed to pay the property taxes due on the Parry Loans Properties, which resulted in those Parry Loans Properties accruing substantial interest charges and penalties. *See* Property Tax Details from the Maricopa County Treasurer's Office (Ex. D).

54.     During its ownership of the Parry Loans Properties, SF5 never caused any distributions to be made to the Trust.

### D.     Sale of Assets to BVC and Unanimous Consent Document.

55.     On November 30, 2010, Baldwin notified the Trust, via email, that SF5 would be causing the sale of some of the apartment complexes associated with the Parry Loans and paying off the Lincolnshire Loan. *See* Email from Baldwin to Boulware, dated November 30, 2010 (Ex. E).

56.     Baldwin, however, concealed the fact that the sale was to BVC, and included all of the apartment complexes and vacant land associated with the Parry Loans. *See id.*

9

57.     Baldwin also concealed the facts that a warranty deed had already been signed conveying the Parry properties to BVC, as well as that he had already executed a November 30, 2010 loan agreement with BVC.

58.     Baldwin further concealed the fact that deal with BVC also involved the effective refinancing of the Lincolnshire loan by BVC on extremely favorable terms to BVC.

59.     On December 8, 2010, Baldwin emailed the Trust to propose two options for the Trust's unpaid distributions. *See* Email from Baldwin to Boulware, dated December 8, 2010 (Ex. F).

60.     With Baldwin's Email, he attached a spreadsheet detailing the parties' options going forward and indicating that the Trust's unpaid distributions totaled at least $353,444.68. *See* Going Forward Alternatives Spreadsheet (Ex. G).

61.     The first option Baldwin presented was that the Trust could simply take its $353,444.68 and keep its 7.4079% interest in the remaining assets.

62.     The second option Baldwin presented to the Trust was to have the Trust leave in its share of the proceeds in exchange for a 25% interest in a new partnership, which would be leveraged to obtain a new loan of $1,000,000.00 from an undisclosed party, for which the Trust would be partially responsible.

63.     The Trust ultimately learned that the undisclosed party that would be making the $1,000,000.00 loan was BVC. The terms of the loan included an origination fee of $100,000, interest at the rate of 15%, and a 12-month payoff.

10

64.     The Trust elected to take the first option and receive the distributions that SF5 had withheld.

65.     On December 9, 2010, Staples emailed the Trust regarding the payment of distributions. *See* Email from Staples to Boulware, dated December 9, 2010 (Ex. H).

66.     In his email, Staples stated that, "The reason we have not been receiving cash at the partnership level is that it has been used to make tenant improvements and pay our property taxes." *See id.*

67.     Staples statement was false, because, unbeknownst to the Trust at that time, SF5 had caused distributions to be made to SF5 and BVC, and had failed to pay a majority of the property taxes associated with SF5.

68.     On or about December 10, 2010, the Trust discovered that SF5 had used proceeds from the Loans to pay distributions to BVC and to pay down the Lincolnshire Loan.

69.     At this same time, SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin disclosed that they needed to sell the Parry Loans Properties to pay off the Lincolnshire Loan, or risk Lincolnshire foreclosing on the Loans and attendant properties.

70.     Due to these circumstances, SF5, Silverleaf Financial, Silverleaf Ventures, and Baldwin requested that the Trust sign a Unanimous Consent to sell the Parry Loan Properties to a company wholly owned by BVC. *See* Unanimous Consent of Participants to Action, dated November 30, 2010 (Ex. I).

11

71.     The Trust protested this course of action, the distributions made to SF5 and BVC, the low purchase price of the Parry Loans Properties to BVC, as well as the fact that the Trust had not received any distributions.

72.     The Trust also protested the lack of time it had to review a transaction that SF5, Silverleaf Financial, Silverleaf Ventures, Baldwin, Staples, and BVC had worked on for months and told Staples that she wanted time to review the transaction with an attorney.

73.     Staples told the Trust not to consult an attorney and stated, "I have got to close this deal now."

74.     In order to induce her to sign the Unanimous Consent, Staples represented that the Trust would receive all of its distributions from the Martin Loan in January of 2011 plus 6% interest until paid and all of the Trust's distributions from the Parry Loans Properties in January 2011. *See* Email from Staples to Boulware, dated December 13, 2010 (Ex. J).

75.     Staples also promised the Trust that it would receive the detailed monthly and quarterly reports that the Trust had been demanding from that point on. *See id.*

76.     In reliance on Staples promises, and due to the Trust's fear of potential liability from not doing so, the Trust signed the Unanimous Consent allowing the sale of the Parry Loans Properties to BVC.

77.     SF5 ultimately failed to pay the Trust its promised payments during January 2011 or to provide any of the promised reports.

78.     At the end of January 2011, the Trust contacted Staples regarding the missing payments and reports.

79.     Staples responded that he had hired some new accounting personnel and that they were a little behind in sending out payments and reports.

80.     Staples, however, promised the Trust that it would have everything previously promised by mid-February 2011.

81.     When nothing came by mid-February 2011, the Trust again contacted Staples, who told the Trust that the final work on the Parry Loans Properties was taking longer than expected.

82.     Staples once again promised that the Trust would have everything promised by the end of February 2011.

83.     On March 2, 2011, after SF5 had once again failed to provide the promised payments and reports, the Trust composed and issued a demand to SF5, Silverleaf Financial, Silverleaf Ventures, Staples, and Baldwin for a full payment of distributions, interest on the distributions, and an accounting. *See* Letter from Boulware to Baldwin, Staples, and Heston Neilson ("Neilson"), dated March 2, 2011 (Ex. K).

84.     The Trust still has not received the payments or detailed reporting it was promised and to which it is entitled.

## II.     SILVERLEAF FINANCIAL 17, LLC

### A.     Silverleaf and Baldwin Induce the Trust to Invest in SF17.

85.     On March 25, 2010, Baldwin caused the creation of SF17 through his Silverleaf entities.

86.     As of April 19, 2011, SF17 had a delinquent status with the Utah Department of Commerce. *See* Utah Business Search – Details (Ex. L).

87.     On March 29, 2010, Silverleaf Financial approached the Trust about investing in SF17. *See* Email from Benjamin Smith ("Smith") and Baldwin to Boulware, dated March 29, 2010 (Ex. M).

88.     On that same day, the Trust indicated it might be interested in investing in SF17. *See* Email from Boulware to Smith dated March 29, 2010 (Ex. N).

89.     When the Trust failed to immediately agree to invest, Baldwin called Boulware to ask if the Trust was interested in investing in SF17.

90.     Boulware responded that she, as trustee, was still considering the matter.

91.     Baldwin responded that the only reason the investment opportunity was available to the Trust was that another investor had been forced to back out at the last minute due to tax problems, and that if the Trust was not going to invest then Baldwin would do so himself with his own personal funds.

92.     Baldwin simultaneously represented SF5 was preparing to cause distributions to be made to the Trust that same month.

93.     Boulware then stated that the Trust would only be willing to invest $250,000.00 and that the Trust had no interest in becoming involved in a deal that would be leveraged.

94.     When Baldwin assured Boulware that SF17 would not be leveraged, the Trust tentatively agreed to invest $250,000.00.

14

**B.     The Private Placement Memorandum.**

95.     On April 5, 2010, SF17 and Baldwin provided the Trust with a Confidential Private Placement Memorandum (the "PPM"). *See* PPM at Title Page (Ex.O).

96.     The PPM states that SF17 is managed by Silverleaf Financial, which is managed by Staples and Silverleaf Ventures, which is managed by Baldwin. *See id.* at 1.

97.     The PPM also states that SF17 is a single purpose entity formed to purchase a single loan from M&I Bank. *See id.*

98.     The PPM further states that the borrower on the loan is Avista Properties, LLC with Anil and Surekha Valbh as personal guarantors, that the loan of $4,102,780.00 is currently in default, and secured by 80 units of a Quality Suites Condo Hotel in Orlando, Florida (the "Florida Loan"). *See id.* at Exhibit A.

99.     The PPM discloses that SF17's purchase price for the Florida Loan would be $2,059.596.00. *See id.*

100.    The PPM also discloses that SF17's business plan is to "seek to facilitate the refinance or restructuring of, sell, foreclose upon and otherwise liquidate the [Florida Loan] and/or underlying capital as soon as practical." *See id.* at 1.

101.    With regard to the distribution of Profits and Proceeds, the PPM provides that,

Available Cash from operations and liquidation of the Loans or other assets will be distributed, when and as determined by the discretion of [Silverleaf Financial] in the following order of priority:

• first, solely to the holders of the Preferred Units pro rata based on the number of Preferred Units until distributions to the Preferred Members equal their Capital Contributions.

*Id.* at 1.

102.    With regard to the management of SF17, the PPM states that Silverleaf Financial will have broad discretion in operating the business, managing the Florida Loan, and liquidating assets. *See id.* at 2.

103.    The PPM also states that Silverleaf Financial is only to be compensated from the profits from the Florida Loan, after the Preferred Members have received a return of their investment and 70% of any net profits. *See id.* at 9.

104.    The PPM also acknowledges regarding SF17's assets and liabilities:

The Company was recently organized solely to purchase the [Florida Loan].   The Company does not have any operating history.  The Company does not have any assets other than its rights with respect to the [Florida Loan].  The Company does not have any liabilities other than an obligation to reimburse the manager for third party expenses associated with its pre-transaction diligence and purchase of the [Florida Loan]....

*Id.* at 29.

## C.    Baldwin Fraudulently Induces the Trust to Double Its Investment.

105.    On April 6, 2010, Baldwin emailed the Trust wire instructions for SF17. *See* Email from Baldwin to Boulware, dated April 6, 2010 (Ex. P).

106.    That same day, the Trust responded via email to inquire about when SF5 would be making a distribution and to ensure that no leverage would be used in SF17. *See* Email from Boulware to Baldwin, dated April 6, 2010 (Ex. Q).

107.    Later that night, Baldwin called to respond to the Trust's concerns.

108.    Baldwin reiterated that the SF5 distribution would happen soon and that the SF17 investment would not involve leverage. Following up on that representation, Baldwin sent

16

Boulware an SF5 Workout Summary showing the status of the various assets involved with it, and depicting sources and amounts of funds that Boulware should expect the Trust to receive.

109.    Baldwin then stated that he had spoken with M&I Bank earlier that day, and that M&I Bank had received a payoff offer from Anil Valbh of $2,700,000.00 that could be completed by the end of April 2010.

110.    Baldwin also stated that M&I Bank nevertheless had offered to honor its previously negotiated deal with Baldwin for a purchase price of $2,059,596, but that it would be a "gift" due to the prospect of an almost immediate $640,404 profit.

111.    Baldwin stated that because of the quick profit, he wanted the Trust to invest $500,000.00, which the Trust agreed to do in reliance on Baldwin's representations.

112.    On April 27, 2011, however, the Trust learned that Baldwin's statements were utterly false through a conversation Boulware had with Mr. Anil Valbh ("Valbh").

113.    Valbh stated that he never made a $2,700,000.00 payoff offer to M&I Bank, and that the most he would have offered was $1,200,000.00 to $1,500,000.00.

114.    Valbh also stated that he never even had the chance to make such an offer.

115.    Valbh further stated that Silverleaf Financial had contacted him approximately a month before the loan sale closing, which Valbh remembered because he specifically asked if the Florida Loan had been sold yet and was told no.

116.    Valbh indicated that the underlying property was subsequently foreclosed upon by an entity known as ITI Venture, LP ("ITI") and that he had transferred title to the subject property to ITI in or about the first part of April 2011.

17

117.    On April 6, 2010, without knowing any of the facts later related by Valbh, the Trust entered into a Subscription Agreement for the purchase of interests in SF17. *See* Subscription Agreement, signed April 6, 2010 (Ex. R).

118.    The PPM was incorporated by reference into the Subscription Agreement that the Trust signed, and SF17 accepted. *See* Subscription Agreement at 1 and 3.

119.    In doing so, the Trust purchased 500,000 Preferred Units for $500,000.00.

**D.    Acquisition, Sale, and Misrepresentations Regarding the Florida Loan.**

120.    On April 14, 2010, M&I Bank assigned the Florida Loan to SF17. *See* Assignment of Mortgage, signed April 14, 2010 and recorded May 20, 2010 (Ex. S).

121.    On April 19, 2010, SF17 transferred the Florida Loan to Cobalt Workout Partners, LLC ("Cobalt"). *See* Assignment of Leases, Rents and Profits, signed April 19, 2010 and recorded May 20, 2010 (Ex. T).

122.    On May 17, 2010, Cobalt transferred the Florida Loan to ITI, who then began foreclosure proceedings on the Florida Loan on November 1, 2010. *See* Assignment of Leases, Rents and Profits, signed May 17, 2010 and recorded May 20, 2010 (Ex. U) *and* Notice of Lis Pendens, dated November 1, 2010 (Ex. V).

123.    Neither SF17, Silverleaf Financial, Silverleaf Ventures nor Baldwin disclosed any of the above transactions to the Trust.

124.    SF17, Silverleaf Financial, Silverleaf Ventures and Baldwin also failed to make any distribution to the Trust despite its Preferred Member status and promise of priority payment

of proceeds under the PPM and Subscription Agreement. *See* Placement Memorandum at 1 *and* Subscription Agreement at 1.

125.    On July 19, 2010, Boulware, on behalf of the Trust, emailed Baldwin to inquire about information and answers regarding SF17 and the Florida Loan. *See* Email from Boulware to Baldwin, dated July 19, 2010 (Ex. W).

126.    On July 19, 2010 Baldwin responded by stating:

I will jump on this. There is [sic] no financial updates on the Florida deal. We are working on a definitive agreement with him now. He has been reluctant to sign a deal until he knows he has the money. I have spoken to his funding source and he has given me the date of Aug. 11th as the date they will have the money to close. The borrower is pretty weird, but has been very upfront with what he is trying to do. I will get you all the other information over the next couple of days...

Shane

Email from Baldwin to Boulware, dated July 19, 2010 (Ex. X) (ellipsis in original).

127.    Baldwin's statements were knowingly false because, unbeknownst to the Trust, SF17 had sold its interest exactly three months before this statement. *See* Assignment of Leases, Rents and Profits, signed April 19, 2010 and recorded May 20, 2010.

128.    Indeed, at the time Baldwin made told this lie, the Florida Loan was already in ITI's hands and moving toward foreclosure within four months.

129.    To make matters worse, neither SF17, Silverleaf Financial, Silverleaf Ventures, Staples, nor Baldwin ever sent the Trust any more information on the Florida Loan.

130.    As the months went on, the Trust became increasingly concerned about its investments, which led the trust to issue the above-referenced demand letter on March 2, 2011.

*See* Letter from Boulware to Baldwin, Staples, and Heston Neilson, dated March 2, 2011 (Ex. Y).

131.    When SF17, Silverleaf Financial, Silverleaf Ventures, Staples, Baldwin, and Neilson failed to provide the Trust with any useful information on SF17 or the Florida Loan, Boulware began investigating on her own on behalf of the Trust.

132.    On March 23, 2011, the Trust discovered multiple sales and assignments of the Florida Loan, which had occurred nearly a year before. *See* Email to Neilson from Boulware, dated March 23, 2011 (Ex. Z).

133.    On the same day, the Trust emailed Staples demanding an immediate update, to which Staples responded that Baldwin would contact the Trust by telephone regarding the Florida Loan. *See* Email exchange between Boulware and Staples, dated March 23, 2011 (Ex. AA).

134.    On March 23, 2011, Baldwin called the Trust regarding the Florida Loan and the subsequent sales.

135.    Baldwin represented that SF17 had assigned the Loan to Cobalt but had retained a residual interest.

136.    Baldwin's statement regarding a residual interest was false because the assignment of Leases, Rents and Profits states that SF17 sold the Leases, Rents, and Profits, to Cobalt, "Together with the note(s) or obligations described in said Mortgage and the money due and to become due thereon, with interest as set forth in the note(s)." *See* Assignment of Leases, Rents and Profits, signed April 19, 2010 and recorded May 20, 2010.

137.     This mortgage assignment language is identical to that used by M&I Bank in transferring the Florida Loan to SF17. *See* Assignment of Mortgage.

138.     On March 23, 2011, Baldwin also represented that Cobalt and ITI were alter egos of one another and that the cash flow thus far had been spent on legal fees.

139.     The Trust responded by demanding facts and a copy of the Agreement between SF17 and Cobalt showing a residual interest.

140.     Baldwin then hesitated and asked why the Trust would want that, and when pressed stated that he needed to get a copy from Cobalt.

141.     On March 30, 2011, Boulware, on behalf of the Trust, contacted Jeff Carter, who is the Chief Financial Officer for ITI.

142.     After Boulware told Carter about the $500,000.00 investment and Baldwin's representations, Carter informed Boulware that when ITI purchased the Florida Loan, there was no retained interest.

143.     Carter also informed Boulware that ITI and Cobalt were not affiliated and that Cobalt was just another entity in the distressed loan arena.

144.     Carter further informed Boulware that Baldwin had contacted him earlier that day about an investor that might be interested in investing $500,000.00 in the Florida Loan now held by ITI.

145.    After that telephone conversation with Carter, Boulware received a voice message from Baldwin in which he indicated that he had not in fact, invested the Trust's money in the Florida Loan.

> Um so essentially what we need to do is choose whether or not we want to buy in to Avista and he [Carter] is going to send the numbers over um and we would be you know a partner in that deal for, you know Silverleaf 17, would be a partner in that deal for your participation amount....

*Id.*

146.    Carter then telephoned Boulware to relate to her that Baldwin stated that the Trust originally signed up for the Florida Loan, but that Baldwin decided to sell the Florida Loan and had spoken to the Trust about this fact and about moving the Trust into another investment.

147.    According to Carter, Baldwin stated that the Trust had now changed its mind and now wanted to invest in the Florida Loan, and that Baldwin was attempting to accommodate the Trust.

148.    Baldwin, however, never discussed with the Trust the sale of the Florida Loan, moving to a different investment, or doing anything except investing in the Florida Loan from the beginning.

149.    Carter later confirmed to the Trust, via email, that, "For Shane [Baldwin] to claim confusion over the relationship between Cobalt and ITI is a flat out lie." *See* Email from Carter to Boulware, dated March 31, 2011 (Ex.BB).

22

### III.   BALDWIN'S CRIMINAL HISTORY OF INVESTMENT THEFT AND FRAUD.

150.    In March of 2010, the Utah Attorney General charged Baldwin with two felony counts of securities fraud and two felony counts of theft (the "Criminal Charges"). *See* Paul Beebe, *SilverLeaf CEO Accepts Deal to Settle Theft Charges*, SALT LAKE TRIBUNE, June 21, 2010 (Ex. CC).

151.    On April 8, 2010, just two days after the Trust had invested $500,000.00 with Baldwin, Baldwin agreed to repay the two investors that Baldwin stole from, each of which had invested $100,000.00. *See id.*

152.    In exchange for Baldwin's promise to repay the defrauded investors, the Utah Attorney General's office agreed to allow Baldwin to enter into am 18-month plea in abeyance to two felony counts of attempted theft. *See id.*

153.    Neither Baldwin, Staples, Silverleaf Financial, Silverleaf Ventures nor SF5 ever disclosed any accusations or investigations against Baldwin in connection with the SF5 investment.

154.    Although Baldwin did disclose the investigation in the PPM for SF17, Baldwin indicated that he was innocent of the charges and would be pleading "not guilty." Two days later, Baldwin pleaded guilty.

### IV.   SETTLEMENT AGREEMENT AND DEFENDANTS' BREACH.

155.    In May of 2011, Boulware brought all of the facts alleged in this Complaint directly to the attention of all defendants, even providing a copy of the Complaint in draft form.

Boulware's objective in doing so was to provide an opportunity for the defendants to avoid the embarrassment and reputational damage that might accompany filing of the Complaint.

156.    After receiving a draft copy of the Complaint, the defendants engaged with Boulware in an extended series of negotiations aimed at reaching a settlement agreement under which the defendants would make Boulware whole, and Boulware would release her claims and not file her Complaint.

157.    Settlement negotiations culminated on August 8, 2011 when all parties executed the Settlement Agreement attached hereto as Exhibit DD.

158.    Under the Settlement Agreement, SilverLeaf and Baldwin promised, among other things, to execute and return to Boulware's counsel a "Confession of Judgment" in the form attached hereto as Exhibit EE.

159.    After agreeing to all terms and executing the Settlement Agreement, SilverLeaf and Baldwin failed and refused to execute and return the Confession of Judgment.

160.    Under the Settlement Agreement, SilverLeaf agreed to pay to Boulware One Million Five-Hundred and Twenty Three Thousand Six Hundred and Nine and 73/100 Dollars ($1,523,609.73).

161.    Also under the Settlement Agreement, Boulware agreed not file her Complaint or otherwise pursue claims related to the matters alleged in the Complaint.

162.    Boulware honored all of her obligations under the Settlement Agreement.

163.    An initial payment of One Million Three Hundred and Twenty-Five Thousand and no/100 Dollars ($1,325,000.00) (the "Initial Payment") was due from SilverLeaf to Boulware on or before August 10, 2011.

164.    As of the date of this Complaint, none of the defendants has made any payment in any amount to Boulware.

165.    The Settlement Agreement provides that interest shall accrue on the Initial Payment at the rate of fifteen percent (15%).

166.    The Settlement Agreement also provides in section 13 that, in the event action to enforce the Settlement Agreement is required, then the party taking the action shall be entitled to recover all attorneys' fees incurred in its enforcement.

## FIRST CAUSE OF ACTION
## (RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS (RICO) ACT VIOLATIONS)

167.    The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

168.    In the event that the Court deems the above transactions as not involving securities or securities fraud, the Trust, pleading in the alternative, asserts the following violation of the Racketeer Influenced And Corrupt Practices Act ("RICO").

169.    Baldwin and Staples are controlling individuals that conduct Silverleaf Financial and Silverleaf Ventures, which in turn control SF5 and SF17.

170.    Baldwin and Staples operated Silverleaf Financial, Silverleaf Ventures, SF5, and SF17 by means of a pattern of racketeering activity, specifically under 18 U.S.C. § 1343 (2011)

through the use of the telephone system and email, both of which constitute means of interstate commerce under federal law.

171.  In the first instance of this pattern, Baldwin used the telephone system and email to convince the Trust to enter into the Participation Agreement and to give SF5, Silverleaf Financial, Silverleaf Ventures, and himself $500,000.00 by the use of fraudulent pretenses.

172.  Specifically, that the Trust would be entitled to the proceeds from the Loans, which was false because Baldwin, on behalf of SF5 and himself, had already negotiated with Lincolnshire that it would receive the proceeds from the Loans; a fact Baldwin concealed from the Trust.

173.  A second instance began on March 29, 2010, when Baldwin, through Smith, sent the Trust information about the Florida Loan, including writings and pictures via email, to induce the Trust to invest in the Florida Loan.

174.  After the Trust indicated that it might be interested in investing $250,000.00, Baldwin telephoned the Trust on April 6, 2010 to induce the Trust to double its contemplated investment by falsely representing that the borrower on the Florida Loan would pay off the Florida Loan by the end of the month, thus yielding a large and fast return of investment and profit.

175.  This representation was false because the borrower never had the chance to make a pay off offer and would not have offered such a high offer even if the borrower had the opportunity to do so.

176. Baldwin's representation was also false because Baldwin did not invest the Trust's $500,000.00 in the Florida Loan, but instead used it for his own purposes.

177. A third instance of Baldwin's pattern of racketeering occurred on July 19, 2010 when in response to the Trust's inquiries regarding the Florida Loan, Baldwin falsely represented to the Trust that SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin were working with the borrower and expected to close on August 11, 2010 in order to ward off any requests for the Trust's investment or promised profit.

178. Baldwin's emailed representation was false because SF17 had sold the Florida Loan to Cobalt exactly three months earlier, and Cobalt had since sold the Florida Loan to ITI.

179. As a result of the Trust not knowing of the falsity of Baldwin's email, the Trust relied on the email by not seeking a return of its investment or payment of the promised profit for another 8 months.

180. A fourth instance of Baldwin and Staples pattern of racketeering occurred December 9, 2010 when Staples emailed the Trust and represented that there had not been any distributions of the Proceeds of the Loans because the SF5 had been making tenant improvements and paying property taxes associated with the Loans.

181. Staples' emailed representation was false because Baldwin and Staples had actually caused SF5 to distribute proceeds to BVC and Silverleaf Financial, just not to the Trust.

182. Staples' emailed representation was also false because SF5, Silverleaf Financial, Silverleaf Ventures, Staples, and Baldwin had failed to pay most if not all of the property taxes associated with the Loans.

27

183.    Staples made his emailed misrepresentations to induce the Trust to leave its investment and the concealed proceeds in SF5, Silverleaf Financial, Silverleaf Ventures, Staples, and Baldwin's hands, which investment Baldwin obtained by false pretenses in September of 2009.

184.    Baldwin and Staples fraudulent intent to keep the Trust's investment and proceeds is evident from the fact that just the day before Staples' email, Baldwin had emailed the Trust in an attempt leave in the proceeds she had earned, but not yet received.

185.    In addition, Baldwin and Staples thereafter promised via telephone and email that the Trust would receive its distributions with 6% interest, if the Trust left the money with SF5, Silverleaf Financial, Silverleaf Ventures, Staples, and Baldwin.

186.    Besides the SF5 and SF17 schemes, Baldwin has personally pled guilty to attempting to steal $200,000.00 from two other investors through an investment scheme. Baldwin and Staples have both repeatedly violated 18 U.S.C. § 1343 (2011), such that their actions amount to and/or threaten long-term criminal activity and establish continuity. As a result of Baldwin and Staples RICO violation, the Trust has suffered damages in an amount to be determined at trial, and thus, pursuant to 18 U.S.C. 1964(c) (2011), the Trust is entitled to treble damages in an amount to be determined at trial, as well as the costs of this suit, including attorney's fees.

## SECOND CAUSE OF ACTION
## (FEDERAL SECURITIES FRAUD – INDUCEMENT TO INVEST IN THE FLORIDA LOAN)

187.   The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

188.   The Preferred Units that the Trust believed it had purchased constituted securities under Federal law.

189.   Baldwin, acting on behalf of SF17, Silverleaf Financial, Silverleaf Ventures, and himself, told the Trust that he had spoken to M&I Bank on April 6, 2010, who had informed him that the borrower made a payoff bid of $2,700,000.00 that could be finalized by the end of the April 2010, and that because of this fact SF17 would make a fast approximately $600,000.00 profit.

190.   Baldwin's statements were false because the borrower never had the opportunity to submit a payoff offer and would not have offered more than $1,500,000.00 if he had.

191.   At the same time, Baldwin provided the Trust with a Workout Summary for SF5 indicating that substantial distributions would be forthcoming shortly, meaning that the Trust would have substantial additional funds available for reinvestment.

192.   Baldwin's representations of imminent SF5 distributions were also false, and no such distributions were ever made.

193.   Baldwin's misrepresentations were material because they convinced the Trust not only to go forward with the investment, to double its contemplated investment.

194.   Indeed, the fact that a large profit could not be gained within a month's time when such was promised would be something that any prudent and reasonable investor would want to know when determining whether or not to purchase a given security.

195.    Baldwin used the telephone system, which is an instrument of interstate commerce, to make his material misrepresentations.

196.    Baldwin's material misrepresentations were in connection with the purchase and sale of a security because Baldwin made his material misrepresentations to induce the Trust into purchasing securities, namely preferred units in the Florida Loan.

197.    Baldwin acted with scienter in making his material misrepresentations, as evidenced by the fact that Baldwin used precise amounts in his misrepresentations, i.e., $2,700,000.00 and $600,000.00, which demonstrate that Baldwin put some thought into the lie before he told it to the Trust.

198.    Baldwin's scienter is further evident from the fact that he did not invest the Trust's money as promised, and then lied to Carter and later the Trust about why he had not done so.

199.    The Trust relied on Baldwin's fraudulent statements by going forward with the investment, and in fact doubling the amount of its investment to $500,000.00.

200.    As a result of Baldwin's fraudulent statements in connection with the sale of securities, the Trust is entitled to collect the lost investment from Baldwin, SF17, Silverleaf Financial, and Silverleaf Ventures, as well as any proceeds that may would have been gained through the investment or that may have been gained through the use of the Trust's funds.

201.    Because Baldwin's actions on behalf of SF17, Silverleaf Financial, Silverleaf Ventures, and himself represent a knowing and intentional or reckless disregard for the Trust's

rights, the Trust is entitled to collect punitive damages from SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin, jointly and severally, in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
## (UTAH SECURITIES FRAUD – INDUCEMENT TO INVEST IN THE FLORIDA LOAN)

202.    The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

203.    The interest sold to the Trust under the Subscription Agreement and PPM constituted a security under UTAH CODE ANN. § 61-1-13 (2011).

204.    UTAH CODE ANN. § 61-1-22 (2011) provides a private right of action for any purchaser that buys a security from a person who offers or sells securities in violation of UTAH CODE ANN. § 61-1-1(2) (2011).

205.    UTAH CODE ANN. § 61-1-1(2) (2011) makes it unlawful for any person, in connection with the sale of a security to directly or indirectly, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading."

206.    Baldwin told the Trust that he had spoken to M&I Bank on April 6, 2010, who had informed him that the borrower made a payoff bid of $2,700,000.00 that could be finalized by the end of the April 2010, and that because of this fact SF17 would make a fast $600,000.00 profit.

207.    Baldwin's statements were false because the borrower never had the opportunity to submit a payoff offer, and would not have offered more than $1,500,000.00 if he had.

208. At the same time, Baldwin provided the Trust with a Workout Summary for SF5 indicating that substantial distributions would be forthcoming shortly, meaning that the Trust would have substantial additional funds available for reinvestment.

209. Baldwin's representations of imminent SF5 distributions were also false, and no such distributions were ever made.

210. Baldwin's misrepresentations were material because they actually convinced the Trust to go forward with, and even double, its contemplated investment.

211. Indeed, the fact that a large profit could not be gained within a month's time when such was promised would be something that any prudent and reasonable investor would want to know when determining whether or not to purchase a given security.

212. Baldwin's material misrepresentations were in connection with the purchase and sale of a security because Baldwin made his material misrepresentations to induce the Trust into purchasing securities, namely preferred units in the Florida Loan.

213. The Trust did not know of the untruth.

214. Baldwin knew or in the exercise of reasonable care would have learned of the untruth.

215. Moreover, Baldwin knew of the material misrepresentations, as evidenced by the fact that Baldwin used precise amounts in his misrepresentations, i.e., $2,700,000.00 and $600,000.00, which demonstrate that Baldwin put some thought into the lie before he told it to the Trust.

32

216.    Baldwin's knowledge is further evident from the fact that he did not invest the Trust's money as promised, and then lied to Carter and later the Trust about why he had not done so.

217.    As a result of Baldwin's fraudulent statements in connection with the sale of securities, the Trust is entitled to collect the lost investment from Baldwin, SF17, Silverleaf Financial and Silverleaf Ventures, as well as any proceeds that would have been gained through that investment or that have been gained through the use of the Trust's investment in an amount to be determined at trial.

218.    Because Baldwin's actions on behalf of SF17, Silverleaf Financial, Silverleaf Ventures, and himself represent a knowing and intentional or reckless disregard for the Trust's rights, the Trust is entitled to collect punitive damages from SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin, jointly and severally, in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (UTAH COMMON LAW FRAUD – INDUCEMENT TO INVEST IN THE FLORIDA LOAN)

219.    The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

220.    Baldwin represented to the Trust that he had spoken to M&I Bank on April 6, 2010, who had informed him that the borrower made a payoff bid of $2,700,000.00 that was expected to be finalized by the end of the April 2010, and that because of this fact SF17 would make a fast $600,000.00 profit.

33

221. Baldwin's representations were false because the borrower never had the opportunity to submit a payoff offer, and would not have offered more than $1,500,000.00 if he had.

222. Baldwin knew of the falsity of the misrepresentations as evidenced by the fact that Baldwin used precise amounts in his misrepresentations, i.e., $2,700,000.00 and $600,000.00, which demonstrate that Baldwin put some thought into the lie before he told it to the Trust.

223. Baldwin's knowledge is further evident from the fact that he did not invest the Trust's money as promised, and then lied to Carter and later the Trust about why he had not done so.

224. At the same time, Baldwin provided the Trust with a Workout Summary for SF5 indicating that substantial distributions would be forthcoming shortly, meaning that the Trust would have substantial additional funds available for reinvestment.

225. Baldwin's misrepresentations were material because they actually convinced the Trust to go forward with its investment in SL17 and to double its contemplated investment.

226. Indeed, the fact that a large profit could not be gained within a month's time when such was promised would be something that any prudent and reasonable investor would want to know when determining whether or not to purchase a given security.

227. Baldwin made his fraudulent statements with the intent that the Trust would rely on those false statements and with the intent to induce the Trust into doubling its investment in the Florida Loan.

228.    The Trust reasonably relied on Baldwin's fraudulent statements.

229.    As a result of the Trust's reasonable reliance on Baldwin's fraudulent statements, the Trust has suffered investment losses and is entitled to collect those losses from Baldwin, SF17, Silverleaf Financial, and Silverleaf Ventures jointly and severally, as well as any proceeds that would have been gained through that investment or that have been gained by any Silverleaf principal or entity through the use of the Trust's investment.

230.    Because Baldwin's actions represented a knowing and intentional or reckless disregard for the Trust's rights, the Trust is entitled to collect punitive damages from SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin, jointly and severally, in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION
### (UTAH COMMON LAW FRAUD – MISUSE OF SF17 FUNDS)

231.    The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

232.    On July 19, 2010, Baldwin emailed the Trust to state that,

There is [sic] no financial updates on the Florida deal. We are working on a definitive agreement with him now. He has been reluctant to sign a deal until he knows he has the money. I have spoken to his funding source and he has given me the date of Aug. 11th as the date they will have the money to close. The borrower is pretty weird, but has been very upfront with what he is trying to do. I will get you all the other information over the next couple of days...

Shane

Email from Baldwin to Boulware, dated July 19, 2010 (Ex. X) (ellipsis in original)

233. Baldwin's statements were false because SF17 had already transferred the Florida Loan to Cobalt three months earlier and because Baldwin never invested the Trust's funds in the Florida Loan.

234. Baldwin knew of the falsity of the representations or made them in reckless disregard for the truth as evident from fact as due to his position at the head of the Silverleaf companies, Baldwin knew or should have known that SF17 sold the Florida Loan three months before he made his misrepresentations.

235. Baldwin's knowledge is also evident from the particularity used in the misrepresentations, i.e., "Aug. 11th" and "The borrower is pretty weird, but has been very upfront with what he is trying to do," which show that Baldwin put some prior thought into the false statements.

236. Baldwin's statements were material because they affected the central purpose of the entity, namely, to purchase the Florida Loan and make a profit from either selling or restructuring the Florida Loan.

237. Thus, a reasonable and prudent investor would want to know if the sole asset it invested in was sold and if there were any profits.

238. The Trust reasonably relied on Baldwin's false statements, and as a result deferred undertaking any action to protect its interests and was lulled into inaction for another eight months.

239.    Baldwin never caused SF17 to invest the Trust's funds in the Florida property as it had promised to do, and instead commingled the Trust's $500,000 with and among funds of other Silverleaf entities and/or principals.

240.    As a result of the Trust's reasonable reliance on Baldwin's fraudulent statements, the Trust has sustained investment losses which it is entitled to recover from Baldwin, SF17, Silverleaf Financial, and Silverleaf Ventures, as well as any investment gains that might have been realized through that investment or that have been realized through the use of the Trust's investment.

241.    Because Baldwin's actions represent a knowing and intentional or reckless disregard for the Trust's rights, the Trust is entitled to collect punitive damages from SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin, jointly and severally, in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION
### (FEDERAL SECURITIES FRAUD – LINCOLNSHIRE LOAN)

242.    The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

243.    The interest sold to the Trust under the Participation Agreement constituted a security under Federal law.

244.    Rule 10b-5, promulgated by the United States Securities and Exchange Commission ("SEC") pursuant to the Securities Exchange Act of 1934, prohibits any person

37

from using any means of interstate commerce in connection with the purchase and sale of a security to:

    a. Employ any device, scheme, or artifice to defraud;

    b. Make any untrue statement of a material fact or to omit to state a material fact; or

    c. Engage in any act, practice, or course of business that operates a fraud or deceit on any person.

245. SF5, Silverleaf Financial, Silverleaf Ventures, and Baldwin used the mails, telephone system, and electronic mail, which are instruments of interstate commerce to induce the Trust to invest in the Loans.

246. Throughout SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin's recruitment of the Trust as an investor, SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin concealed the existence or terms of the Lincolnshire Loan.

247. The existence and terms of the Lincolnshire Loan were material to the Trust's contemplated investment because it contradicted the express terms of the Participation Agreement and affected the availability and manner of distributions of the proceeds from the Loans. In addition, it materially changed the risk profile of the proposed investment.

248. As such, any reasonable and prudent investor would find it important to know about the existence and terms of the Lincolnshire Loan in deciding whether to invest its money with SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin.

249. SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin's omission regarding the Lincolnshire Loan related to the Trust's investment because with no knowledge of the Lincolnshire Loan, the Trust had no knowledge of the term in the Lincolnshire Loan that required SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin to use the proceeds from the Loans to pay down the Lincolnshire Loan prior to the return of the Trust's invested capital, which could and did result in the Trust failing to receive its rightful distributions.

250. In short, because of the omission, the Trust did not know about the Lincolnshire Loan, which means the Trust did not know that the Trust's proceeds were going to the Lincolnshire rather than to the Trust, which resulted in the Trust not receiving those proceeds.

251. SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin acted with scienter in omitting any statements regarding the Lincolnshire Loan to the Trust as evidenced by the fact that the Participation Agreement and the Lincolnshire Loan requires the proceeds from the Loans to go exclusively to two separate entities.

252. Thus, because SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin already promised to pay the proceeds from the Loans to Lincolnshire, it is clear that SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin had no intention of paying those proceeds to the Trust.

253. In addition, the scienter of SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin is also evident from the fact that because SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin failed to disclose the Lincolnshire Loan, SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin did not want the Trust to know about the Lincolnshire Loan. This fact

supports an inference that SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin planned to do something other than what was represented with the Trust's money and the proceeds from investing the Trust's money.

254.    In entering into the Participation Agreement, the Trust reasonably relied on the omission of any reference to the Lincolnshire Loan by SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin, to the detriment of the Trust.

255.    As a result of SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin's fraud in connection with the purchase and sale of a security, the Trust has suffered investment losses in an amount to be determined at trial, which the Trust is entitled to collect, along with its attorney fees and costs, from SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin, jointly and severally.

256.    Because SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin's actions represent a knowing and intentional or reckless disregard for the Trust's rights, the Trust is entitled to collect punitive damages from SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin, jointly and severally, in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### (FEDERAL SECURITIES FRAUD – STAPLES' STATEMENT)

257.    The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

258.    On December 13, 2010, Staples, on behalf of SF5, Silverleaf Financial, Silverleaf Ventures, and himself, advised the Trust that there had been no distributions because of tenant improvements and the payment of property taxes.

259.    This statement was false because at the time, SF5, Silverleaf Financial, Silverleaf Ventures, and Staples had made distributions to BVC and Silverleaf Financial.

260.    This statement was also false because SF5, Silverleaf Financial, Silverleaf Ventures, and Staples had failed to pay property taxes on property related to the Loans.

261.    Staples' false statements were material because they led the Trust to believe that it was not entitled to any distribution of proceeds because no distributions had yet been made.

262.    Staples used the telephone system and email to convey his false statements, both of which are instruments of interstate commerce.

263.    Staples false statement related to the purchase and sale of the securities that the Trust purchase because it concerned the central reason the Trust purchased the securities was to receive distributions of proceeds and profits, the promise of which induced the Trust to purchase the securities detailed in the Participation Agreement.

264.    Staples acted with scienter in making his false statements because he was desperate to keep the Trust's investment and its proceeds, as evidenced by the facts that:

        a.  Staples proposed a partnership arrangement that would leave the Trust's money in SF5;

        b.  Staples promised to give the Trust 6% interest if the Trust would allow SF5 to keep the money;

41

    c.   Staples giving his personal guarantee that all of the Trust's concerns would be resolved; and

    d.   Failing to ever provide the Trust with documents detailing his actions.

265.    The Trust relied on Staples' false statements by foregoing a demand for her proceeds.

266.    As a result of the Trust's reliance on Staples' fraudulent statements, the Trust has suffered investment losses in an amount to be determined at trial, which the Trust is entitled to collect, along with its attorney fees and costs, from SF5, Silverleaf Financial, Silverleaf Ventures, and Staples, jointly and severally.

267.    Because Staples actions on behalf of SF5, Silverleaf Financial, Silverleaf Ventures, and himself represent a knowing and intentional or reckless disregard for the Trust's rights, the Trust is entitled to collect punitive damages from SF5, Silverleaf Financial, Silverleaf Ventures, and Staples, jointly and severally, in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION
### (UTAH SECURITIES FRAUD – LINCOLNSHIRE LOAN)

268.    The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

269.    The interest sold to the Trust under the Participation Agreement constituted a security under UTAH CODE ANN. § 61-1-13 (2011).

270.    UTAH CODE ANN. § 61-1-22 (2011) provides a private right of action for any purchaser that buys a security from a person who offers or sells securities in violation of UTAH CODE ANN. § 61-1-1(2) (2011).

271.    UTAH CODE ANN. § 61-1-1(2) (2011) makes it unlawful for any person, in connection with the sale of a security to directly or indirectly, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading."

272.    Throughout SF5, Silverleaf Financial, Silverleaf Ventures, Staples, and Baldwin's recruitment of the Trust, SF5, Silverleaf Financial, Silverleaf Ventures, Staples, and Baldwin concealed the existence or terms of the Lincolnshire Loan, or their plans concerning it.

273.    The omission of the existence and terms of the Lincolnshire Loan were material to the Trust's contemplated investment because it contradicted the express terms of the Participation Agreement and affected the availability and manner of distributions of the proceeds from the Loans.

274.    As such, any reasonable and prudent investor would find it important to know about the existence and terms of the Lincolnshire Loan in deciding whether to invest its money with SF5, Silverleaf Financial, Silverleaf Ventures, Staples, and Baldwin.

275.    The Trust did not know of the omission.

276.    Because of the omission, the Trust did not know about the Lincolnshire Loan, and thus the Trust did not know that the Trust's proceeds were going to the Lincolnshire rather than

to the Trust, which resulted in the Trust not receiving the proceeds to which the Trust was entitled.

277.   SF5, Silverleaf Financial, Silverleaf Ventures, Staples, and Baldwin SF5, Silverleaf Financial, Silverleaf Ventures, Staples, and Baldwin knew of the omission or in the exercise of reasonable care could have learned of the omission and had no intention of paying proceeds to the Trust on a pari passu basis pursuant to the Participation Agreement.

278.   As a result of SF5, Silverleaf Financial, Silverleaf Ventures, Staples, and Baldwin's fraud in connection with the purchase and sale of a security, the Trust has suffered investment losses in an amount to be determined at trial, which the Trust is entitled to collect, along with its attorney fees and costs, from SF5, Silverleaf Financial, Silverleaf Ventures, Staples, and Baldwin, jointly and severally.

279.   Because SF5, Silverleaf Financial, Silverleaf Ventures, Staples, and Baldwin's actions represent a knowing and intentional or reckless disregard for the Trust's rights, the Trust is entitled to collect punitive damages from SF5, Silverleaf Financial, Silverleaf Ventures, Staples, and Baldwin, jointly and severally, in an amount to be determined at trial.

### NINTH CAUSE OF ACTION
### (UTAH COMMON LAW FRAUDULENT NON-DISCLOSURE – LINCOLNSHIRE LOAN)

280.   The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

281.   The Participation Agreement states, and the principals of SF5 confirmed verbally, that the participants will receive the proceeds of the Loans through distributions. Neither the

Participation Agreement nor the principals of SF5 said anything about any third-party lenders receiving the proceeds from the Loans.

282. Because the Lincolnshire Loan created a condition that was fundamentally different than what the Trust was told it was entering into, SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin had a duty to disclose this material departure from the stated and agreed upon facts.

283. SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin knew of the Lincolnshire Loan and its effect upon the Participation Agreement and failed to disclose that fact to the Trust.

284. Indeed, throughout SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin's recruitment of the Trust, SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin concealed the existence or terms of the Lincolnshire Loan, and represented themselves as being the "Lead Investor" in the transaction – suggesting that they were putting up their own funds for the investment.

285. The omission of the existence and terms of the Lincolnshire Loan were material to the Trust's contemplated investment because it contradicted the express terms of the Participation Agreement and affected the availability and manner of distributions of the proceeds from the Loans.

286. After eventually acknowledging the existence of the Lincolnshire Loan, Baldwin specifically represented to Boulware in February of 2010 that the loan was not being paid with proceeds that otherwise would have been available for distribution to the Trust.

45

287. The above statement was false when made, and Baldwin knew it was false.

288. Any reasonable and prudent person would find it important to know about the existence, terms and details of repayment of the Lincolnshire Loan in deciding whether to invest its money with or to begin to take any protective action vis-à-vis SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin.

289. Because of the omission, the Trust did not know about the Lincolnshire Loan, and thus the Trust did not know that proceeds from the Loans would first go to the Lincolnshire Loan rather than to the Trust, which would result in the Trust not receiving the proceeds to which the Trust was entitled.

290. SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin knew of the omission or in the exercise of reasonable care could have learned of the omission because they already intended to pay the proceeds from the Loans to Lincolnshire, and thus had no intention of paying those proceeds to the Trust pursuant to the Participation Agreement.

291. As a result of SF5, Silverleaf Financial, Silverleaf Ventures Baldwin's fraudulent concealment, the Trust has suffered investment losses in an amount to be determined at trial, which the Trust is entitled to collect, along with its attorney fees and costs, from SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin, jointly and severally.

292. Because SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin's actions represent a knowing and intentional or reckless disregard for the Trust's rights, the Trust is

entitled to collect punitive damages from SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin, jointly and severally, in an amount to be determined at trial.

### TENTH CAUSE OF ACTION
### (UTAH COMMON LAW FRAUDULENT NON-DISCLOSURE – BVC'S DISTRIBUTIONS)

293.    The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

294.    The Participation Agreement states that the participants will receive the proceeds of the Loans on a pari passu basis with no participant being favored above another.

295.    Because the distributions to BVC and not to the Trust created a condition that was fundamentally different than what the Trust agreed to in the Participation Agreement, SF5, Silverleaf Financial, Silverleaf Ventures, Staples, and Baldwin had a duty to disclose this material departure from the stated and agreed upon terms.

296.    SF5, Silverleaf Financial, Silverleaf Ventures, Staples, and Baldwin knew of the distributions to BVC because it was they who made the distributions to BVC and not to the Trust.

297.    Despite first-hand knowledge of this fact, SF5, Silverleaf Financial, Silverleaf Ventures, Staples, and Baldwin concealed that they had made distributions to BVC.

298.    This fact was material because the Participation Agreement requires that all investors receive distributions on an equal or pari passu basis, thus the fact that this was not the case would be important to any reasonable and prudent person.

47

299.    The Trust did not know of the omission because it did not know of the distributions to BVC.

300.    In reliance on the omission of these material facts, the Trust deferred taking actions to protect its interests and was lulled to inaction for a substantial period of time during which SF5, Silverleaf Financial, Silverleaf Ventures, Staples and Baldwin continued to undertake a course of conduct detrimental to the Trust.

301.    Also in reliance of the omission of these material facts, the Trust ultimately decided to invest additional funds with the Silverleaf entities and principals because it did not know of their propensity for dishonest and illegal actions.

302.    As a result of SF5, Silverleaf Financial, Silverleaf Ventures, Staples, and Baldwin's fraudulent omission, the Trust has suffered investment losses in an amount to be determined at trial, which the Trust is entitled to collect, along with its attorney fees and costs, from SF5, Silverleaf Financial, Silverleaf Ventures, Staples, and Baldwin, jointly and severally.

303.    Because SF5, Silverleaf Financial, Silverleaf Ventures, Staples, and Baldwin's actions represent a knowing and intentional or reckless disregard for the Trust's rights, the Trust is entitled to collect punitive damages from SF5, Silverleaf Financial, Silverleaf Ventures, Staples, and Baldwin, jointly and severally, in an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION
### (UTAH COMMON LAW FRAUD – STAPLES' STATEMENT)

304.    The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

305. On December 13, 2010, Staples advised the Trust that there had been no distributions because of tenant improvements and the payment of property taxes.

306. This statement was false because at the time. SF5 had caused distributions to be made to BVC and itself.

307. This statement was also false because SF5 had failed to pay property taxes on property related to the Loans.

308. Staples' false statements were material because they led the Trust to believe that it was not entitled to any distribution of proceeds because no distributions had yet been made and because it concerned the central reason the Trust purchased the securities was to receive distributions of proceeds and profits, the promise of which induced the Trust to purchase the securities detailed in the Participation Agreement.

309. Staples knew his statements were false or else made them in reckless disregard for the truth because Staples was the President of Silverleaf Financial and because:

      a. Staples proposed a partnership arrangement that would leave the Trust's money in SF5;

      b. Staples promised to give the Trust 6% interest if the Trust would allow SF5 to keep the money; and

      c. Staples gave his personal assurance that all of the Trust's concerns would be resolved.

310. Staples intended that the Trust would rely on his statements so that the Trust would not seek the money to which it was rightfully entitled.

311.    In reliance on these misrepresentations, the Trust deferred taking actions to protect its interests and was lulled to inaction for a substantial period of time during which SF 5, Silverleaf Financial, Silverleaf Ventures, Staples and Baldwin continued to undertake a course of conduct detrimental to the Trust.

312.    As a result of the Trust's reasonable reliance on Staples' fraudulent statements, the Trust has suffered investment losses in an amount to be determined at trial, which the Trust is entitled to collect, along with its attorney fees and costs, from SF5, Silverleaf Financial, Silverleaf Ventures, and Staples, jointly and severally.

313.    Because Staples' actions represent a knowing and intentional or reckless disregard for the Trust's rights, the Trust is entitled to collect punitive damages from SF5, Silverleaf Financial, Silverleaf Ventures, and Staples, jointly and severally, in an amount to be determined at trial.

## TWELFTH CAUSE OF ACTION
### (BREACH OF CONTRACT – SF5 PARTICIPATION AGREEMENT)

314.    The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

315.    The Participation Agreement constitutes a binding and enforceable legal contract among the parties.

316.    The Trust fully and timely tendered its performance under the Participation Agreement.

317. Pursuant to the Participation Agreement, SF5 had a duty to make distributions of the proceeds from the Loans to the Trust.

318. Pursuant to the Participation Agreement, SF5 also had a duty to make distributions of the proceeds from the Loans on a pari passu basis.

319. Pursuant to the Participation Agreement, SF5 further had a duty to pay the participant investors either before any payment on, or on a pari passu basis with, the Lincolnshire Loan.

320. Pursuant to the Participation Agreement, SF5 had a duty to make copies available to the Trust of all books, records and documents related to the Loans.

321. SF5, however, materially breached the Participation Agreement by:

    a. Failing to make any distributions whatsoever to the Trust;

    b. Failing to make any distributions to the Trust while at the same time making distributions to BVC and Silverleaf Financial in violation of the stated pari passu basis for distributions;

    c. Siphoning off proceeds from the Loans to pay down the Lincolnshire Loan rather than pay the proceeds to the Trust; and

    d. Failing to make the Loan Documents or other books and records available to the Trust upon demand.

322. As a direct result of these material breaches of the Participation Agreement, the Trust suffered damages in an amount to be determined at trial.

323. Pursuant to Article 5 and Section 12.8 of the Participation Agreement, as well as UTAH CODE ANN. § 78B-5-826 (2011), the Trust is also entitled to all of its attorneys' fees and costs associated with this Action.

## THIRTEEN CAUSE OF ACTION
### (BREACH OF CONTRACT – STAPLES' GUARANTEE)

324. The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

325. On December 13, 2010, Staples, on behalf of SF5, Silverleaf Financial, Silverleaf Ventures, and himself, entered into a binding and enforceable legal contract with the Trust, which Stapes confirmed in writing that same day.

326. The Trust fully and timely performed its obligations under the contract Staples presented.

327. Pursuant to the offer by Staples, which the Trust accepted and acted upon, SF5 had a duty to pay the Trust all of its distribution from the Martin Loan in January of 2011 with 6% interest until that amount was paid in full.

328. Pursuant to the offer by Staples, which the Trust accepted and acted upon, SF5 also had a duty to pay the Trust its distribution from the Parry Loans Properties in January of 2011.

329. Pursuant to the offer by Staples, which the Trust accepted and acted upon, SF5 further had a duty to provide the Trust with monthly and quarterly reports.

330.    SF5, however, materially breached the contract formed when the Trust accepted and acted upon the offer from Staples in at least the following ways:

      a.  Failing to make any distributions whatsoever to the Trust in January 2011 or at any time thereafter;

      b.  Failing to pay any interest whatsoever; and

      c.  Failing to provide the Trust with monthly or quarterly reports.

331.    As a direct result of SF5's material breaches of the contract Staples presented, the Trust suffered damages in an amount to be determined at trial.

### FOURTEENTH CAUSE OF ACTION
### (BREACH OF CONTRACT – SF17 SUBSCRIPTION AGREEMENT & PPM)

332.    The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

333.    The Subscription Agreement and the PPM constitute a single binding and enforceable legal contract among the parties.

334.    The Trust fully and timely tendered its performance under the Subscription Agreement and the PPM.

335.    Pursuant to the Subscription Agreement and the PPM, SF17 had a duty to invest the Trust's $500,000.00 in the Florida Loan.

336.    SF17 materially breached the Subscription Agreement and the PPM by:

      a.  Failing to invest the Trust's $500,000.00 investment in SF17 or the Florida Loan;

    b.   Diverting the Trust's $500,000.00 for other uses; and

    c.   Failing to distribute profits to the Trust.

337.    As a direct result of SF17's material breaches of the Subscription Agreement and the PPM, the Trust suffered damages in an amount to be determined at trial.

338.    Pursuant to Section 5(c) of the Subscription Agreement, the Trust is also entitled to all of its attorneys' fees and costs associated with this Action.

### FIFTEENTH CAUSE OF ACTION
### (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – PARTICIPATION AGREEMENT)

339.    The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

340.    Every contract in the State of Utah contains an implied covenant of good faith and fair dealing (the "Implied Covenant").

341.    Under the Implied Covenant, the parties to the contract impliedly promise not to intentionally take any action or refrain from taking any action that will preclude the other party or parties to the contract from receiving the fruits of the contract.

342.    Pursuant to Section 12.8 of the Participation Agreement, the Participation Agreement is governed, construed, and enforced by Utah law, and thus contains the Implied Covenant.

343.    Despite this Implied Covenant, SF5 breached the Implied Covenant by intentionally:

    a.   Failing to make any distributions whatsoever to the Trust;

b.  Failing to make any distributions to the Trust while at the same time making distributions to BVC and Silverleaf Financial in violation of the stated pari passu basis for distributions;

c.  Concealing the distributions to BVC and Silverleaf Financial;

d.  Concealing the existence and terms of the Lincolnshire Loan;

e.  Concealing payments to Lincolnshire from the proceeds of the Loans;

f.  Diverting proceeds from the Loans to pay down the Lincolnshire Loan rather than pay any proceeds to the Trust; and

g.  Concealing the SF5's records from the Trust so as not to reveal wrongdoings.

344.    As a direct result of SF5's material breaches of the Implied Covenant within the Participation Agreement, the Trust suffered damages in an amount to be determined at trial.

345.    Pursuant to Article 5 and Section 12.8 of the Participation Agreement, as well as UTAH CODE ANN. § 78B-5-826 (2011), the Trust is also entitled to all of its attorneys' fees and costs associated with this Action.

## SIXTEENTH CAUSE OF ACTION
### (BREACH OF THE IMPLIED COVENANT – STAPLES' GUARANTEE)

346.    The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

347.    The contract that Staples provided on December 13, 2010 was entered into with the Trust within the State of Utah, and is therefore governed by the laws of the State of Utah.

348.    Because the contract that Staples provided is governed by the laws of the State of Utah, it contains the Implied Covenant.

349.    SF5 breached the Implied Covenant by intentionally:

    a.    Failing to make any distributions whatsoever to the Trust in January 2011 or at any time thereafter;

    b.    Failing to pay any interest whatsoever; and

    c.    Concealing the SF5's records from the Trust so as not to reveal wrongdoings.

350.    As a direct result of SF5's material breaches of the Implied Covenant, the Trust suffered damages in an amount to be determined at trial.

**SEVENTEENTH CAUSE OF ACTION**
**(BREACH OF THE IMPLIED COVENANT – SUBSCRIPTION AGREEMENT & PPM)**

351.    The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

352.    Pursuant to Section 10 of the Subscription Agreement, the laws of the state of Utah govern the Subscription Agreement and Placement Memorandum.

353.    Because Utah law governs the Subscription Agreement and Placement Memorandum, those documents contain the Implied Covenant.

354.    SF17 breached the Implied Covenant by intentionally:

    a.    Failing to invest the Trust's $500,000.00 investment in SF17 or the Florida Loan; and

        b. Diverting those funds to other uses without the knowledge or consent of the

Trust.

355. As a direct result of SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin's breaches of the Implied Covenant, the Trust suffered damages in an amount to be determined at trial, for which SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin are jointly and severally liable by virtue of their commingling of funds.

356. Pursuant to Section 5(c) of the Subscription Agreement, the Trust is also entitled to all of its attorneys' fees and costs associated with this Action.

## EIGHTEENTH CAUSE OF ACTION
### (UTAH COMMON LAW NEGLIGENT MISREPRESENTATION – STAPLES' STATEMENTS CONCERNING SF5)

357. The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

358. On December 9, 2010, Staples emailed the Trust and stated that there had been no distributions because of tenant improvements and the payment of property taxes.

359. This statement was false because at the time, SF5 had caused distributions to be made to BVC and Silverleaf Financial.

360. This statement was also false because SF5 had failed to pay property taxes on property related to the Loans.

361. Staples' false statements were material because they led the Trust to believe that it was not entitled to any distribution of proceeds because no distributions had yet been made and because it concerned the central reason the Trust purchased the securities, which was to receive

distributions of proceeds and profits, the promise of which induced the Trust to purchase the securities detailed in the Participation Agreement.

362.    SF5, Silverleaf Financial, Silverleaf Ventures, and Staples failed to use reasonable care to determine whether the representations were true.

363.    SF5, Silverleaf Financial, Silverleaf Ventures, and Staples were in a better position than the Trust to know the true facts.

364.    SF5, Silverleaf Financial, Silverleaf Ventures, and Staples had a financial interest in the transaction.

365.    The Trust reasonably relied on Staples' misrepresentations, and as a result of those misrepresentations, deferred taking action to protect its interests and was lulled into inaction for several months.

366.    As a result of the Trust's reasonable reliance on Staples' fraudulent statements, the Trust has suffered investment losses in an amount to be determined at trial, which the Trust is entitled to collect, along with its attorney fees and costs, from SF5, Silverleaf Financial, Silverleaf Ventures, and Staples, jointly and severally.

## NINETEENTH CAUSE OF ACTION
### (UTAH COMMON LAW NEGLIGENT MISREPRESENTATION - INDUCEMENT TO INVEST IN THE FLORIDA LOAN)

367.    The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

368.    Baldwin, acting on behalf of SF17, Silverleaf Financial, Silverleaf Ventures, and himself, represented to the Trust that he had spoken to M&I Bank on April 6, 2010, who had

informed him that the borrower made a payoff bid of $2,700,000.00 that could be finalized by the end of the April 2010, and that because of this fact SF17 would make a fast profit of approximately $600,000.00.

369.    Baldwin's representations were false because the borrower never had the opportunity to submit a payoff offer, and would not have offered more than $1,500,000.00 if he had.

370.    Baldwin, acting on behalf of SF17, Silverleaf Financial, Silverleaf Ventures, and himself, also represented to the Trust that substantial cash distributions from SF5 would be made to the Trust within a month and provided the Trust with a workout summary report showing various asset valuations and identifying potential liquidity.

371.    Baldwin's representations were false in that certain reported asset valuations were grossly overstated and Baldwin did not have and could not reasonably have had any belief or expectation that substantial distributions would in fact be made to the Trust in that timeframe, and ultimately the promised distributions were not made.

372.    SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin failed to use reasonable care to determine whether the representations were true.

373.    SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin were in a better position than the Trust to know the true facts.

374.    Baldwin's misrepresentations were material because they actually convinced the Trust to go forward with and double its contemplated investment.

375. Indeed, the fact that a large profit could not be gained within a month's time when such was promised, and the availability of additional funds to "roll over" into a new Silverleaf investment from SF5 distributions are things that any prudent and reasonable investor would want to know when determining whether or not to purchase the offered securities.

376. SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin had a financial interest in the transaction.

377. The Trust reasonably relied on Baldwin's false statements.

378. As a result of the Trust's reasonable reliance on Baldwin's misrepresentations, the Trust has suffered investment losses and is entitled to collect the same from Baldwin, SF17, Silverleaf Financial, and Silverleaf Ventures jointly and severally, as well as any proceeds that would have been gained through that investment or that have been gained through the use of the Trust's funds.

## TWENTIETH CAUSE OF ACTION
### (UTAH COMMON LAW NEGLIGENT MISREPRESENTATION – SALE OF THE FLORIDA LOAN)

379. The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

380. On July 19, 2010, Baldwin, acting on behalf of SF17, Silverleaf Financial, Silverleaf Ventures, and himself, emailed the Trust to state that,

> There is [sic] no financial updates on the Florida deal. We are working on a definitive agreement with him now. He has been reluctant to sign a deal until he knows he has the money. I have spoken to his funding source and he has given me the date of Aug. 11th as the date they will have the money to close. The

borrower is pretty weird, but has been very upfront with what he is trying to do.  I will get you all the other information over the next couple of days…

Shane

Email from Baldwin to Boulware, dated July 19, 2010 (Ex. W) (ellipsis in original)

381.    Baldwin's statements were false because SF17 had already transferred the Florida Loan to Cobalt three months earlier and because Baldwin never invested the Trust's funds in the Florida Loan.

382.    SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin failed to use reasonable care to determine whether the representations were true.

383.    SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin were in a better position than the Trust to know the true facts.

384.    Baldwin's statements were material because they affected the central purpose of the entity, namely, to purchase the Florida Loan and make a profit from either selling or restructuring the Florida Loan.

385.    Thus, a reasonable and prudent investor would want to know if the sole asset it invested in was sold and if there were any profits.

386.    SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin had a financial interest in the transaction.

387.    In reasonable reliance on Baldwin's false statements, the Trust deferred undertaking any further action with respect to her investment for another eight months.

388.   As a result of the Trust's reasonable reliance on Baldwin's fraudulent statements, the Trust is entitled to collect all investment losses from Baldwin, SF17, Silverleaf Financial, and Silverleaf Ventures, as well as any proceeds that would have been gained through that investment or that have been gained through the use of the Trust's investment.

## TWENTY-FIRST CAUSE OF ACTION
### (BREACH OF FIDUCIARY DUTIES – SF5)

389.   The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

390.   By entering into the Participation Agreement with the Trust and accepting the Trust's investment of $500,000.00, SF5, Silverleaf Financial, Silverleaf Ventures and Baldwin created and assumed a fiduciary role with the Trust.

391.   As a result, SF5, Silverleaf Financial, Silverleaf Ventures, and Baldwin owed a fiduciary duty to the Trust to disclose all known material information to the Trust.

392.   SF5, Silverleaf Financial, Silverleaf Ventures, and Baldwin also owed a fiduciary duty to maintain the Loans and the associated real property in a manner that would provide the Trust with a return of, and on, its investment.

393.   SF5, Silverleaf Financial, Silverleaf Ventures, and Baldwin further owed a fiduciary duty to act with honesty towards the Trust and not to conceal material information.

394.   SF5, Silverleaf Financial, Silverleaf Ventures, and Baldwin additionally owed the Trust a fiduciary duty to not undertake any action that would harm the Trust or its interests.

395.    SF5, Silverleaf Financial, Silverleaf Ventures, and Baldwin likewise owed a fiduciary duty to distribute the proceeds from the Loans fairly and on a pari passu basis.

396.    In addition, SF5, Silverleaf Financial, Silverleaf Ventures, and Baldwin owed a fiduciary duty to the Trust to account for all benefits received.

397.    SF5, Silverleaf Financial, Silverleaf Ventures, and Baldwin breached their fiduciary duties to the Trust by:

   a.    Taking distributions in violation of the *pari passu* basis of distributions of proceeds from the Loans;

   b.    Causing distributions to be made to BVC and not to the Trust;

   c.    Concealing distributions to BVC and Silverleaf Financial;

   d.    Concealing the existence of the Lincolnshire Loan;

   e.    Using the proceeds from the Loans to pay off the Lincolnshire Loan;

   f.    Concealing payments to Lincolnshire;

   g.    Concealing the dealings with BVC regarding the Parry Loans Properties;

   h.    Concealing the receipt of proceeds from the Loans

   i.    Failing to pay the property taxes on numerous parcels of real property that secured the Loans;

   j.    Selling the Martin Loan at an unreasonably low price;

   k.    Making material misrepresentations regarding the absence of distributions to the Trust;

   l.    Failing to pay any distributions to the Trust whatsoever;

m. Failing to pay the promised interest on distributions to the Trust;

n. Preventing the Trust from consulting an attorney regarding the Unanimous Consent; and

o. Failing to provide an accounting to the Trust when the Trust demanded an accounting.

398.    As a direct result of SF5, Silverleaf Financial, Silverleaf Ventures, and Baldwin's breach of their fiduciary duties, the Trust suffered damages in an amount to be determined at trial, which the Trust is now entitled to collect from SF5, Silverleaf Financial, Silverleaf Ventures, and Baldwin.

399.    Because SF5, Silverleaf Financial, Silverleaf Ventures, and Baldwin's actions represent a knowing and intentional or reckless disregard for the Trust's rights, the Trust is entitled to collect punitive damages from SF5, Silverleaf Financial, Silverleaf Ventures, and Baldwin, jointly and severally, in an amount to be determined at trial.

## TWENTY-SECOND CAUSE OF ACTION
### (BREACH OF FIDUCIARY DUTIES – SF17)

400.    The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

401.    By entering into the Subscription Agreement and PPM with the Trust and accepting the Trust's investment of $500,000.00, SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin created and assumed a fiduciary role with the Trust.

402.    As a result, SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin owed a fiduciary duty to the Trust to disclose all known material information to the Trust and to correct any misleading statements previously made to the Trust.

403.    SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin also owed a fiduciary duty to invest the Trust's $500,000.00 in the Florida Loan as represented.

404.    SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin further owed a fiduciary duty to act with honesty towards the Trust and not to conceal material information.

405.    SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin additionally owed the Trust a fiduciary duty to not undertake any action that would harm the Trust or its interests.

406.    SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin likewise owed a fiduciary duty to distribute the proceeds from the Florida Loan.

407.    In addition, SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin owed a fiduciary duty to the Trust to account for all benefits received.

408.    SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin breached their fiduciary duties to the Trust by:

> a.  Failing to correct SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin's prior misrepresentation regarding Baldwin's discussions with M&I Bank regarding a quick profit from the Florida Loan;
>
> b.  Failing to invest the Trust's $500,000.00 in the Florida Loan;

c. Using part of the Trust's $500,000.00 investment to pay off previously defrauded investors so as to allow Baldwin to obtain a better plea bargain on his felony theft and fraud charges;

d. Concealing the fact that SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin had not invested the Trust's $500,000.00 in the Florida Loan;

e. Failing to inform the Trust of the sale of the Florida Loan to Cobalt;

f. Failing to make any distributions to the Trust after the sale of the Florida Loan to Cobalt;

g. Making material misrepresentations that SF17 continued to hold the Florida Loan after SF17 had sold the Loan to Cobalt three months before;

h. Making material misrepresentations that SF17 had continuing interest in the Florida Loan after the sale to Cobalt;

i. Making material misrepresentations that Cobalt was affiliated with ITI;

j. Making material misrepresentations to ITI regarding the Trust's decision to invest in the Florida Loan;

k. Failing to provide the Trust with an accounting; and

l. Failing to provide the Trust with the documents it demanded.

409. As a direct result of SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin's breach of their fiduciary duties, the Trust suffered damages in an amount to be determined at trial, which the Trust is now entitled to collect from SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin jointly and severally.

410.    Because SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin's actions represent a knowing and intentional or reckless disregard for the Trust's rights, the Trust is entitled to collect punitive damages from SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin, jointly and severally, in an amount to be determined at trial.

## TWENTY-THIRD CAUSE OF ACTION
### (PROMISSORY ESTOPPEL – SF5)

411.    The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

412.    SF5, Silverleaf Financial, Silverleaf Ventures, Staples and Baldwin promised the Trust that the Trust would receive the proceeds gained from the Loans.

413.    SF5, Silverleaf Financial, Silverleaf Ventures, Staples and Baldwin also promised the Trust that it would receive distributions of the proceeds gained from the Loans on an equal basis with all other participants.

414.    SF5, Silverleaf Financial, Silverleaf Ventures, Staples and Baldwin further promised that the Trust would receive 6% interest on its distributions for the period of December 13, 2010 until the end of January of 2011 when the Trust would be paid in full.

415.    SF5, Silverleaf Financial, Silverleaf Ventures, Staples and Baldwin additionally promised the Trust that SF5, Silverleaf Financial, Silverleaf Ventures, and Baldwin would provide the trust with an accounting, monthly reports, and quarterly reports.

416.    The Trust acted with prudence and in reasonable reliance on SF5, Silverleaf Financial, Silverleaf Ventures, Staples and Baldwin's promises.

417.    SF5, Silverleaf Financial, Silverleaf Ventures, Staples and Baldwin knew that the Trust had relied upon SF5, Silverleaf Financial, Silverleaf Ventures, Staples and Baldwin promises and should have reasonably expected that SF5, Silverleaf Financial, Silverleaf Ventures, Staples and Baldwin's promises would induce action or forbearance on the part of the Trust or Boulware.

418.    SF5, Silverleaf Financial, Silverleaf Ventures, Staples and Baldwin were aware of all material facts related to each of their promises.

419.    The Trust's reliance on SF5, Silverleaf Financial, Silverleaf Ventures, Staples and Baldwin's promises resulted in a loss to the Trust of its $500,000.00 investment, the proceeds from the Loans, the promised 6% interest, as well as the accounting, monthly statements, and quarterly statements, in addition to other damages in an amount to be determined by the Court.

420.    As a result, SF5, Silverleaf Financial, Silverleaf Ventures, Staples and Baldwin are estopped from acting contrary to their promises and the Court should impose a constructive trust on SF5, Silverleaf Financial, Silverleaf Ventures, Staples and Baldwin for the repayment of the Trust's initial investment, the Trust's distributions, interest on those distributions, and all other amounts due to the Trust plus restitution for any and all benefits that SF5, Silverleaf Financial, Silverleaf Ventures, Staples and Baldwin have received as a result of their use of the Trust's money.

## TWENTY-FOURTH CAUSE OF ACTION
### (PROMISSORY ESTOPPEL – SF17)

421.    The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

422.    SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin promised the Trust that Silverleaf Financial, Silverleaf Ventures, and Baldwin would invest the money in the Florida Loan

423.    Silverleaf Financial, Silverleaf Ventures, and Baldwin also promised the Trust that if it invested $500,000.00 in the Florida Loan the investment would quickly result in a $600,000.00 profit.

424.  . Because the Trust would have contributed approximately 23.8095% of the purchase price of the Florida Loan, it would be entitled to 23.8095% of the promised $600,000.00 profit, or approximately $142,857.00.

425.    Silverleaf Financial, Silverleaf Ventures, and Baldwin also promised the Trust on July 19, 2010 that Silverleaf Financial, Silverleaf Ventures, and Baldwin were working with the borrower and to expect a profit on or about August 11, 2010.

426.    The Trust acted with prudence and in reasonable reliance on Silverleaf Financial, Silverleaf Ventures, and Baldwin's promises.

427.    Silverleaf Financial, Silverleaf Ventures, and Baldwin should have reasonably expected their promises to induce action or forbearance on the part of the Trust or Boulware.

428.   Silverleaf Financial, Silverleaf Ventures, and Baldwin knew that the Trust had relied upon its promises because the Trust contributed the $500,000.00 and forwent pursuing the proceeds from the Florida Loan until after August 11, 2010.

429.   Silverleaf Financial, Silverleaf Ventures, and Baldwin were aware of all material facts related to each of their promises to the Trust.

430.   As a result of the Trust's reasonable reliance on Silverleaf Financial, Silverleaf Ventures, and Baldwin promises, the trust lost its $500,000.00 investment, its $142,857.00 profit, and suffered other damages in an amount to be determined by the Court.

431.   As a result, SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin are estopped from acting contrary to their promises and the Court should impose a constructive trust on SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin for the repayment of the Trust's investment, the lost profit, and all other amounts due to the Trust, plus restitution for any and all benefits SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin gained as a result of having the use of the Trust's money.

## TWENTY-FIFTH CAUSE OF ACTION
### (UNJUST ENRICHMENT – SF5)

432.   The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

433.   By contributing $500,000.00, as well as additional funds for the maintenance of the Loans and their attendant properties, the Trust conferred a benefit on SF5, Silverleaf Financial, Silverleaf Ventures, Baldwin, and BVC.

434. SF5, Silverleaf Financial, Silverleaf Ventures, Baldwin, and BVC knew that the Trust had conferred the benefit of the $500,000.00 and additional maintenance funds.

435. Given SF5, Silverleaf Financial, Silverleaf Ventures, Baldwin, and BVC's actions, omissions, concealments, and failures to pay required distributions, it is unjust and inequitable for SF5, Silverleaf Financial, Silverleaf Ventures, Baldwin, and BVC to retain the benefits they received without payment for their value.

436. As a result, the Court should impose a constructive trust on SF5, Silverleaf Financial, Silverleaf Ventures, Baldwin, and BVC for the repayment of the Trust's contributions plus restitution for any and all benefits that SF5, Silverleaf Financial, Silverleaf Ventures, Baldwin, and BVC have received as a result of the Trust's contributions.

## TWENTY-SIXTH CAUSE OF ACTION
### (UNJUST ENRICHMENT – SF17)

437. The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

438. By contributing $500,000.00, the Trust conferred a benefit on SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin.

439. SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin knew of the benefit that the Trust had conferred.

440. Given SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin's misrepresentations, concealments, as well as other actions and omissions, it is unjust and

71

inequitable to allow SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin to retain the Trust's conferred benefit without payment for its value.

441.    As a result, the Court should impose a constructive trust on SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin for the repayment of the Trust's investment, the lost profit and all other amounts due to the Trust, plus restitution for any and all benefits SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin gained as a result of having the use of the Trust's money.

## TWENTY-SEVENTH CAUSE OF ACTION
### (CONVERSION – SF5)

442.    The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

443.    The Trust was entitled to immediate possession of its share of the proceeds from the Loans when SF5 caused distributions to be made to BVC and Silverleaf Financial.

444.    SF5, Silverleaf Financial, Silverleaf Ventures, Staples, Baldwin and BVC, however, exercised dominion and control over the proceeds as if the proceeds belonged to SF5, Silverleaf Financial, Silverleaf Ventures, Staples, Baldwin and BVC in a manner that is inconsistent with the Trust's right to possession of the proceeds, and thus denied the Trust its rightful possession of its share of the proceeds.

445.    As a result, the Court should impose a constructive trust on SF5, Silverleaf Financial, Silverleaf Ventures, Staples, Baldwin, and BVC for any and all proceeds from the

Loans to which the Trust was entitled, plus any benefit SF5, Silverleaf Financial, Silverleaf Ventures, Staples, Baldwin, and BVC derived from the use of those proceeds.

## TWENTY-EIGHTH CAUSE OF ACTION
### (CONVERSION – SF17)

446. The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

447. When SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin decided to not invest the Trust's $500,000.00 in the Florida Loan, the Trust became entitled to immediate possession of the $500,000.00.

448. SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin, however, exercised dominion in control over the $500,000.00 as if it belonged to SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin in a manner inconsistent with the Trust's right to possession, and thus denied the Trust of the use and enjoyment of the $500,000.00.

449. As a result, the Court should impose a constructive trust on SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin for the repayment of the Trust's investment, the profit that the Trust expected to realize on the Florida Loan investment, as well as restitution for any and all proceeds and benefits SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin obtained in connection with the their conversion of the Trust's money.

## TWENTY-NINTH CAUSE OF ACTION
## (BREACH OF FIDUCIARY DUTIES – BVC)

450.    The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

451.    By investing $500,000.00, the Trust entered into a general partnership with SF5 and BVC.

452.    As a partner, BVC owed a fiduciary duty to the Trust to observe the utmost good faith, fairness, and honesty towards the Trust.

453.    As a partner, BVC also owed a fiduciary duty to the Trust to disclose all material facts known to BVC and not to the Trust.

454.    As a partner, BVC further owed a fiduciary duty to the Trust to abstain from all concealments.

455.    As a partner, BVC additionally owed a fiduciary duty of loyalty to the Trust.

456.    As a partner, BVC likewise owed a fiduciary duty to the Trust to account for all advantages that BVC improperly obtained and to hold those advantages in trust.

457.    BVC breached fiduciary duties to the Trust by:

   a. Accepting distributions in violation of the *pari passu* basis of distributions of proceeds from the Loans;

   b. Failing to disclose the fact that it received distributions when BVC knew the Trust did not receive its share of any distributions;

   c. Using its status as a partner to engage in self-dealing with SF5 and Silverleaf.

74

    d.  Failing to disclose its self-dealing with the SF5 to obtain the Parry Loans Properties; and

    e.  Failing to account to the Trust for all advantages BVC obtained and holding those advantages in trust.

458.    As a direct result of BVC's breach of fiduciary duties, the Trust suffered damages in an amount to be determined at trial, which the Trust is now entitled to collect from BVC.

## THIRTIETH CAUSE OF ACTION
### (BREACH OF CONTRACT – SPECIFIC PERFORMANCE)

459.    The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

460.    The Trust entered into a binding legal contract when the parties executed the Settlement Agreement.

461.    The Trust fully tendered its performance under the Settlement Agreement.

462.    The SilverLeaf defendants, Staples and Baldwin breached the Settlement Agreement by failing and refusing to make the payment it required by the specified deadline.

463.    The SilverLeaf defendants, Staples and Baldwin also breached the Settlement Agreement by failing and refusing to execute and submit to Boulware or the Trust the Confession of Judgment.

464.    As a direct and proximate result of the material breaches by the SilverLeaf defendants, Staples and Baldwin, the Trust has suffered damages in an amount to be determined by the Court.

465.     The Settlement Agreement entitles the Trust to obtain from SilverLeaf and Baldwin notarized signatures on the Confession of Judgment so that they may commence collection proceedings under the judgement.

466.     The Settlement Agreement also entitled the Trust to collect from SilverLeaf and Baldwin the attorneys' fees and costs the Trust incurred before, during, and after this Action.

## THIRTY-FIRST CAUSE OF ACTION
## (BREACH OF CONTRACT – DAMAGES)

467.     The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

468.     The Trust entered into a binding legal contract when the parties executed the Settlement Agreement.

469.     The Trust fully tendered its performance under the Settlement Agreement.

470.     The SilverLeaf defendants, Staples and Baldwin breached the Settlement Agreement by failing and refusing to make the payment it required by the specified deadline.

471.     The SilverLeaf defendants, Staples and Baldwin also breached the Settlement Agreement by failing and refusing to make the Initial Payment required thereunder.

472.     As a direct and proximate result of the material breaches by the SilverLeaf defendants, Staples and Baldwin, the Trust has suffered damages in an amount to be determined by the Court.

473.     The Settlement Agreement entitles the Trust to obtain from SilverLeaf and Baldwin the amount of the Initial Payment, plus any attorneys' fees and costs incurred in

pursuing this action, as well as interest at the rate of fifteen percent (15%), and any additional consideration set forth in the Settlement Agreement.

## THIRTY-SECOND CAUSE OF ACTION
## (DECLARATORY JUDGMENT)

474. The Trust hereby reincorporates all preceding paragraphs as if those paragraphs were fully set forth herein.

475. Pursuant to UTAH CODE ANN. § 78B-6-408 (2009), the Trust is entitled to a judicial declaration of the following legal conclusions:

a. The Settlement Agreement is a legally enforceable contract;

b. The Trust fully tendered its performance under the parties' Settlement Agreement;

c. The Settlement Agreement required Baldwin and SilverLeaf to make the payments set forth therein by the dates specified in the agreement;

d. Baldwin and SilverLeaf failed to make the Initial Payment required under the Settlement Agreement by the deadline specified therein;

e. Baldwin's and SilverLeaf's failure to make the Initial Payment as required constituted a material breach of the Settlement Agreement;

f. The Trust is entitled to the payment amounts specified in the Settlement Agreement plus attorneys' fees and costs of pursuing this action, as well as interest and any additional consideration specified in the Settlement Agreement.

## **PRAYER FOR RELIEF**

WHEREFORE, the Trust prays for judgment in favor of the Trust and against Baldwin, Staples, BVC, Silverleaf Financial, Silverleaf Ventures, SF5, and SF17 as follows:

1.      On Count 1 (Racketeering and RICO Act Violations):

     a.   Statutory damages in an amount to be determined by the Court, but not less than $3,000,000.00;

     b.   For all of the Trust's attorneys' fees and costs associated with this Action;

     c.   For pre- and post-judgment interest on the above amounts at the highest legal rate and until paid in full; and

     d.   For any other further and additional relief as this honorable Court deems just.

2.      On Count 2  (Federal Securities Fraud – Inducement to Invest in the Florida Loan):

     a.   For compensatory and/or restitution damages in an amount to be determined at trial;

     b.   For punitive damages in and amount to be determined at trial;

     c.   For all of the Trust's attorneys' fees and costs associated with this Action;

     d.   For pre- and post-judgment interest on the above amounts at the highest legal rate and until paid in full; and

     e.   For any other further and additional relief as this honorable Court deems just.

3.  On Count 3 (Utah Securities Fraud – Inducement to Invest in the Florida Loan):

    a.  For compensatory and/or restitution damages in an amount to be determined at trial;

    b.  For punitive damages in and amount to be determined at trial;

    c.  For all of the Trust's attorneys' fees and costs associated with this Action;

    d.  For pre- and post-judgment interest on the above amounts at the highest legal rate and until paid in full; and

    e.  For any other further and additional relief as this honorable Court deems just.

4.  On Count 4 (Utah Common Law Fraud – Inducement to Invest in the Florida Loan):

    a.  For compensatory and/or restitution damages in an amount to be determined at trial;

    b.  For punitive damages in and amount to be determined at trial;

    c.  For all of the Trust's attorneys' fees and costs associated with this Action;

    d.  For pre- and post-judgment interest on the above amounts at the highest legal rate and until paid in full; and

    e.  For any other further and additional relief as this honorable Court deems just.

5.  On Count 5 (Utah Common Law Fraud – Misuse of SF 17 Funds):

    a.  For compensatory and/or restitution damages in an amount to be determined at trial;

    b.  For punitive damages in and amount to be determined at trial;

    c.  For all of the Trust's attorneys' fees and costs associated with this Action;

    d.  For pre- and post-judgment interest on the above amounts at the highest legal rate and until paid in full; and

    e.  For any other further and additional relief as this honorable Court deems just.

6.    <u>On Count 6 (Federal Securities Fraud – Lincolnshire Loan)</u>:

    a.  For compensatory damages in an amount to be determined at trial;

    b.  For punitive damages in and amount to be determined at trial;

    c.  For all of the Trust's attorneys' fees and costs associated with this Action;

    d.  For pre- and post-judgment interest on the above amounts at the highest legal rate and until paid in full; and

    e.  For any other further and additional relief as this honorable Court deems just.

7.    <u>On Count 7 (Federal Securities Fraud – Staples' Statement)</u>:

    a.  For compensatory damages in an amount to be determined at trial;

    b.  For punitive damages in and amount to be determined at trial;

    c.  For all of the Trust's attorneys' fees and costs associated with this Action;

    d.  For pre- and post-judgment interest on the above amounts at the highest legal rate and until paid in full; and

    e.  For any other further and additional relief as this honorable Court deems just.

8.    <u>On Count 8 (Utah Securities Fraud – Lincolnshire Loan)</u>:

    a.  For compensatory damages in an amount to be determined at trial;

    b.  For punitive damages in and amount to be determined at trial;

  c.  For all of the Trust's attorneys' fees and costs associated with this Action;

  d.  For pre- and post-judgment interest on the above amounts at the highest legal rate and until paid in full; and

  e.  For any other further and additional relief as this honorable Court deems just.

9.  <u>On Count 9 (Utah Common Law Fraudulent Non-Disclosure – Lincolnshire Loan):</u>

  a.  For compensatory damages in an amount to be determined at trial;

  b.  For punitive damages in and amount to be determined at trial;

  c.  For all of the Trust's attorneys' fees and costs associated with this Action;

  d.  For pre- and post-judgment interest on the above amounts at the highest legal rate and until paid in full; and

  e.  For any other further and additional relief as this honorable Court deems just.

10.  <u>On Count 10 (Utah Common Law Fraudulent Non-Disclosure – BVC's Distributions):</u>

  a.  For compensatory damages in an amount to be determined at trial;

  b.  For punitive damages in and amount to be determined at trial;

  c.  For all of the Trust's attorneys' fees and costs associated with this Action;

  d.  For pre- and post-judgment interest on the above amounts at the highest legal rate and until paid in full; and

  e.  For any other further and additional relief as this honorable Court deems just.

11.  <u>On Count 11 (Utah Common Law Fraud – Staples' Statement):</u>

  a.  For compensatory damages in an amount to be determined at trial;

    b.   For punitive damages in and amount to be determined at trial;

    c.   For all of the Trust's attorneys' fees and costs associated with this Action;

    d.   For pre- and post-judgment interest on the above amounts at the highest legal rate and until paid in full; and

    e.   For any other further and additional relief as this honorable Court deems just.

12.    On Count 12 (Breach of Contract – SF 5 Participation Agreement;

    a.   For compensatory damages in an amount to be determined at trial;

    b.   For all of the Trust's attorneys' fees and costs associated with this Action;

    c.   For pre- and post-judgment interest on the above amounts at the highest legal rate and until paid in full; and

    d.   For any other further and additional relief that this honorable Court deems just.

13.    On Count 13 (Breach of Contract – Staples' Guarantee):

    a.   For compensatory damages in an amount to be determined at trial;

    b.   For all of the Trust's attorneys' fees and costs associated with this Action;

    c.   For pre- and post-judgment interest on the above amounts at the highest legal rate and until paid in full; and

    d.   For any other further and additional relief as this honorable Court deems just.

14.   On Count 14 (Breach of Contract – SF 17 Subscription Agreement/Placement Memorandum:

a.  For compensatory and/or restitution damages in an amount to be determined at trial;

b.  For all of the Trust's attorneys' fees and costs associated with this Action;

c.  For pre- and post-judgment interest on the above amounts at the highest legal rate and until paid in full; and

d.  For any other further and additional relief that this honorable Court deems just.

15.   On Count 15 (Breach of the Implied Covenant – Participation Agreement):

a.  For compensatory and/or restitution damages in an amount to be determined at trial;

b.  For all of the Trust's attorneys' fees and costs associated with this Action;

c.  For pre- and post-judgment interest on the above amounts at the highest legal rate and until paid in full; and

d.  For any other further and additional relief that this honorable Court deems just.

16.   On Count 16 (Breach of the Implied Covenant – Staples' Guarantee):

a.  For compensatory damages in an amount to be determined at trial;

b.  For all of the Trust's attorneys' fees and costs associated with this Action;

    c.  For pre- and post-judgment interest on the above amounts at the highest legal rate and until paid in full; and

    d.  For any other further and additional relief that this honorable Court deems just.

17.    On Count 17 (Breach of the Implied Covenant - Subscription Agreement and Placement Memorandum):

    a.  For compensatory and restitution damages in an amount to be determined at trial;

    b.  For all of the Trust's attorneys' fees and costs associated with this Action;

    c.  For pre- and post-judgment interest on the above amounts at the highest legal rate and until paid in full; and

    d.  For any other further and additional relief that this honorable Court deems just.

18.    On Count 18 (Utah Common Law Negligent Misrepresentation - Staples' Statements  Staples' Statements Concerning SF5):

    a.  For compensatory damages in an amount to be determined at trial;

    b.  For all of the Trust's attorneys' fees and costs associated with this Action;

    c.  For pre- and post-judgment interest on the above amounts at the highest legal rate and until paid in full; and

    d.  For any other further and additional relief as this honorable Court deems just.

19.     On Count 19 (Utah Common Law Negligent Misrepresentation – Inducement to
        Invest in the Florida Loan):

    a.   For compensatory and/or restitution damages in an amount to be determined
     at trial;

    b.   For all of the Trust's attorneys' fees and costs associated with this Action;

    c.   For pre- and post-judgment interest on the above amounts at the highest legal
     rate and until paid in full; and

    d.   For any other further and additional relief as this honorable Court deems just.

20.     On Count 20 (Utah Common Law Negligent Misrepresentation – Sale of the
        Florida Loan):

    a.   For compensatory and/or restitution damages in an amount to be determined
     at trial;

    b.   For all of the Trust's attorneys' fees and costs associated with this Action;

    c.   For pre- and post-judgment interest on the above amounts at the highest legal
     rate and until paid in full; and

    d.   For any other further and additional relief as this honorable Court deems just.

21.     On Count 21 (Breach of Fiduciary Duties – SF5):

    a.   For compensatory damages in an amount to be determined at trial;

    b.   For punitive damages in and amount to be determined at trial;

    c.   For all of the Trust's attorneys' fees and costs associated with this Action;

    d.   For pre- and post-judgment interest on the above amounts at the highest legal
     rate and until paid in full; and

    e.  For any other further and additional relief as this honorable Court deems just.

22.    On Count 22 (Breach of Fiduciary Duties – SF17):

    a.  For compensatory and/or restitution damages in an amount to be determined at trial;

    b.  For punitive damages in and amount to be determined at trial;

    c.  For all of the Trust's attorneys' fees and costs associated with this Action;

    d.  For pre- and post-judgment interest on the above amounts at the highest legal rate and until paid in full; and

    e.  For any other further and additional relief as this honorable Court deems just.

23.    On Count 23 (Promissory Estoppel – SF5):

    a.  For the imposition of a constructive trust on SF5, Silverleaf Financial, Silverleaf Ventures, Staples, and Baldwin for the repayment of the Trust's investment, payment of the Trust's distributions, interest on those distributions at the rate of 6%, as well as any and all benefits received as a result of the use of the Trust's investment; and

    b.  For any other further and additional relief as this honorable Court deems just.

24.    On Count 24 (Promissory Estoppel – SF17):

    a.  For the imposition of a constructive trust on SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin for the repayment of the Trust's investment, payment of the Trust's expected profit on the Florida Loan, payment any and

all benefits received as a result of the use of the Trust's investment; and interest thereon at the highest legal rate; and

b.  For any other further and additional relief as this honorable Court deems just.

25.  On Count 25 (Unjust Enrichment – SF5):

a.  For the imposition of a constructive trust on SF5, Silverleaf Financial, Silverleaf Ventures, Staples, Baldwin, and BVC for the repayment of the Trust's investment, payment of the Trust's distributions, interest on those distributions at the rate of 6%, as well as any and all benefits received as a result of the use of the Trust's investment; and

b.  For any other further and additional relief as this honorable Court deems just.

26.  On Count 26 (Unjust Enrichment – SF17):

a.  For the imposition of a constructive trust on SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin for the repayment of the Trust's investment, payment of the Trust's expected profit on the Florida Loan, payment any and all benefits received as a result of the use of the Trust's investment; and interest thereon at the highest legal rate; and

b.  For any other further and additional relief as this honorable Court deems just.

27.  On Count 27 (Conversion – SF5):

a.  For the imposition of a constructive trust on SF5, Silverleaf Financial, Silverleaf Ventures, Staples, Baldwin, and BVC for the repayment of the Trust's investment, payment of the Trust's distributions, interest on those

distributions at the rate of 6%, as well as any and all benefits received as a result of the use of the Trust's investment; and

    b.  For any other further and additional relief as this honorable Court deems just.

28.    On Count 28 (Conversion – SF17):

    a.  For the imposition of a constructive trust on SF17, Silverleaf Financial, Silverleaf Ventures, and Baldwin for the repayment of the Trust's investment, payment of the Trust's expected profit on the Florida Loan, payment any and all benefits received as a result of the use of the Trust's investment; and interest thereon at the highest legal rate; and

    b.  For any other further and additional relief as this honorable Court deems just.

    c.  and

    d.  For any other further and additional relief as this honorable Court deems just.

29.    On Count 29 (Breach of Fiduciary Duties – BVC):

    a.  For compensatory damages in an amount to be determined at trial;

    b.  For punitive damages in and amount to be determined at trial;

    c.  For all of the Trust's attorneys' fees and costs associated with this Action;

    d.  For pre- and post-judgment interest on the above amounts at the highest legal rate and until paid in full; and

    e.  For any other further and additional relief as this honorable Court deems just.

30.   On Count 30 (Breach of Contract – SilverLeaf, Staples and Baldwin):

    a.   For specific performance of the obligations set forth in the Settlement

       Agreement, including the obligation to return a signed and notarized

       Confession of Judgment to the Trust or Boulware;

    b.   For all of the Trust's attorneys' fees and costs associated with this Action;

    c.   For pre- and post-judgment interest on the above amounts at the highest legal

       rate and until paid in full; and

    d.   For any other further and additional relief as this honorable Court deems just.

31.   On Count 31 (Breach of Contract – SilverLeaf, Staples and Baldwin):

    a.   For compensatory damages in an amount to be determined at trial;

    b.   For all of the Trust's attorneys' fees and costs associated with this Action;

    c.   For pre- and post-judgment interest on the above amounts at the highest legal

       rate and until paid in full; and

    d.   For any other further and additional relief as this honorable Court deems just. .

32.   On Count 32 (Declaratory Judgment – SilverLeaf, Staples and Baldwin):

    a.   For an Order of this Court declaring that SilverLeaf, Staples and Baldwin are

       legally bound by the terms of the Settlement Agreement and that they

       breached its terms, and are required to perform their obligations thereunder as

       set forth in the Settlement Agreement;

    b.   For all of the Trust's attorneys' fees and costs associated with this Action;

c.  For pre- and post-judgment interest on the above amounts at the highest legal

rate and until paid in full; and

d.  For any other further and additional relief as this honorable Court deems just

DATED this 22nd day of August, 2011.

**WRONA LAW FIRM, P.C.**

Joseph E. Wrona
Todd D. Wakefield
Jared C. Bowman
Attorneys for Plaintiff The Joni R. Boulware Trust

Plaintiff's Address:
2772 Four Lakes Drive
Park City, Utah 84060