# EXHIBIT A

# LOAN PARTICIPATION AGREEMENT

SEPTEMBER 23, 2009

## SILVERLEAF FINANCIAL 5, LLC
### A UTAH LIMITED LIABILITY COMPANY

SILVERLEAF FINANCIAL 5, LLC
ATTN: SHANE BALDWIN
224 S. 200 W.
SALT LAKE CITY, UT 84101
TEL: (801) 359-2855
EMAIL: SHANE@SILVERLEAFCOMPANIES.COM

THE PARTICIPATION INTERESTS BEING OFFERED IN THIS LOAN PARTICIPATION AGREEMENT HAVE NOT BEEN REGISTERED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE BECAUSE THEY ARE BELIEVED TO BE EXEMPT FROM REGISTRATION UNDER SECTION 4(2) OF THE SECURITIES ACT OF 1933 AND/OR REGULATION D, PROMULGATED THEREUNDER, AND CORRESPONDING PROVISIONS OF STATE BLUE SKY LAWS OR OTHER EXEMPTIONS FROM SUCH LAWS. THE PARTICIPATION INTERESTS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS AGREEMENT OR THE ACCURACY OR THE ADEQUACY OF THIS AGREEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THE PARTICIPATION INTERESTS MAY NOT BE RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.

# LOAN PARTICIPATION AGREEMENT

This **LOAN PARTICIPATION AGREEMENT** (this "Agreement"), signed on the dates set forth below to be effective as of September 23, 2009 (the "Effective Date"), is by and between **SILVERLEAF FINANCIAL 5, LLC,** a Utah limited liability company ("Lead Lender"), and **JONI R. BOULWARE, TRUSTEE OF THE JONI R. BOULWARE TRUST, CREATED ON THE 21ST DAY OF NOVEMBER, 2006** ("Participant").

## RECITALS

A.     Lead Lender has purchased from M&I Marshall & Ilsley Bank, a Wisconsin state-chartered bank, (the "Bank") ten loans: one loan in the original principal amount of $250,000 on an unsecured line of credit ("First Loan"), one loan in the original principal amount of $812,296 secured by a first position deed of trust on a Multifamily, Multiple Residence District in the City of Phoenix, Arizona ("Second Loan"), one loan in the original principal amount of $367,250 secured by a first position deed of trust on commercial land located in Maricopa, Arizona ("Third Loan"), one loan in the original principal amount of $1,680,000 secured by a first position deed of trust on a Multifamily building located in Phoenix, Arizona ("Fourth Loan"), one loan in the original principal amount of $3,000,000 secured by a first position deed of trust on a Multifamily building located in Glendale, Arizona ("Fifth Loan"), one loan in the original principal amount of $632,000 secured by a first position deed of trust on a Multifamily building located in Phoenix, Arizona ("Sixth Loan"), one loan in the original principal amount of $3,145,000 secured by a first position deed of trust on a Retail building located in Algonquin, Illinois ("Seventh Loan"), one loan in the original principal amount of $1,650,000 secured by a first position deed of trust on a Retail building located in Indianapolis, Indiana ("Eighth Loan"), one loan in the original principal amount of $1,700,000 secured by a first position deed of trust on a Retail building located in Lafayette, Indiana ("Ninth Loan"), and one loan in the original principal amount of $2,520,000 secured by a first position deed of trust on a Retail building located in West Chester, Ohio ("Tenth Loan") (hereinafter collectively referred to as the "Loans"). The Loans were collectively purchased from the Bank for a total purchase price of $6,749,582.

B.     The First Loan was originally made by the Bank to Mark Perry, the Second Loan was originally made by the Bank to JP Partners, LLC, the Third Loan was originally made by the Bank to JP Partners, LLC, the Fourth Loan was originally was made by the Bank to Parry Properties, LLC, the Fifth Loan was originally made by the Bank to Parry Properties, LLC, the Sixth Loan was originally made by the Bank to Arizona Equity Growth, LLC, the Seventh Loan was originally made by the Bank to Martin Capital, LLC, the Eighth Loan was originally made by the Bank to Eagle Creek Commons, LLC, the Ninth Loan was originally made by the Bank to Tippecanoe Shoppes, LLC, and the Tenth Loan was originally made by the Bank to Tylersville Station, LLC (collectively referred to herein as the "Borrowers"). Information about the Loans, including, without limitation, copies of the original Loan documents, copies of the documents between the Lead Lender and the Bank or its representative relating to Lead Lender's purchase of the Loans, information about the collateral for the Loans (the "Collateral") and the priority of the trust deed or mortgage that secures the Loans, copies of guaranties, if any, of the Loans, information about the Borrower and the Borrower's and guarantors, if any, credit worthiness, the

2

payment history of the Loans and other general information about the Loans is contained in Exhibit C attached hereto, or has been previously provided to Participant by Lead Lender.

      C.    Participant wishes to purchase a participation interest (a "Participation Interest") in Lead Lender's interest in the Loans upon the terms and conditions set forth in this Agreement. This Agreement sets forth the terms of relationship and understanding between Lead Lender and Participant with respect to its participation in the Loans and the administration of the Loans.

      D.    Documents relating to the Loans are referred to herein as the "Loan Documents." When the Participant has funded its commitment as provided in this Agreement, the Lead Lender will issue a Participation Certificate to the Participant in substantially the form of Exhibit A attached, evidencing ownership by Participant of a Participation Interest in the Loans as stated in Exhibit A.

## ARTICLE I - DEFINITIONS

      Unless otherwise indicated, capitalized terms used in this Agreement have the following meanings.

      1.1    Event of Default: Any event occurring or state of facts existing which constitutes, or with the passage of time or giving of notice or both would constitute, a default or breach of its obligations by Borrower under any of the Loan Documents.

      1.2    Participants: Participant and any other parties who may be participating in the Loans.

      1.3    Participating Amount: $500,000.00, which is the purchase price amount for the Participation Interest paid to Lead Lender by Participant.

      1.4    Participation Interest: The interest that Participant will acquire in the Loans as provided in this Agreement, particularly, without limitation, the payment rights and obligations provided for in Article II below. The Participation Interest entitles Participant to own the Participation Percentage of the Loans and to share and receive the Participation Percentage of all principal payments, interest payments, origination fees, default interest payments, net proceeds from sale of Collateral for the Loans, payments from guarantors of the Loans, net amounts realized from litigation relating to the Loans against any third party, and all other monetary benefits arising out of ownership of the Loans. Ownership of the Participation Interest also requires the Participant to pay the Participation Percentage of all costs and expenses relating to administration, documentation, closing, foreclosure, litigation, preservation of Collateral for the Loans and all other costs arising out of ownership of the Loans.      7.4079 %

      1.5    Participation Percentage: Participant shall have a Seven Percent (7%) interest in the Loans, with the payment rights and obligations that are described in Article II below.

## ARTICLE II - PARTICIPATION IN THE LOANS

      2.1    Purchase of the Participation Interest. Participant agrees to purchase the Participation Percentage of the Loans by paying the Participating Amount to Lead Lender or by

payment history of the Loans and other general information about the Loans is contained in Exhibit C attached hereto, or has been previously provided to Participant by Lead Lender.

C.      Participant wishes to purchase a participation interest (a "Participation Interest") in Lead Lender's interest in the Loans upon the terms and conditions set forth in this Agreement. This Agreement sets forth the terms of relationship and understanding between Lead Lender and Participant with respect to its participation in the Loans and the administration of the Loans.

D.      Documents relating to the Loans are referred to herein as the "Loan Documents." When the Participant has funded its commitment as provided in this Agreement, the Lead Lender will issue a Participation Certificate to the Participant in substantially the form of Exhibit A attached, evidencing ownership by Participant of a Participation Interest in the Loans as stated in Exhibit A.

## ARTICLE I - DEFINITIONS

Unless otherwise indicated, capitalized terms used in this Agreement have the following meanings.

1.1      Event of Default: Any event occurring or state of facts existing which constitutes, or with the passage of time or giving of notice or both would constitute, a default or breach of its obligations by Borrower under any of the Loan Documents.

1.2      Participants: Participant and any other parties who may be participating in the Loans.

1.3      Participating Amount: **$500,000.00**, which is the purchase price amount for the Participation Interest paid to Lead Lender by Participant.

1.4      Participation Interest: The interest that Participant will acquire in the Loans as provided in this Agreement, particularly, without limitation, the payment rights and obligations provided for in Article II below. The Participation Interest entitles Participant to own the Participation Percentage of the Loans and to share and receive the Participation Percentage of all principal payments, interest payments, origination fees, default interest payments, net proceeds from sale of Collateral for the Loans, payments from guarantors of the Loans, net amounts realized from litigation relating to the Loans against any third party, and all other monetary benefits arising out of ownership of the Loans.  Ownership of the Participation Interest also requires the Participant to pay the Participation Percentage of all costs and expenses relating to administration, documentation, closing, foreclosure, litigation, preservation of Collateral for the Loans and all other costs arising out of ownership of the Loans.

1.5      Participation Percentage: Participant shall have a Seven Percent (7%) interest in the Loans, with the payment rights and obligations that are described in Article II below.

## ARTICLE II - PARTICIPATION IN THE LOANS

2.1      Purchase of the Participation Interest. Participant agrees to purchase the Participation Percentage of the Loans by paying the Participating Amount to Lead Lender or by

3

funding the same amount of the purchase price for the Loans at closing of the Lead Lender's purchase of the Loans from the Bank. The interest so acquired by Participant is Participant's Participation Interest, with the rights, duties and obligations described in this Agreement.

2.2     Nature of the Participation Interest. The Participation Interest is an undivided fractional interest in the Loans that are owned by Participant and that is of equal rank and pari passu with the participation interests of all other Participants in the Loans, and no undivided fractional interest shall have preference or priority over any other undivided fractional interest.

2.3     Sharing of Payments and Costs.

(a)     Participant shall receive a return of the Participation Amount, pro rata and pari passu with the return of investment amounts in the Loans by other Participants based on their relative ownership interests in the Loans, with Participant's share equal to the Participation Percentage. The return of the investment amounts of all Participants shall be shared only after payment and reimbursement of all costs and expenses arising out of the Loans.

(b)     The Lead Lender and Participant shall then share Participant's share of "net profits" from the Loans, after all costs have been paid and after all investment amounts by Participants have been returned, in the following shares: **70% to Participant and 30% to Lead Lender.** Such net profits will probably be derived from interest payments, origination fees, default interest payments, net proceeds from sale of Collateral for the Loans, payments from guarantors of the Loans, net amounts realized from litigation relating to the Loans against any third party, and all other monetary benefits in excess of payments constituting return of principal arising out of ownership of the Loans, reduced by the total amount of expenditures and costs incurred in acquiring and administering the Loans.

(c)     In the same shares, i.e., with Participant using the Participation Interest, Participant and Lead Lender shall bear all costs incurred in closing, administering and foreclosing the Loans and protecting the Collateral.

(d)     By way of example, assume that Participant provides Lead Lender with a Participating Amount of $1 million, and that Lead Lender uses $4 million of its own funds to purchase the Loans for $5 million. This will cause Participant's Participation Percentage to be 20%, subject to the sharing percentages of this Section 2.3. Assume further that Participant and Lead Lender have agreed under Section 2.3(b) above that they would share Participant's share of profits arising out of the Loan 30% in favor of Lead Lender and 70% in favor of Participant. Assume that the total monetary benefits returned by the Loan amount to $6.2 million. The $6.2 million would be paid and distributed as follows:

(i)     $200,000 to pay costs and expenses, with Lead Lender being deemed to have paid $160,000 of such costs

4

(iii)    factual information received by Lead Lender relating to the continued creditworthiness of the Borrowers and any guarantor,

(iv)    copies of other such documents as Lead Lender shall from time to time receive from the Borrowers or any guarantor; and

(v)    to notify Participant of the occurrence or existence of any Event of Default after Lead Lender shall have received actual knowledge of its occurrence or existence.

(vi)    The fees and expenses payable to third parties of all of the foregoing shall be borne by each Participant, as such fees and expenses are incurred, in proportion to their respective Participation Interests in the Loans. To the extent that fees and expenses previously paid by a Participant are recovered from the Borrowers or, if lawful, out of the Collateral, Participant shall be reimbursed for such amount in proportion to the percentage share of such fees or expenses previously paid by the Participant.

3.2    _Loan Defaults._ After the occurrence of any Event of Default, Lead Lender shall notify Participant, the parties shall endeavor to agree upon the course of action to be taken with respect to any such Event of Default but, in all cases, Lead Lender shall have the sole and exclusive right, acting in Lead Lender's sole discretion, to:

(a)    exercise any remedy contained in the Loan Documents;

(b)    take possession of the Collateral, or seek the appointment of a receiver of the Collateral;

(c)    collect any rentals, receivables, or other revenues attributable to the Collateral;

(d)    conduct public or private foreclosure proceedings;

(e)    bid for and sell or purchase the Collateral in any foreclosure proceedings;

(f)    take such further action as Lead Lender deems advisable to collect any deficiency remaining after any foreclosure sale, and

(g)    exercise any and all other remedies permitted to secured parties under the laws of the jurisdiction where the Collateral is located, including, without limitation, the Uniform Commercial Code of such jurisdiction, and all other applicable laws.

(h)     In addition, Lead Lender may, if in its reasonable judgment the same is advisable, pay real estate taxes and insurance premiums, spend money for maintenance, repairs or capital improvements or other expenses which may be necessary to be incurred in the judgment of Lead Lender, and the cost thereof shall be borne by the Lead Lender and Participants in proportion to their respective Participation Interests in the Loans and Participants shall pay to Lead Lender their portions thereof as such expenses are incurred to the extent that same have not been recovered contemporaneously from the Borrowers or out of the Collateral.

(i)     At such time as all or any portion of such expenses are recovered from the Borrowers, or, if lawful, out of the Collateral, Lead Lender and Participants shall be reimbursed from the amounts recovered from the Borrowers for amounts previously paid by Lead Lender and Participants for such expenses, such reimbursement to be in proportion to the percentage share of such amounts previously paid by Lead Lender and Participants, respectively.

3.3     Power and Authorities. Lead Lender shall have the following powers and authorities, in Lead Lender's sole and absolute discretion:

(a)     to determine in accordance with the Loan Documents the application of any proceeds received by Lead Lender on policies of insurance carried on the Collateral or with respect to the Collateral, whether to the restoration or repair of loss or damage to the Collateral, to the reduction of the Borrowers indebtedness, or as may otherwise be permitted under the provisions of the Loan Documents;

(b)     to execute and deliver in its own name as Lead Lender, the Loan Documents and any and all other documents or instruments related to the Loans or Collateral and to take any action related thereto, including without limitation extensions, amendments, partial releases of Collateral, modification or amendment or release of any guarantors, acceptance by Lead Lender or an affiliate thereof of a deed in lieu of foreclosure, settlement of any claim, acceptance of replacement Collateral, etc;

(c)     to execute and deliver to the Borrowers consents, modifications, or waivers of or in connection with the provisions of the Loan Documents; and

(d)     to sell participation interests in the Loans to other Participants on any terms that Lead Lender deems necessary or proper, regardless of whether such terms are more or less favorable to such other Participants than the terms provided for herein.

3.4     Offsets. In the event that Lead Lender or Participant actually offsets any funds of the Borrowers held by Lead Lender or Participant against the Loans or any part thereof, the party not exercising such offset shall be entitled to share in the benefit of such offset either by deducting the amount of such offset from the amount of funds otherwise payable to the party

7

entitled to such offset or requiring that the party exercising such offset remit to the other party an amount equal to the product obtained by multiplying the amount of the actual offset times (x) the Participation Interest of the Loans of the party not exercising the offset.

## ARTICLE IV - REPRESENTATIONS, WARRANTIES, COVENANTS AND AGREEMENTS

Lead Lender hereby represents and warrants to Participant the following:

4.1     Loans.  Subject to all Participants funding the purchase price of the Loans, Lead Lender will execute the Loan Documents and obtain, as agent for Lead Lender and the Participants, all right, title and interest in the Loans secured by the deeds of trust encumbering the properties and associated Collateral;

4.2     Loan Documents. Lead Lender will make available to Participant copies of all executed material Loan Documents, other than participation agreements entered into with other Participants, when they become available to Lead Lender; and

4.3     Power and Authority. Lead Lender has the power and authority to assign the Participation Interest in the Loan Documents to Participant.

## ARTICLE V - COMPENSATION AND EXPENSES OF THE LEAD LENDER

Participant shall pay to Lead Lender as promptly as practicable after Lead Lender's request therefor Participant's Participation Interest of all third-party costs and expenses in connection with the Loans, including attorney's fees and fees of other consultants or advisors incurred by Lead Lender in connection with the negotiation, preparation, and execution of the Loan Documents prior to and in connection with the purchase of the Loans from the Bank, and in connection with the negotiation, preparation and execution of this Agreement, as such costs and expenses are incurred, to the extent that such costs and expenses are not recovered from the Borrowers or any guarantor, or, if lawful, out of the Collateral.

## ARTICLE VI - EXCULPATION OF THE LEAD LENDER

Participant agrees that neither Lead Lender nor any of its members, attorneys, agents, representatives or employees shall be liable for any action taken or omitted to be taken by it or them hereunder or in connection herewith except for its or their own bad faith, gross negligence, or willful misconduct. Lead Lender shall not be responsible to Participant for any recitals, statements, disclaimers, warranties or representations contained in the Loan Documents or for its failure to ascertain or inquire as to the failure of the performance or observance of any of the terms, conditions, covenants or agreements contained in the Loan Documents by or on behalf of the Borrowers, the Bank, or any architect, designer, engineer, builder or contractor or any other third party under any of the Loan Documents.  Lead Lender shall not be responsible to Participant for the due execution, genuineness, validity, enforceability or effectiveness of any of the Loan Documents or for the description or value of any Collateral for the Loans or for the creditworthiness of the Borrowers. Lead Lender may execute any of its duties, power or authorities under this Agreement by or through Lead Lender's employees, accountants, representatives, members, escrow or title companies or attorneys.

8

## ARTICLE VII - PARTICIPANT'S REPRESENTATIONS, WARRANTIES AND COVENANTS

Participant represents, warrants and acknowledges to and for the benefit of Lead Lender as follows:

7.1     Power and Authority. Participant has the power and authority to purchase a participation interest in the Loans; has made an independent investigation and analysis to the extent Participant wished to do so of the creditworthiness of the Borrowers, any guarantor and the Collateral, and based upon such independent investigation and analysis, is funding the Participation Interest in the Loans; is not relying upon any recommendations, representations or warranties of Lead Lender or Lead Lender's agents, attorneys or representatives, whether written or oral, as to the creditworthiness of the Borrowers or any guarantor, the value of the Collateral or as to the advisability of making the Loans or the likelihood that the Loans will be repaid or any aspect of the Collateral in purchasing the Participation Interest in the Loans; and has exercised reasonable efforts to satisfy itself as to the validity of the recitals, statements, warranties and representations contained in the Loan Documents, and has not knowingly committed, admitted to, suffered or permitted to occur any event, and has no actual knowledge of any facts which would materially affect the validity of the Loan Documents or the creditworthiness of the Borrowers or any guarantor.

7.2     Risks. Participant has no expectation that it will derive profits from the efforts of Lead Lender or any third party in respect of the acquisition of Participant's participation hereunder, such participation merely constitutes a commercial transaction by Participant with Lead Lender regarding Participant's Participation Amount of the obligations of the Borrowers under the Loan Documents and does not represent an "investment", as that term is commonly understood or used in the Uniform Commercial Code or any state or federal securities act, in Lead Lender or Borrower, Participant is purchasing its participation hereunder for its own account in respect of a commercial transaction made in the ordinary course of business and not with a view to or in connection with any subdivision, or distribution thereof, and Participant can bear the economic risk related to the purchase of the same, and has had access to all information deemed necessary by it in making its decision whether or not to purchase the same. Participant has read and agreed to accept the risk factors listed in Exhibit B attached. Participant has also read and understands the information about the Loans and Collateral that is contained in Exhibit C attached.

7.3     RESERVED

7.4     RESERVED

7.5     Information. Participant has also had the opportunity to ask questions of, and receive answers from, the Lead Lender concerning the terms and provisions of this Agreement, the Loan Documents, the agreements entered into by Lead Lender and the Bank, the business and affairs of the Lead Lender and to obtain any additional information necessary to verify such information, and Participant has received all information as Participant considers necessary or advisable in order to form a decision concerning an investment in the Participation Interest. In making this investment, Participant is not relying on any representation or warranty of any

9

person, entity or individual, other than the representations and warranties of the Lead Lender set forth in this Agreement or otherwise provided in writing by an authorized officer of the Lead Lender to Participant. The Participant understands:

        (i)    The risks involved in this investment, including the speculative nature of the investment;

        (ii)   The financial hazards involved in this investment, including the risk of losing the Participant's entire investment;

        (iii)  The lack of liquidity and restrictions on transfers; and

        (iv)  The tax consequences of this investment.

    7.6    <u>RESERVED</u>

    7.7    <u>Plans</u>. Participant acknowledges and understands that any information provided about the Lead Lender's future plans and prospects is uncertain and subject to all of the uncertainties inherent in future predictions.

    7.8    <u>No Regulatory Approval</u>. Participant understands that this transaction has not been scrutinized by the United States Securities and Exchange Commission (the "Commission") or by any state securities or other authority and, because of the small number of persons solicited to invest in the Lead Lender and the private nature of the offering being made by the Lead Lender (the "Offering"), that all documents, records and books pertaining to this investment have been made available to Participant and Participant's representatives, such as attorneys, accountants and/or purchaser representatives.

    7.9    <u>Investment</u>. Participant realizes that this investment involves a high degree of risk, including the risk of loss of all investment in the Participation Interest.

    7.10   <u>Financial Worth of Participant</u>. Participant is able to bear the economic risk of the investment, including the total loss of such investment. See Exhibit D.

    7.11   <u>Suitable Investment</u>. Participant believes, in light of the information provided pursuant to Section 3(a) hereinabove, that investing funds pursuant to the terms of this Agreement is an appropriate and suitable investment for Participant. See Exhibit D.

    7.12   <u>Financial Condition of Participant</u>. Participant's current financial condition is such that (and Participant expects Participant's financial condition to be such that in the future) Participant does not have any present or contemplated need to assign the Participation Interest to satisfy any existing or contemplated undertaking, need or indebtedness. Participant agrees that the Participation Interest is not transferable.

    7.13   <u>Participant's Experience</u>. Participant is experienced and knowledgeable in financial and business matters to the extent that Participant is capable of evaluating the merits and risks of the prospective investment in the Participation Interest. Participant has obtained, to the extent Participant deems necessary, personal and professional advice with respect to the risks

inherent in the investment in the Participation Interest in light of Participant's financial condition and investment needs. Participant and Participant's purchaser representative, if any, have been given access to full and complete information regarding the Loans and have utilized such access to their satisfaction.

7.14    Residence. Participant is a resident of the state and county as set forth on the signature page below. The Participation Interest is being purchased by the undersigned in the undersigned's name solely for the undersigned's own beneficial interest and not as nominee for, on behalf of, for the beneficial interest of, or with the intention to transfer to, any other person, trust or organization.

7.15    No General Solicitation. Participant's purchase of the Participation Interest is not the result of any general solicitation or general advertising, including, but not limited to (i) any advertisement, article, notice or other communication published in any newspaper, magazine or similar media or broadcast over television or radio; and (ii) any seminar or meeting whose attendees have been invited by any general solicitation or general advertising.

7.16    Lead Lender's Legal Counsel. Participant understands that Lead Lender has engaged legal counsel to represent the Lead Lender in connection with the purchase of the Loans and the offer and sale of the Participation Interest Such legal counsel does not represent Participant or Participant's interests and Participant is not relying in any way on legal counsel engaged by the Lead Lender. Participant has had the opportunity to engage, and obtain advice from, Participant's own legal counsel with respect to the investment contemplated herein.

7.17    Pari Passu Nature of Participation Interests. Participant understands and agrees that the Participation Interest, when duly purchased and owned by Participant, will be subject to payment on a pari passu basis with all other participation interests sold by Lead Lender and with Lead Lender's own ownership interests in the Loans.

## ARTICLE VIII - SALES OF OTHER PARTICIPATION INTERESTS

Lead Lender may assign or sell further participating interests in the balance of the Loans retained by it to any other party, on any terms deemed proper by Lead Lender.

## ARTICLE IX - NOTICES

All notices required or permitted to be given hereunder shall be deemed to be given when hand-delivered or faxed to the designated party at the address provided by that party from time to time, or, whether actually received or not, on the third following business day after being deposited with the United States Postal Service, or on the next following business day after being deposited, prepaid and properly addressed, with Federal Express or other similar air courier service providing "next business day" delivery service.

## ARTICLE X - TERM OF THIS AGREEMENT

The term of this Agreement shall commence on the Effective Date and shall expire when Lead Lender and Participant each shall have fully performed and discharged all of their

respective liabilities and obligations hereunder; except that this Agreement may be earlier terminated by a writing signed by Lead Lender and Participant.

## ARTICLE XI - AMENDMENT OF THIS AGREEMENT

This Agreement may only be amended by a writing executed by Lead Lender and Participant.

## ARTICLE XII - MISCELLANEOUS

12.1    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of Lead Lender and Participant and their respective successors and assigns; provided, however, that any transfer of any interest herein in violation of the provisions hereof shall confer no rights under this Agreement upon the transferee. This Agreement shall be governed by Utah law.  Venue for all legal proceedings arising out of or related to this Agreement shall be in Salt Lake County, Utah.

12.2    No Waiver, Cumulative Remedies.  No failure or delay on the part of Lead Lender in exercising any right, power or remedy hereunder or under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder or thereunder. The remedies herein and therein provided are cumulative and not exclusive of any remedies provided by law or in equity.

12.3    Survival of Representations and Warranties.  All representations, warranties, covenants and agreements contained herein or made in writing by Participant in connection herewith shall survive the execution and delivery of this Agreement and be true and correct until all of the obligations hereunder have been satisfied in full pursuant to this Agreement.

12.4    Time of the Essence.  Time is of the essence under this Agreement.

12.5    Headings. The headings in this Agreement are intended to be for convenience of reference only, and shall not define or limit the scope, extent or intent or otherwise affect the meaning of any portion hereof.

12.6    Further Assurances. Participant shall, from time to time, execute such additional documents as reasonably may be requested by Lead Lender and take such other actions, to carry out and fulfill the intent and purpose of this Agreement.  Participant agrees to execute, acknowledge and deliver such documents as reasonably requested by Lead Lender for such purposes and otherwise to cooperate in Lead Lender's efforts in this regard.

12.7    Construction.  This Agreement has been prepared and negotiated through the joint efforts of Lead Lender and Participant.  This Agreement was drafted initially by Lead Lender solely as a matter of convenience to the parties, and shall not be construed or interpreted for or against any of the parties on the grounds that it was so initially drafted.  Accordingly, any construction of this Agreement shall be made without any reference whatsoever as to which party drafted this Agreement.

12.8    Choice of Law. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Utah without giving effect to its conflict of laws principles.

12.9    Entire Agreement. The Loan Documents and this Agreement and the documents executed pursuant hereto, embody the entire agreement and understanding between Participant and Lead Lender and supersede all prior agreements and understandings between said parties relating to the subject matter thereof.

12.10   Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original document, but all of which shall constitute a single document.

12.11   No Third Party Beneficiaries.  This Agreement is solely between the parties hereto and no person not a party to this Agreement shall have any rights or privileges hereunder.

12.12   WAIVER OF JURY TRIAL. PARTICIPANT AND LENDER HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT, THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY PARTICIPANT AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. PARTICIPANT AND LENDER ARE HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER. THIS PROVISION SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT.


IN WITNESS WHEREOF, Lead Lender and Participant have caused the Agreement to be executed and delivered on the dates set forth below, to be effective as of the date first set forth above.

**LEAD LENDER:**

SILVERLEAF FINANCIAL 6, LLC, a Utah limited
liability company
By: SilverLeaf Financial, LLC, Manager
  By: SilverLeaf Ventures, LLC, Manager
   By: Shane Baldwin, Manager

Date:_____  _____

**PARTICIPANT:**

**JONI R. BOULWARE, TRUSTEE OF THE
JONI R. BOULWARE TRUST, CREATED ON
THE 21ST DAY OF NOVEMBER, 2006**

Date:_____  _____
          By: Joni Boulware, Trustee

LEAD LENDER:

SILVERLEAF FINANCIAL 6, LLC, a Utah limited
liability company
By: SilverLeaf Financial, LLC, Manager
    By: SilverLeaf Ventures, LLC, Manager.
        By: Shane Baldwin, Manager

Date: 9/24/09

PARTICIPANT:

JONI R. BOULWARE, TRUSTEE OF THE
JONI R. BOULWARE TRUST, CREATED ON
THE 21ST DAY OF NOVEMBER, 2006

By: Joni Boulware, Trustee

Date: 9/24/09

14

## EXHIBIT A

### Form of Participation Certificate

TO: _____

SILVERLEAF FINANCIAL 6, LLC, a Utah limited liability company ("Lead Lender"), hereby certifies that JONI R. BOULWARE, TRUSTEE OF THE JONI R. BOULWARE TRUST, CREATED ON THE 21ST DAY OF NOVEMBER, 2006 (the "Participant"), has, and is hereby granted, a participation and security interest, pari passu, in the amount of $500,000.00 in the Loans made by M&I Marshall and Ilsley Bank (the "Bank"), to Borrowers, as further described in that certain Participation Agreement dated as of September _____, 2009 entered into by Participant and Lead Lender and that, effective as of September_____, 2009 Participant holds a total monetary participation in the Loans of $500,000.00.00 ("Participating Amount"), representing 7% ("Participation Percentage") in the Loans.

Participant shall be entitled to receive the Participation Percentage of all principal payments, interest payments, origination fees, default interest payments, net proceeds from sale of Collateral for the Loans, payments from guarantors of the Loans, net amounts realized from litigation relating to the Loans against any third party, and all other monetary benefits arising out of ownership of the Loans as purchased from the Bank. Ownership of the Participation Interest also requires the Participant to pay the Participation Percentage of all costs and expenses relating to administration, documentation, closing, foreclosure, litigation, preservation of Collateral for the Loans and all other costs arising out of ownership of the Loans.

The obligation of Lead Lender to disburse any amounts owing to Participant shall be a limited recourse obligation of Lead Lender meaning that Lead Lender shall be obligated to disburse funds to Participant on a pro rata and pari passu basis only, along with other participants in the Loans, and only to the extent that Lead Lender actually receives good funds for disbursement from the Borrowers or otherwise from realization on the Collateral for the Loans. The Participant has agreed to contribute its Participation Percentage of all future advances and other costs and expenditures required by Participant for the Loans as provided in the Participation Agreement. Participant is administering the Loans pursuant to the Participation Agreement and to similar participation agreements entered into with other participants in the Loans. The terms of this instrument are governed by and are subject in all respects to the provisions of the Participation Agreement.

SILVERLEAF FINANCIAL 5, LLC, a Utah limited liability company
By: SilverLeaf Financial, LLC, Manager
    By: SilverLeaf Ventures, LLC, Manager
        By: Shane Baldwin, Manager

Date:_____   _____

## PARTICIPATION CERTIFICATE

TO Joni Boulware,

SILVERLEAF FINANCIAL 6, LLC, a Utah limited liability company ("Lead Lender"), hereby certifies that JONI R. BOULWARE, TRUSTEE OF THE JONI R. BOULWARE TRUST, CREATED ON THE 21ST DAY OF NOVEMBER, 2006 (the "Participant"), has, and is hereby granted, a participation and security interest, pari passu, in the amount of $195,000.00 in the Loans made by M&I Marshall and Ilsley Bank (the "Bank"), to Borrowers, as further described in that certain Participation Agreement dated as of September 23, 2009 entered into by Participant and Lead Lender and that, effective as of September 23, 2009 Participant holds a total monetary participation in the Loans of $500,000.00.00 ("Participating Amount"), representing 7.4079% ("Participation Percentage") in the Loans.

Participant shall be entitled to receive the Participation Percentage of all principal payments, interest payments, origination fees, default interest payments, net proceeds from sale of Collateral for the Loans, payments from guarantors of the Loans, net amounts realized from litigation relating to the Loans against any third party, and all other monetary benefits arising out of ownership of the Loans as purchased from the Bank. Ownership of the Participation Interest also requires the Participant to pay the Participation Percentage of all costs and expenses relating to administration, documentation, closing, foreclosure, litigation, preservation of Collateral for the Loans and all other costs arising out of ownership of the Loans.

The obligation of Lead Lender to disburse any amounts owing to Participant shall be a limited recourse obligation of Lead Lender meaning that Lead Lender shall be obligated to disburse funds to Participant on a pro rata and pari passu basis only, along with other participants in the Loans, and only to the extent that Lead Lender actually receives good funds for disbursement from the Borrowers or otherwise from realization on the Collateral for the Loans. The Participant has agreed to contribute its Participation Percentage of all future advances and other costs and expenditures required by Participant for the Loans as provided in the Participation Agreement. Participant is administering the Loans pursuant to the Participation Agreement and to similar participation agreements entered into with other participants in the Loans. The terms of this instrument are governed by and are subject in all respects to the provisions of the Participation Agreement.

> SILVERLEAF FINANCIAL 6, LLC, a Utah limited
> liability company
> By: SilverLeaf Financial, LLC, Manager
>    By: SilverLeaf Ventures, LLC, Manager
>       By: Shane Baldwin, Manager

Date: 9/24/09

EXHIBIT B

# RISK FACTORS

AN INVESTMENT IN PARTICIPATION INTERESTS INVOLVES SIGNIFICANT RISKS. THE INVESTOR SHOULD INDEPENDENTLY EVALUATE THE LEAD LENDER, THE MANAGER AND THE INTERESTS OFFERED BY THIS AGREEMENT AND ANY AND ALL INFORMATIONAL MATERIAL CONCERNING THIS INVESTMENT. THEREFORE, EACH PROSPECTIVE INVESTOR CONSIDERING PURCHASING THESE INTERESTS SHOULD RECOGNIZE THE RISKY AND SPECULATIVE NATURE OF THIS INVESTMENT AND TAKE WHATEVER STEPS ARE NECESSARY TO SATISFY HIMSELF THAT THIS INVESTMENT IS PROPER IN LIGHT OF HIS INVESTMENT EXPERIENCE AND ECONOMIC CONDITION. THE PRINCIPAL OF THE MANAGER, D. SHANE BALDWIN, WILL ENDEAVOR TO ANSWER ANY AND ALL QUESTIONS POTENTIAL INVESTORS MAY HAVE CONCERNING THIS OFFERING.

*This offering involves a high degree of risk. In addition to the other information set forth in this Agreement, the following risk factors should be considered carefully, among other risks, in evaluating an investment in the Interests. Actual results could differ materially from those discussed in this Agreement. Factors that could cause or contribute to such differences include those discussed below, as well as those discussed elsewhere in this Agreement. The list of risk factors below is not an exhaustive list, and many other risk factors that are unforeseen at this time could prevent the Lead Lender from achieving its investment objectives. No investment should be made by any person who is not in a position to lose his entire investment.*

Participant acknowledges that its purchase of the Participation Interest is subject to the following risks, together with all other risks inherent in a real estate loan and together with all risks described in this Agreement:

    ***Speculative Nature of Investment.*** Investment in a Participation Interest is highly speculative. Participant assumes a substantial degree of risk that may lose its entire investment. The success of any investment in the Participation Interest may be determined by factors beyond the control of the management of Lead Lender and cannot be predicted at this time. Accordingly, only investors who are able to bear the loss of their entire investment should consider an investment in a Participation Interest.

    ***Risk of Non-payment of the Loan(s).*** Although the Loan(s) will be secured by a [*false*] Mortgage or Trust Deed, there can be no assurance that the Loan(s) will be repaid, or that [*one loan is*] the Borrowers will not declare bankruptcy or litigate in an attempt to prevent Lead [*unsecured*] Lender from collecting amounts owed it under the Loan(s). There can also be no assurance that the Collateral for the Loan(s) will be adequate to repay the Loan(s) if the Collateral is foreclosed upon by Lead Lender. **The Participation Interest is unsecured.**

*Potential Foreclosure Problems.* If the Loan(s) are not paid by the Borrowers in full when due, Lead Lender will not be able to make payments to Participant without foreclosing on the Collateral for the Loan(s). Foreclosure is a legal process that may require substantial delay and expense. Lead Lender's ability to foreclose may be delayed if the Borrowers become subject to bankruptcy protection. In addition, a bankruptcy court could require any payments made by the Borrowers within 90 days before the bankruptcy filing to be returned by Lead Lender. If Lead Lender acquires property as the result of foreclosure, Lead Lender may be unable to resell the property for cash in a prompt manner or at fair market value. Any delay or discount associated with foreclosure may adversely affect the return paid by Lead Lender to Participant.

*Restrictions on Transfer.* Participant should be prepared to hold the Participation Interest for an indefinite period. The Participation Interest may not be resold unless it is subsequently registered under the Securities Act and applicable state securities laws or exemptions from such laws exist. Lead Lender has no obligation to register the Participation Interest. There is no public market for the Participation Interest. An investment in the Participation Interest is not suitable for persons who may need to liquidate their investment quickly.

*The Participation Interests are Not Insured.* The Participation Interests are neither insured by any governmental agency, as are certain investments issued by financial institutions such as commercial banks, savings institutions, or credit unions, nor are they guaranteed by any other agency. Thus, the risk of loss to Participants is substantially higher than the risks incurred by Investors in insured securities issued by traditional financial institutions.

*Tax Considerations and Risks.* Each individual Investor may have very different tax requirements and/or needs. These various situations may impose additional risks and/or tax requirements on any given Investor depending on the nature and extent of their involvement with the Company. All Investors and/or potential Investors are strongly encouraged to consult with qualified tax authorities and/or advisors about the possible existence and nature of any such risks before investing with the Company.

*Litigation To Delay Foreclosure Or Enforcement Of Guaranties.* Borrowers are likely from time to time to attempt to use litigation threats and/or actual litigation proceedings or bankruptcy filings as a way of preventing or delaying exercise of remedies by the Lead Lender. Such litigation could be based on various theories of lender liability, equitable defenses or other theories. While the Lead Lender believes that all such theories are without merit, there can be no assurance that such theories will not succeed from time to time. Lead Lender has no way of preventing a real estate transaction borrower from seeking bankruptcy protection as a strategy to avoid loss of collateral securing a loan made to the borrower. If this occurs, there can be no assurance that Lead Lender will be deemed to be a secured creditor in the bankruptcy proceeding, or that, even as a secured creditor in the bankruptcy, the Lead Lender will be able to obtain relief from the automatic stay of bankruptcy in order to foreclose upon collateral for the real estate transaction or to enforce other remedies to which Lead Lender believes it is entitled.

*No Detailed Knowledge Of Local Real Estate Conditions Or Markets.* Lead Lender intends to make investments in Loans only in circumstances where it believes that the collateral for or other property involved in the transactions is sufficient for Lead Lender to realize a profit from its activities. However, because the Lead Lender expects to make or enter into transactions throughout the United States and possibly in foreign countries, there can be no assurance that Lead Lender will know that the collateral will in fact be worth more than the amount paid. Lead Lender will inevitably be making investments in real estate markets in which it is not familiar with trends or values. This lack of familiarity may lead to impaired or inadequate collateral, despite the Lead Lender's good faith efforts to verify values using sources and information other than that provided by borrowers. Loans made outside the United States may involve additional risks of foreign property and lending laws and currency risks.

*No Financial Covenants For Borrowers Or Guarantors, No Monitoring Of Guarantor Net Worth During Loan Term.* The financial condition of borrowers or guarantors may change adversely during the term of one or more of the Loans, and that the Lead Lender may not be aware of such changes until after a payment default occurs, and that adverse change in the credit worthiness of a borrower or guarantor will not automatically result in a breach of any loan documents.

*No Guaranteed Returns.* Even if the Lead Lender succeeds in its objectives, there is never at any time, whether express or implied, a guaranteed return on    investment or return on principal.

*General Economic Conditions Could Affect our Objectives.* Lead Lender will be subject to general and local economic conditions as well as to competitive factors affecting Lead Lender's objectives. Any return on your investment will depend on a number of factors that include business cycles, national and local events, legislation and regulation affecting the Lead Lender's business in general, and changes in state and federal income tax laws. Additionally, the Lead Lender's business may be subject to losses as a result of natural disasters or acts of terror, or environmental hazards. Similarly, wars (including the potential for war), terrorist activity (including threats of terrorist activity), political unrest and other forms of civil strife as well as geopolitical uncertainty, acts of god or force majeure have caused in the past, and may cause in the future, our results to differ materially from our anticipated results. The occurrence of these factors cannot be predicted at this time and many of them are beyond the control of the Lead Lender.

*Purchaser Has No Voting Rights And May Not Participate In Management Of The Lead Lender.* The Participants will not be entitled to participate in the management of the Lead Lender or its business. The Manager will have exclusive management authority with respect to the Lead Lender's business. This Agreement provides that the Manager and Lead Lender will not be liable to the Participants for errors of judgment or other acts or omissions if they do not amount to willful misconduct or gross negligence. Therefore, you may have more limited rights against the Manager and/or Lead Lender than you would absent these provisions in the Agreement.

## REGULATORY RISKS

*Compliance with Securities Laws.* The Participation Interest described in this Agreement are being offered pursuant to section 4(2) of the Act and/or Regulation D of the Securities Act of 1933, which concerns transactions involving limited offers and sales without registration with the Securities and Exchange Commission or any state securities regulator. The exemptions are based, to a significant extent, on the representations and warranties made by each Investor/Participant. However, there can be no assurance that the Lead Lender currently qualifies or will continue to qualify under such exemption provisions. If the Company should fail to comply with every requirement of the available exemptions, the holders may have the rights to rescind their purchase of the securities. Compliance with securities regulations is highly technical. There can be no assurance that the Lead Lender will be able to secure the funds to repurchase the Participation Interest if any holder(s) should obtain a right of rescission of his investment commitment hereunder. If, and to the extent claims or suits for rescission are brought and successfully concluded for failure to: (i) register the securities offered hereby or (ii) qualify under applicable exemptions, such an event would have a material and adverse impact on the Lead Lender for which no contingency reserve has been established.

## RISKS RELATED TO THE LEAD LENDER

*Lack Of Operating History Of The Lead Lender.* The Lead Lender was organized in September of 2007 and has a limited operating history upon which you may evaluate the Lead Lender's future performance.

*No Regulatory Oversight Of The Lead Lender.* The Lead Lender is not, and will not be, registered as an "investment advisor" as that term is defined in the Investment Advisors Act of 1940 or any other law or regulation. Consequently, Participants will not benefit from some of the protections afforded by such laws, including oversight by the SEC or any other U.S. authority.

*Exculpation Of The Lead Lender.* The Agreement provides for exculpation of Lead Lender and officers against claims arising from certain conduct on behalf of the Lead Lender.

*Critical Involvement Of Lead Lender's Management And/Or Principals.* Lead Lender generates returns that are dependent on Lead Lender's management and principals. Therefore, if any or all of the principals should die, become mentally incapacitated, suffer a situation-critical accident, incur legal incapacity of such a nature as to preclude them from participating in Lead Lender's activities, or in any other way leave Lead Lender, then Lead Lender may be unable to maintain its performance. Even if the principals remain in good health and faculty, there remains a risk in the reliance on the judgment of said principals. While the Lead Lender and the principals are dedicated to their fiduciary duty to promote the best interests of the Participants, even at their best level of performance and capability there potentially remains the risk of mistakes, improper judgment, or other incompetence.

*Limited Personal Liability of Lead Lender's Management and/or Principals.* The limited liability structure of the Lead Lender shields its principals from personal liability for the partial or complete loss of investment in Participation Interests of the Lead Lender, provided that the Lead Lender and its principals can demonstrate that it/they has/have been operating in accordance with good faith efforts to comply with legal requirements and due care. Furthermore, this Agreement and the Exhibits attached hereto and other documentation are examples and proof of the due diligence taken by the Lead Lender. In case of partial or total loss of investment, these documents will legally show that the Lead Lender exercised due diligence in disclosing to and informing the Participant or potential participant the ultimate risk involved in the purchase of Participation Interests.

*Possible Conflict of Interest of Lead Lender Principals, and/or Management.* Lead Lender's principals and/or management may be involved in many separate, distinct, and related or unrelated business activities. As a result, the Lead Lender's managers/principals may not dedicate his/their full time and attention to any given transaction.

*Lack of Diversification.* Due to the nature of the Lead Lender's real estate-oriented investment strategy, the Lead Lender's portfolio will be concentrated in a limited number of real estate and loans secured by underlying collateral investments. Thus, the Lead Lender is expected to have limited diversification. In addition, if the Lead Lender makes an investment in a single transaction with the intent of refinancing or selling a portion of the investment, there is a risk that the Lead Lender will be unable to successfully complete such a financing or sale. This could lead to increased risk as a result of the Lead Lender having an unintended long-term investment and reduced diversification. The full amount of a Participant's Participation Interest may be invested in one single loan secured by a first-position deed of trust or a pool of loans secured by collateral. Due to this lack of diversification, the Lead Lender and Participant may be forced to hold this one investment indefinitely or at a substantial loss.

*Leverage.* The Lead Lender may use leverage in connection with its one or more of its principal investments. In addition, the Lead Lender has the authority to leverage its investments with non-recourse debt financing. The Lead Lender may also obtain recourse debt financing in select situations to allow it to close transactions quickly and on favorable terms. Although the use of leverage may enhance returns and increase the number of investments that can be made, it may also substantially increase the risk of loss.

*Third Party Fraud.* The Lead Lender could be subject to losses due to fraudulent and negligent acts on the part of third parties, including borrowers, brokers, sellers and vendors.

*Uncollectability of Loans.* The Lead Lender may purchase real estate related loans from affiliated companies. Each of these loans may be in default. In addition, the Lead Lender may be required to expend monies in connection with foreclosure proceedings

and other remedial actions which could adversely affect the performance of the Lead Lender. Certain loans entered into by Lead Lender may be effected by economic, political, interest rate and other risks, any of which could result in an adverse change in the value of the asset or other property that is used as collateral for the loan.

*No Separate Counsel.* The attorneys, accountants and others who have performed services for the Lead Lender in connection with this offering, and who will perform services for the Lead Lender in the future, have been and will be selected by the Lead Lender or the Manager. No independent counsel has been retained to represent the interests of investors/Participants. You are therefore urged to consult your own counsel as to the terms and provisions of this Agreement and all other related documents.

The attorneys, accountants and other service providers to the Lead Lender will not oversee or monitor the Lead Lender's investment activities and Participants should not rely on them to do so.

*ULTIMATE RISK:* ULTIMATELY, FOR ANY OF THE ABOVE REASONS, OR FOR ANY OTHER REASON NOT LISTED, OR ANY COMBINATION OF POSSIBLE REASONS, EACH PARTICIPANT ASSUMES FULL LIABILITY FOR THIS INVESTMENT. THE INVESTMENT MAY BE LOST IN ITS ENTIRETY OR MAY NEVER BE REPAID, WITH THE RESULT THAT A PARTICIPANT MAY HAVE TO HOLD HIS INVESTMENT FOR AN INDEFINITE AND/OR INFINITE PERIOD OF TIME. THE EFFORTS, EXPECTATIONS AND/OR EXERCISES DO NOT GUARANTEE, OFFER, IMPLY, OR WARRANT ANY TYPE OF ABSOLUTE SECURITY AGAINST COMPLETE LOSS OF INVESTMENT AND/OR AN INFINITE PERIOD ON NON-REPAYMENT.

**EXHIBIT C**

<u>Information about the Loans</u>

Previously provided

# EXHIBIT D

## SUITABILITY OF INVESTMENT

### GENERAL SUITABILITY STANDARDS

*Qualified Subscribers.* SilverLeaf Financial 5, LLC (the "Lead Lender") has adopted as a general investor/participation suitability standard the requirement that each investor/participant represents in writing that: (1) he is acquiring the participation interests ("Participation Interests") for investment and not with a view of resale or distribution; (2) he can bear the economic risk of losing his entire investment; (3) his overall commitment to investments which are not readily marketable is not disproportionate to his net worth, and his investment in the Loans will not cause such overall commitment to become excessive; (4) he has adequate means of providing for his current and future needs and has personal contingencies and has no need for liquidity of his investment; and (5) he has substantial experience in making investment decisions of this type, or is relying on his own purchaser representative, in making this investment decision.

Participation Interests will be made only to a person (other than to an accredited investor, as that term is defined in Regulation D promulgated under the Securities Act of 1933 (the "Act"), as set forth below, or in applicable state securities laws if more stringent that Regulation D) whom the Lead Lender believes and has the reasonable grounds to believe immediately prior to each such sale, and upon making reasonable inquiry, (1) has a preexisting personal and business relationship with the Lead Lender or its officers or directors, or (2) either by reason of his business or financial experience, or the business and financial experience of his professional advisor (such as an attorney, accountant or other advisor) who is unaffiliated with the Lead Lender, has the capacity to evaluate the risks and merits of, and protects his own interests in connection with this offering.

Each Participant desiring to purchase Participation Interests in this offering will be required to represent that he is acquiring the Participation Interests for his own account for investment and not with a view to resale or distribution or subdivisions thereof, and that he meets the above suitability requirements.

**Because the Participation Interests will be offered without registration under the Act in reliance upon an exemption therefrom, a Participant will be required to represent that he knows that the securities have not been registered under the Act, that he has no right to require such registration and that he understands that his right to transfer his securities will be subject to restrictions unless the transfer is not in violation of the Act or applicable state securities laws.**

*Accredited Investors and Non-Accredited Investors.* A purchase of Participation Interests such as is described in this Agreement, is suitable only for persons or entities of adequate financial means that have no need for immediate or short-term liquidity from this investment and who can afford to bear the risks inherent in an investment of the nature discussed herein. Accordingly, Participants will not be admitted until the Participant has demonstrated to

the satisfaction of the Lead Lender, and its legal counsel, that the subscriber meets the aforementioned suitability standards or otherwise is an "accredited investor" as that term is defined under Rule 501 of Regulation D of the Act. However, a maximum of thirty-five (35) non-accredited investors may be admitted at the discretion of the Lead Lender. Regulation D provides, in part, that an "accredited investor" shall generally mean any person or entity that, at the time of purchase of the securities is:

*Accredited Investor.* Accredited investor shall mean any person who comes within any of the following categories, or who the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

1. Any bank as defined in section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to section 15 of the Securities Exchange Act of 1934; any insurance company as defined in section 2(a)(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

2. Any private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940;

3. Any organization described in section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

4. Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

5. Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000;

6. Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

7. Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) and

8. Any entity in which all of the equity owners are accredited investors.

The suitability standards set forth above represent minimal suitability requirements for Participants, and the satisfaction of such standards by a prospective Participant does not necessarily mean that the Participation Interests are a suitable investment for him. Prior to making a decision to acquire the Participation Interests, each prospective Participant is urged to carefully examine his own financial situation and, where applicable, review his present financial situation with his professional advisors in order to determine whether he meets the foregoing criteria.



## Comments On Pooled September Commercial Mortgage Notes

The loans on the attached excel summary have been selected from a much more extensive list of loans. SilverLeaf Financial has been awarded the right to purchase these notes for the prices shown. On average the price at which we have been awarded right to purchase the loans is $44/SF, with the purchase price being 45% of face value. The price range/SF is from $28 - $129. It should be recognized that the borrower at one time had equity in each note; therefore, the discount becomes even more significant from the actual historical cost.

Accredited investors would be allowed to participate in this pool as equity investors after signing a participation agreement. Our plan is to accept capital on a first-in basis. Profits are assigned to each dollar of purchase price on a 60% investor 40% Silverleaf split basis. The 60% profit to equity investors would be split pro-rata based upon the percentage of the purchase price they funded. The pooled nature of the loans diversifies risk for the investor; whereas, the investment would be spread over multiple assets in different classes, spanning much of the country.

These are loans that were owned by a bank and sold. Presumably, this was done because the bank did not have the time or wherewithal to work them out. These notes are classified as non-performing assets. We are targeting a workout period of no longer than 12 months.

As a note of interest, we are not allowed to talk to the borrower or tenants under the executed confidentiality agreements until we have paid the bid purchase amount in full. Furthermore, we expect that review of this summation material would be treated in a similar confidential fashion. We are given limited information from the seller that provides the means to perform due diligence. With that information and other available information in the market, such as local commercial realtors, we have completed due diligence on each note. Given more time and more information, other facts may have become known to us that would have caused us to reach a different conclusion on a particular note as an investment within this pool.

While it is intended that the participation will be raised as an entire pool, it is possible that one or more of the notes will be removed from the pool prior to closing.

# EXHIBIT B

## BID SUMMARY SHEET

## SCHEDULE 1.A - LOANS

| Asset Name | UPB | Purchase Price (%) | Purchase Price ($) |
|---|---|---|---|
| AZ-6 - Robert & James Chadderton | $481,282 | 40.00% | $192,513 |
| IN-2 - Eagle Creek Commons | $1,574,016 | 52.54% | $826,988 |
| IN-3 - Tippecanoe Shoppes | $1,388,895 | 50.23% | $697,656 |
| OH-1 - Tylersville Station | $2,216,978 | 52.74% | $1,169,234 |
| AZ-8 - Walter B. Johnson | $742,540 | 52.23% | $387,829 |
| AZ-16 - Parry & Juhl Relationship | $6,640,487 | 41.10% | $2,729,324 |
| L-1 - Martin Capital, LLC | $3,077,133 | 43.36% | $1,334,396 |
| Total Proceeds to Seller | $16,121,331 | 45.52% | $7,337,942 |

Deposit for Loans: $733,794

## SCHEDULE 1.B – REAL ESTATE OWNED

| Asset Name | Property Address | Purchase Price ($) |
|---|---|---|
| Not Applicable | | $0 |
| Total Proceeds to Seller | | $0 |

Deposit for Real Estate Owned: $0.00

Total Deposit for Loans and Real Estate Owned: $733,794

41969B2_2

# EXHIBIT C

10:00 AM
06/29/10

# Silverleaf Financial 5
## Statement of Cash Flows
### January through June 2010

| | Jan - Jun 10 |
|---|---|
| **OPERATING ACTIVITIES** | |
| Net Income | -148,712.27 |
| Adjustments to reconcile Net Income | |
| to net cash provided by operations: | |
| Borrower Escrow Reserves:Parry & Juhl #43494638-10000 | -2,197.83 |
| Borrower Escrow Reserves:Parry & Juhl #40749170-10001 | -4,874.99 |
| Borrower Escrow Reserves:Parry & Juhl #40749170-10000 | -377.50 |
| Due to/from SLF 6 | 146,702.17 |
| Due to/From Silverleaf Financla | -32,603.84 |
| I/P Nick Lanphier:Distributions | -138,678.64 |
| **Net cash provided by Operating Activities** | -180,742.90 |
| **INVESTING ACTIVITIES** | |
| 2010 · Land | -153,435.19 |
| 2030 · Buildings | -2,446,368.66 |
| 2200 · Notes Receivable:N/R Tylersville Station:Reduction of Principal | 9,845.67 |
| 2200 · Notes Receivable:N/R Eagle Creek Commons:Reduction of Principal | -577.96 |
| 2200 · Notes Receivable:N/R Martin Capital:Reduction of Principal | 84,621.18 |
| 2200 · Notes Receivable:N/R Parry & Juhl Pepper:Parry & Juhl Pepper Note | 2,969,282.35 |
| 2200 · Notes Receivable:N/R Parry & Juhl Pepper:Purchase Discount | -1,736,368.00 |
| 2200 · Notes Receivable:N/R Parry & Juhl Pepper:Reduction of Principal | -23,400.00 |
| 2200 · Notes Receivable:N/R Parry & Juhl Sunnyslope Phx:Parry & Juhl Sunny Phoenix Note | 818,161.56 |
| 2200 · Notes Receivable:N/R Parry & Juhl Sunnyslope Phx:Purchase Discount | -478,442.00 |
| 2200 · Notes Receivable:N/R Parry & Juhl Sunnyslope Phx:Reduction of Principal | -9,700.00 |
| 2200 · Notes Receivable:N/R Parry & Juhl Suntree:Parry & Juhl Suntree Note | 1,691,736.35 |
| 2200 · Notes Receivable:N/R Parry & Juhl Suntree:Purchase Discount | -989,289.00 |
| 2200 · Notes Receivable:N/R Parry & Juhl Suntree:Reduction of Principal | -7,200.00 |
| 2200 · Notes Receivable:N/R Parry I&I Juhl Mellow:Parry & Juhl Mellow Note | 588,452.72 |
| 2200 · Notes Receivable:N/R Parry I&I Juhl Mellow:Purchase Discount | -344,114.00 |
| 2200 · Notes Receivable:N/R Parry-I&I-Juhl-Mellow:Reduction-of-Principal | -6,696.00 |
| 2200 · Notes Receivable:N/R Tippecanoe Shoppes:Reduction of Principal | -36,342.67 |
| 2200 · Notes Receivable:N/R Land Maricopa:Land Maricopa Note | 369,528.19 |
| 2200 · Notes Receivable:N/R Land Maricopa:Purchase Discount | -218,091.00 |
| **Net cash provided by Investing Activities** | 81,796.54 |
| **Net cash increase for period** | -98,946.36 |
| **Cash at beginning of period** | 121,745.28 |
| **Cash at end of period** | 22,798.92 |

# EXHIBIT D



## Maricopa County
### Treasurer's Office

| Tax Bill | Tax Summary | Pay Online! | Valuations | Home |
|----------|-------------|-------------|------------|------|
| Address | Update Address | Activities | Tax Receipt | New Parcel |

### 2008 Tax Detail - Parcel 143-14-021A 8

| Area Code | 400700 | Assessed Tax | $26,478.84 |
|-----------|--------|--------------|-----------|
| Exemption Status | | Half Tax | |

| Amounts Paid | | | | Tax Percentages | |
|--------------|---|---|---|-----------------|---|
| Tax Paid | $26,478.84 | | | Primary Tax | 53.580% |
| Interest Paid | $6,775.67 | | | Secondary Tax | 44.520% |
| Fees Paid | $974.19 | | | Flood Tax | 1.393% |
| ------------ | | | | Special District Tax | 0.510% |
| Total Paid | $34,228.70 | | | | |

| Special District Taxes | | | | |
|-----|------|------------|-----|----------|
| District | Name | Percentage | Tax | Tax Paid |
| 30002 | WEST-MEC | 100.000% | $134.92 | $134.92 |



| Tax Bill | Tax Summary | Pay Online! | Valuations | Home |
|---|---|---|---|---|
| Address | Update Address | Activities | Tax Receipt | New Parcel |

## Tax Summary - Parcel 143-14-021A 8

| Total Due | $0.00 |
|---|---|

Click on the year to go to tax detail.

Click on the amount due for a tax stub printout.

| Tax Year | Status | Assessed Tax | Tax Paid | Amount Due |
|---|---|---|---|---|
| 2010 | Paid | $28,335.06 | $28,335.06 | $0.00 |
| 2009 | Paid | $27,699.22 | $27,699.22 | $0.00 |
| 2008 | Redeemed Tax Lien | $26,478.84 | $26,478.84 | $0.00 |
| 2007 | Paid | $26,469.94 | $26,469.94 | $0.00 |
| 2006 | Paid | $26,070.30 | $26,070.30 | $0.00 |
| 2005 | Paid | $27,049.92 | $27,049.92 | $0.00 |
| 2004 | Paid | $24,808.34 | $24,808.34 | $0.00 |
| 2003 | Paid | $23,386.06 | $23,386.06 | $0.00 |
| 2002 | Paid | $20,766.16 | $20,766.16 | $0.00 |
| 2001 | Paid | $20,569.20 | $20,569.20 | $0.00 |
| 2000 | Paid | $20,718.74 | $20,718.74 | $0.00 |
| 1999 | Paid | $19,896.16 | $19,896.16 | $0.00 |
| 1998 | Paid | $20,840.02 | $20,840.02 | $0.00 |
| 1997 | Paid | $17,801.76 | $17,801.76 | $0.00 |
| 1996 | Paid | $17,590.16 | $17,590.16 | $0.00 |
| 1995 | Paid | $19,224.20 | $19,224.20 | $0.00 |
| 1994 | Paid | $17,845.06 | $17,845.06 | $0.00 |
| 1993 | Paid | $18,870.44 | $18,870.44 | $0.00 |
| | | | Total Due | $0.00 |

Please call (602) 506-8511 for any questions concerning the Amount Due.

*Most Recent Mailing    Tax Bill    New Parcel    Treasurer's Home Page    Current Assessed Value    Parcel Map

*Note — Adobe Reader 7.0 or higher required.



| Tax Bill | Tax Summary | Pay Online! | Valuations | Home |
|----------|-------------|-------------|------------|------|
| Address | Update Address | Activities | Tax Receipt | New Parcel |

| 2010 Tax Detail - Parcel 153-28-019H 7 | | | | |
|---|---|---|---|---|
| Area Code | 681300 | Assessed Tax | | $15,661.36 |
| Exemption Status | | Half Tax | | |

| Amounts Paid | | | Tax Percentages | |
|---|---|---|---|---|
| Tax Paid | $15,661.36 | | Primary Tax | 50.480% |
| Interest Paid | $0.00 | | Secondary Tax | 48.180% |
| Fees Paid | $0.00 | | Flood Tax | 1.344% |
| | | | Special District Tax | 0.000% |
| Total Paid | $15,661.36 | | | |

| Special District Taxes | | | | |
|---|---|---|---|---|
| District | Name | Percentage | Tax | Tax Paid |
| No Records | | | | |



| Tax Bill | Tax Summary | Pay Online! | Valuations | Home |
|----------|-------------|-------------|------------|------|
| Address | Update Address | Activities | Tax Receipt | New Parcel |

| 2009 Tax Detail - Parcel 153-28-019H 7 | | | |
|---|---|---|---|
| Area Code | 681300 | Assessed Tax | $20,095.86 |
| Exemption Status | | Half Tax | |

| Amounts Paid | | | Tax Percentages | |
|---|---|---|---|---|
| Tax Paid | $20,095.86 | | Primary Tax | 57.290% |
| Interest Paid | $2,947.32 | | Secondary Tax | 41.500% |
| Fees Paid | $0.00 | | Flood Tax | 1.208% |
| ------------ | | | Special District Tax | 0.000% |
| Total Paid | $23,043.18 | | | |

| Special District Taxes | | | | |
|---|---|---|---|---|
| District | Name | Percentage | Tax | Tax Paid |
| No Records | | | | |



| Tax Bill | Tax Summary | Pay Online! | Valuations | Home |
| Address | Update Address | Activities | Tax Receipt | New Parcel |

| 2008 Tax Detail - Parcel 153-28-019H 7 | | | |
|---|---|---|---|
| Area Code | 681300 | Assessed Tax | $16,787.42 |
| Exemption Status | | Half Tax | |

| Amounts Paid | | Tax Percentages | |
|---|---|---|---|
| Tax Paid | $16,787.42 | Primary Tax | 48.490% |
| Interest Paid | $5,924.62 | Secondary Tax | 50.030% |
| Fees Paid | $894.37 | Flood Tax | 1.486% |
| ------------- | | Special District Tax | 0.000% |
| Total Paid | $23,606.41 | | |

| Special District Taxes | | | | |
|---|---|---|---|---|
| District | Name | Percentage | Tax | Tax Paid |
| No Records | | | | |

Maricopa County Tax History                                              Page 1 of 1



| Tax Bill | Tax Summary | Pay Online! | Valuations | Home |
| Address | Update Address | Activities | Tax Receipt | New Parcel |

### Tax Summary - Parcel 153-28-019H 7

| Total Due | $0.00 |

Click on the year to
go to tax detail.

Click on the amount due
for a tax stub printout.

| Tax Year | Status | Assessed Tax | Tax Paid | Amount Due |
|---|---|---|---|---|
| 2010 | Paid | $15,661.36 | $15,661.36 | $0.00 |
| 2009 | Paid | $20,095.86 | $20,095.86 | $0.00 |
| 2008 | Redeemed Tax Lien | $16,787.42 | $16,787.42 | $0.00 |
| 2007 | Paid | $15,727.32 | $15,727.32 | $0.00 |
| 2006 | Paid | $16,295.42 | $16,295.42 | $0.00 |
| 2005 | Paid | $15,977.74 | $15,977.74 | $0.00 |
| 2004 | Paid | $13,975.62 | $13,975.62 | $0.00 |
| 2003 | Paid | $13,837.00 | $13,837.00 | $0.00 |
| 2002 | Paid | $12,050.02 | $12,050.02 | $0.00 |
| 2001 | Paid | $10,730.60 | $10,730.60 | $0.00 |
| 2000 | Paid | $10,658.20 | $10,658.20 | $0.00 |
| 1999 | Paid | $9,796.70 | $9,796.70 | $0.00 |
| 1998 | Paid | $10,080.02 | $10,080.02 | $0.00 |
| 1997 | Paid | $7,514.02 | $7,514.02 | $0.00 |
| 1996 | Paid | $6,586.98 | $6,586.98 | $0.00 |
| 1995 | Paid | $7,246.00 | $7,246.00 | $0.00 |
| 1994 | Paid | $6,115.08 | $6,115.08 | $0.00 |
| 1993 | Paid | $4,383.94 | $4,383.94 | $0.00 |
| | | | Total Due | $0.00 |

Please call (602) 506-8511 for any questions concerning the Amount Due.

*Most Recent Mailing   Tax Bill   New Parcel   Treasurer's Home Page   Current Assessed Value   Parcel Map

*Note – Adobe Reader 7.0 or higher required.



| Tax Bill | Tax Summary | Pay Online! | Valuations | Home |
|---|---|---|---|---|
| Address | Update Address | Activities | Tax Receipt | New Parcel |

### 2010 Tax Detail - Parcel 158-21-083 7

| | Area Code | 061300 | Assessed Tax | $6,727.46 |
|---|---|---|---|---|
| | Exemption Status | | Half Tax | |

| Amounts Paid | | | Tax Percentages | |
|---|---|---|---|---|
| Tax Paid | $6,727.46 | | Primary Tax | 62.510% |
| Interest Paid | $0.00 | | Secondary Tax | 35.640% |
| Fees Paid | $0.00 | | Flood Tax | 1.388% |
| ------------ | | | Special District Tax | 0.470% |
| Total Paid | $6,727.46 | | | |

| Special District Taxes | | | | |
|---|---|---|---|---|
| District | Name | Percentage | Tax | Tax Paid |
| 30002 | WEST-MEC | 100.000% | $31.36 | $31.36 |

1814 W. Vogel PHX

Interest pd   $1026.95



| Tax Bill | Tax Summary | Pay Online! | Valuations | Home |
| Address | Update Address | Activities | Tax Receipt | New Parcel |

| 2009 Tax Detail - Parcel 158-21-083 7 | | | |
|---|---|---|---|
| Area Code | 061300 | Assessed Tax | $7,002.12 |
| Exemption Status | | Half Tax | |

| Amounts Paid | | | Tax Percentages | |
|---|---|---|---|---|
| Tax Paid | $7,002.12 | | Primary Tax | 57.860% |
| Interest Paid | $1,026.95 | | Secondary Tax | 40.080% |
| Fees Paid | $0.00 | | Flood Tax | 1.509% |
| | | | Special District Tax | 0.550% |
| Total Paid | $8,029.07 | | | |

| Special District Taxes | | | | |
|---|---|---|---|---|
| District | Name | Percentage | Tax | Tax Paid |
| 30002 | WEST-MEC | 100.000% | $38.66 | $38.66 |



| Tax Bill | Tax Summary | Pay Online! | Valuations | Home |
|---|---|---|---|---|
| Address | Update Address | Activities | Tax Receipt | New Parcel |

| Activities - Parcel 158-21-083 7 | | | | |
|---|---|---|---|---|
| Year | Activity Description | Amount | Act Date | Pmt Date |
| 2010 | TAX PREPAYMENT | $89.70 | 12/29/2010 | 12/27/2010 |
| 2010 | TAX PAYMENT | $6,727.46 | 12/29/2010 | 12/27/2010 |
| 2009 | TAX PAYMENT | $8,029.07 | 12/22/2010 | 12/20/2010 |
| 2008 | TAX PAYMENT | $3,517.65 | 4/15/2009 | 4/13/2009 |
| 2008 | TAX PAYMENT | $3,517.65 | 10/27/2008 | 10/22/2008 |
| 2007 | TAX PAYMENT | $3,160.77 | 4/25/2008 | 4/23/2008 |
| 2007 | TAX PAYMENT | $3,160.77 | 10/31/2007 | 10/29/2007 |
| 2006 | TAX PAYMENT | $2,805.81 | 4/27/2007 | 4/27/2007 |
| 2006 | TAX PAYMENT | $2,805.81 | 11/1/2006 | 10/31/2006 |
| 2005 | TAX PAYMENT | $2,816.91 | 4/27/2006 | 4/27/2006 |
| 2005 | TAX PAYMENT | $2,816.91 | 11/1/2005 | 10/31/2005 |
| 2004 | TAX PAYMENT | $2,693.20 | 4/30/2005 | 4/30/2005 |
| 2004 | TAX PAYMENT | $2,693.20 | 10/31/2004 | 10/30/2004 |
| 2003 | TAX PAYMENT | $2,528.60 | 4/20/2004 | 4/20/2004 |
| 2003 | TAX PAYMENT | $2,528.60 | 10/23/2003 | 10/23/2003 |
| 2002 | TAX PAYMENT | $2,267.88 | 4/29/2003 | 4/29/2003 |
| 2002 | TAX PAYMENT | $2,267.88 | 11/1/2002 | 10/31/2002 |
| 2001 | TAX PAYMENT | $2,185.04 | 4/30/2002 | 4/30/2002 |
| 2001 | TAX PAYMENT | $2,185.04 | 10/31/2001 | 10/31/2001 |
| 2000 | TAX PAYMENT | $2,167.22 | 4/26/2001 | 4/25/2001 |
| 2000 | TAX PAYMENT | $2,167.22 | 11/1/2000 | 10/31/2000 |
| 1999 | TAX PAYMENT | $2,167.85 | 4/24/2000 | 4/24/2000 |
| 1999 | TAX PAYMENT | $2,167.85 | 11/1/1999 | 10/29/1999 |
| 1998 | TAX PAYMENT | $2,185.05 | 4/30/1999 | 4/30/1999 |
| 1998 | TAX PAYMENT | $2,185.05 | 10/27/1998 | 10/22/1998 |
| 1997 | TAX PAYMENT | $1,984.13 | 4/20/1998 | 4/20/1998 |
| 1997 | TAX PAYMENT | $1,984.13 | 10/22/1997 | 10/21/1997 |
| 1996 | TAX PAYMENT | $1,793.43 | 5/2/1997 | 4/30/1997 |
| 1996 | TAX PAYMENT | $1,793.43 | 11/4/1996 | 10/31/1996 |
| 1995 | TAX PAYMENT | $1,746.46 | 5/7/1996 | 4/30/1996 |
| 1995 | TAX PAYMENT | $1,746.46 | 11/3/1995 | 10/31/1995 |
| 1994 | TAX PAYMENT | $1,666.08 | 5/9/1995 | 4/26/1995 |
| 1994 | TAX PAYMENT | $1,666.08 | 11/3/1994 | 10/27/1994 |
| 1993 | TAX PAYMENT | $1,849.26 | 4/21/1994 | 4/18/1994 |
| 1993 | TAX PAYMENT | $1,849.26 | 11/4/1993 | 10/29/1993 |



| Tax Bill | Tax Summary | Pay Online! | Valuations | Home |
|----------|-------------|-------------|------------|------|
| Address | Update Address | Activities | Tax Receipt | New Parcel |

| 2010 Tax Detail - Parcel 159-15-036 4 | | | |
|---|---|---|---|
| Area Code | 061300 | Assessed Tax | $3,096.20 |
| Exemption Status | | Half Tax | |

| Amounts Paid | | | Tax Percentages | |
|---|---|---|---|---|
| Tax Paid | $3,096.20 | | Primary Tax | 62.500% |
| Interest Paid | $0.00 | | Secondary Tax | 35.640% |
| Fees Paid | $0.00 | | Flood Tax | 1.388% |
| -------------- | | | Special District Tax | 0.470% |
| Total Paid | $3,096.20 | | | |

| Special District Taxes | | | | |
|---|---|---|---|---|
| District | Name | Percentage | Tax | Tax Paid |
| 30002 | WEST-MEC | 100.000% | $14.44 | $14.44 |



# Maricopa County
## Treasurer's Office

| Tax Bill | Tax Summary | Pay Online! | Valuations | Home |
|---|---|---|---|---|
| Address | Update Address | Activities | Tax Receipt | New Parcel |

| 2009 Tax Detail - Parcel 159-15-036 4 | | |
|---|---|---|
| Area Code | 061300 | Assessed Tax | $4,308.74 |
| Exemption Status | | Half Tax | |

| Amounts Paid | | | Tax Percentages | |
|---|---|---|---|---|
| Tax Paid | $4,308.74 | | Primary Tax | 59.540% |
| Interest Paid | $631.93 | | Secondary Tax | 38.490% |
| Fees Paid | $0.00 | | Flood Tax | 1.449% |
| -------------- | | | Special District Tax | 0.530% |
| Total Paid | $4,940.67 | | | |

| Special District Taxes | | | | |
|---|---|---|---|---|
| District | Name | Percentage | Tax | Tax Paid |
| 30002 | WEST-MEC | 100.000% | $22.84 | $22.84 |



| 2008 Tax Detail - Parcel 159-15-036 4 | | |
|---|---|---|
| Area Code | 061300 | Assessed Tax | $4,132.62 |
| Exemption Status | | Half Tax | |

| Amounts Paid | | | | Tax Percentages | |
|---|---|---|---|---|---|
| Tax Paid | $4,132.62 | | | Primary Tax | 54.890% |
| Interest Paid | $894.44 | | | Secondary Tax | 42.950% |
| Fees Paid | $162.45 | | | Flood Tax | 1.583% |
| | | | | Special District Tax | 0.580% |
| Total Paid | $5,189.51 | | | | |

| Special District Taxes | | | | |
|---|---|---|---|---|
| District | Name | Percentage | Tax | Tax Paid |
| 30002 | WEST-MEC | 100.000% | $23.94 | $23.94 |

Page 1 of 1



| Tax Bill | Tax Summary | Pay Online! | Valuations | Home |
|---|---|---|---|---|
| Address | Update Address | Activities | Tax Receipt | New Parcel |

| Activities - Parcel 159-15-036 4 | | | | |
|---|---|---|---|---|
| Year | Activity Description | Amount | Act Date | Pmt Date |
| 2008 | REDEMPTION PAYMENT | $2,865.25 | 12/22/2010 | 12/20/2010 |
| 2010 | TAX PAYMENT | $3,096.20 | 12/22/2010 | 12/20/2010 |
| 2009 | TAX PAYMENT | $4,940.67 | 12/22/2010 | 12/20/2010 |
| 2008 | TAX LIEN BUYER PAYMENT | $2,486.97 | 2/8/2010 | 2/8/2010 |
| 2008 | TAX PAYMENT | $2,314.26 | 8/4/2009 | 7/31/2009 |
| 2007 | REDEMPTION PAYMENT | $4,897.87 | 6/2/2009 | 5/30/2009 |
| 2007 | TAX LIEN BUYER PAYMENT | $4,636.15 | 2/9/2009 | 2/9/2009 |
| 2006 | TAX PAYMENT | $1,506.14 | 5/22/2007 | 5/21/2007 |
| 2006 | TAX PAYMENT | $1,585.01 | 11/9/2006 | 10/31/2006 |
| 2005 | TAX PAYMENT | $1,560.09 | 5/3/2006 | 4/29/2006 |
| 2005 | TAX PAYMENT | $1,560.09 | 10/31/2005 | 10/28/2005 |
| 2004 | TAX PAYMENT | $1,417.65 | 5/4/2005 | 4/29/2005 |
| 2004 | TAX PAYMENT | $1,380.51 | 11/19/2004 | 11/18/2004 |
| 2004 | TAX PAYMENT | $17.50 | 8/27/2004 | 8/27/2004 |
| 2003 | TAX PREPAYMENT | $17.50 | 7/7/2004 | 6/30/2004 |
| 2003 | TAX PAYMENT | $1,347.53 | 7/7/2004 | 6/30/2004 |
| 2003 | TAX PAYMENT | $1,365.03 | 1/12/2004 | 1/12/2004 |
| 2002 | TAX PAYMENT | $1,170.20 | 5/6/2003 | 4/30/2003 |
| 2002 | TAX PAYMENT | $1,170.20 | 11/1/2002 | 10/31/2002 |
| 2001 | TAX PAYMENT | $2,254.90 | 12/27/2001 | 12/27/2001 |
| 2000 | TAX PAYMENT | $1,099.92 | 5/21/2001 | 5/21/2001 |
| 2000 | TAX PAYMENT | $1,114.39 | 12/27/2000 | 12/27/2000 |
| 1999 | TAX PAYMENT | $73.91 | 12/15/2000 | 12/15/2000 |
| 1999 | TAX PAYMENT | $689.64 | 10/26/2000 | 10/26/2000 |
| 1999 | TAX PAYMENT | $300.00 | 6/28/2000 | 6/28/2000 |
| 1999 | TAX PAYMENT | $508.01 | 1/12/2000 | 1/10/2000 |
| 1999 | TAX PAYMENT | $494.82 | 11/2/1999 | 10/28/1999 |
| 1998 | TAX PAYMENT | $1,034.39 | 4/13/1999 | 4/12/1999 |
| 1998 | TAX PAYMENT | $1,034.39 | 10/23/1998 | 10/16/1998 |
| 1997 | TAX PAYMENT | $936.75 | 4/29/1998 | 4/27/1998 |
| 1997 | TAX PAYMENT | $936.75 | 11/6/1997 | 10/31/1997 |
| 1996 | TAX PAYMENT | $938.69 | 4/23/1997 | 4/22/1997 |
| 1996 | TAX PAYMENT | $938.69 | 10/28/1996 | 10/25/1996 |
| 1995 | TAX PAYMENT | $914.09 | 4/29/1996 | 4/26/1996 |
| 1995 | TAX PAYMENT | $914.09 | 11/3/1995 | 10/31/1995 |
| 1994 | TAX PAYMENT | $872.02 | 5/10/1995 | 4/28/1995 |
| 1994 | TAX PAYMENT | $872.02 | 10/31/1994 | 10/31/1994 |
| 1993 | TAX PAYMENT | $967.97 | 5/6/1994 | 4/30/1994 |
| 1993 | TAX PAYMENT | $993.78 | 12/8/1993 | 12/8/1993 |

3/21/2011



| 2010 Tax Detail - Parcel 159-15-040U 2 | | | | |
|---|---|---|---|---|
| Area Code | 061300 | Assessed Tax | $6,371.84 | |
| Exemption Status | | Half Tax | | |

| Amounts Paid | | | Tax Percentages | |
|---|---|---|---|---|
| Tax Paid | $6,371.84 | | Primary Tax | 62.200% |
| Interest Paid | $0.00 | | Secondary Tax | 35.930% |
| Fees Paid | $0.00 | | Flood Tax | 1.400% |
| | | | Special District Tax | 0.470% |
| Total Paid | $6,371.84 | | | |

| Special District Taxes | | | | |
|---|---|---|---|---|
| District | Name | Percentage | Tax | Tax Paid |
| 30002 | WEST-MEC | 100.000% | $29.96 | $29.96 |

10821 N. 15th Ave PHX.

Interest pd. $877.31

2100.09

Fees Pd   352.35



| Tax Bill | Tax Summary | Pay Online! | Valuations | Home |
|---|---|---|---|---|
| Address | Update Address | Activities | Tax Receipt | New Parcel |

### 2009 Tax Detail - Parcel 159-15-040U 2

| | | | |
|---|---|---|---|
| Area Code | 061300 | Assessed Tax | $5,981.80 |
| Exemption Status | | Half Tax | |

| Amounts Paid | | | Tax Percentages | |
|---|---|---|---|---|
| Tax Paid | $5,981.80 | | Primary Tax | 56.690% |
| Interest Paid | $877.31 | | Secondary Tax | 41.190% |
| Fees Paid | $0.00 | | Flood Tax | 1.551% |
| | | | Special District Tax | 0.570% |
| Total Paid | $6,859.11 | | | |

### Special District Taxes

| District | Name | Percentage | Tax | Tax Paid |
|---|---|---|---|---|
| 30002 | WEST-MEC | 100.000% | $33.94 | $33.94 |



| Tax Bill | Tax Summary | Pay Online! | Valuations | Home |
| Address | Update Address | Activities | Tax Receipt | New Parcel |

| 2008 Tax Detail - Parcel 159-15-040U 2 | | | |
|---|---|---|---|
| Area Code | 061300 | Assessed Tax | $5,946.94 |
| Exemption Status | | Half Tax | |

| Amounts Paid | | Tax Percentages | |
|---|---|---|---|
| Tax Paid | $5,946.94 | Primary Tax | 55.280% |
| Interest Paid | $2,100.69 | Secondary Tax | 42.580% |
| Fees Paid | $352.35 | Flood Tax | 1.570% |
| | | Special District Tax | 0.570% |
| Total Paid | $8,399.98 | | |

| Special District Taxes | | | | |
|---|---|---|---|---|
| District | Name | Percentage | Tax | Tax Paid |
| 30002 | WEST-MBC | 100.000% | $34.16 | $34.16 |



| Tax Bill | Tax Summary | Pay Online! | Valuations | Home |
| Address | Update Address | Activities | Tax Receipt | New Parcel |

| Activities - Parcel 159-15-040U 2 | | | | |
|---|---|---|---|---|
| Year | Activity Description | Amount | Act Date | Pmt Date |
| 2008 | REDEMPTION PAYMENT | $8,389.98 | 12/22/2010 | 12/20/2010 |
| 2010 | TAX PAYMENT | $6,371.84 | 12/22/2010 | 12/20/2010 |
| 2009 | TAX PAYMENT | $6,859.11 | 12/22/2010 | 12/20/2010 |
| 2008 | TAX LIEN BUYER PAYMENT | $7,305.06 | 2/8/2010 | 2/8/2010 |
| 2007 | REDEMPTION PAYMENT | $7,140.66 | 6/2/2009 | 5/30/2009 |
| 2007 | TAX LIEN BUYER PAYMENT | $6,765.38 | 2/9/2009 | 2/9/2009 |
| 2006 | TAX PAYMENT | $2,399.10 | 5/22/2007 | 5/22/2007 |
| 2006 | TAX PAYMENT | $2,367.53 | 11/9/2006 | 10/31/2006 |
| 2005 | TAX PAYMENT | $2,330.91 | 5/3/2006 | 4/29/2006 |
| 2005 | TAX PAYMENT | $2,330.91 | 10/31/2005 | 10/28/2005 |
| 2004 | TAX PAYMENT | $2,001.85 | 5/4/2005 | 4/29/2005 |
| 2004 | TAX PAYMENT | $1,949.42 | 11/19/2004 | 11/18/2004 |
| 2004 | TAX PAYMENT | $24.71 | 8/27/2004 | 8/27/2004 |
| 2003 | TAX PREPAYMENT | $24.71 | 7/7/2004 | 6/30/2004 |
| 2003 | TAX PAYMENT | $1,902.96 | 7/7/2004 | 6/30/2004 |
| 2003 | TAX PAYMENT | $1,927.67 | 1/12/2004 | 1/12/2004 |
| 2002 | TAX PAYMENT | $1,670.72 | 5/7/2003 | 4/30/2003 |
| 2002 | TAX PAYMENT | $1,670.72 | 11/1/2002 | 10/31/2002 |
| 2001 | TAX PAYMENT | $3,219.36 | 12/27/2001 | 12/27/2001 |
| 2000 | TAX PAYMENT | $1,474.54 | 5/21/2001 | 5/21/2001 |
| 2000 | TAX PAYMENT | $1,000.49 | 12/27/2000 | 12/27/2000 |
| 2000 | TAX PAYMENT | $493.45 | 12/15/2000 | 12/15/2000 |
| 1999 | TAX PAYMENT | $252.35 | 12/15/2000 | 12/15/2000 |
| 1999 | TAX PAYMENT | $500.00 | 11/14/2000 | 10/31/2000 |
| 1999 | TAX PAYMENT | $710.74 | 10/26/2000 | 10/26/2000 |
| 2000 | TAX PAYMENT | $500.00 | 10/17/2000 | 10/13/2000 |
| 1999 | TAX PAYMENT | $500.00 | 6/28/2000 | 6/28/2000 |
| 1999 | TAX PAYMENT | $261.18 | 3/2/2000 | 2/9/2000 |
| 1999 | TAX PAYMENT | $275.00 | 2/11/2000 | 2/9/2000 |
| 1999 | TAX PAYMENT | $242.00 | 1/12/2000 | 1/10/2000 |
| 1999 | TAX PAYMENT | $855.37 | 11/2/1999 | 10/28/1999 |
| 1998 | TAX PAYMENT | $1,704.40 | 4/13/1999 | 4/12/1999 |
| 1998 | TAX PAYMENT | $1,704.40 | 10/22/1998 | 10/20/1998 |
| 1997 | TAX PAYMENT | $1,510.16 | 4/29/1998 | 4/27/1998 |
| 1997 | TAX PAYMENT | $1,510.16 | 11/6/1997 | 10/31/1997 |
| 1996 | TAX PAYMENT | $1,513.29 | 4/23/1997 | 4/22/1997 |

| 1996 | TAX PAYMENT | $1,513.29 | 10/28/1996 | 10/25/1996 |
| 1995 | TAX PAYMENT | $1,473.65 | 4/29/1996 | 4/26/1996 |
| 1995 | TAX PAYMENT | $1,473.65 | 11/3/1995 | 10/31/1995 |
| 1994 | TAX PAYMENT | $1,405.83 | 5/10/1995 | 4/28/1995 |
| 1994 | TAX PAYMENT | $1,405.83 | 10/31/1994 | 10/31/1994 |
| 1993 | TAX PAYMENT | $1,560.31 | 5/6/1994 | 4/30/1994 |
| 1993 | TAX PAYMENT | $1,601.92 | 12/8/1993 | 12/8/1993 |



| Tax Bill | Tax Summary | Pay Online! | Valuations | Home |
|---|---|---|---|---|
| Address | Update Address | Activities | Tax Receipt | New Parcel |

| 2010 Tax Detail - Parcel 143-14-021A 8 | | | |
|---|---|---|---|
| Area Code | 400700 | Assessed Tax | $28,335.06 |
| Exemption Status | | Half Tax | |

| Amounts Paid | | Tax Percentages | |
|---|---|---|---|
| Tax Paid | $28,335.06 | Primary Tax | 48.600% |
| Interest Paid | $0.00 | Secondary Tax | 49.720% |
| Fees Paid | $0.00 | Flood Tax | 1.252% |
| | | Special District Tax | 0.420% |
| Total Paid | $28,335.06 | | |

| Special District Taxes | | | | |
|---|---|---|---|---|
| District | Name | Percentage | Tax | Tax Paid |
| 30002 | WEST-MEC | 100.000% | $119.16 | $119.16 |



| Tax Bill | Tax Summary | Pay Online! | Valuations | Home |
|----------|-------------|-------------|------------|------|
| Address | Update Address | Activities | Tax Receipt | New Parcel |

| 2009 Tax Detail - Parcel 143-14-021A 8 | | | | |
|---|---|---|---|---|
| Area Code | 400700 | | Assessed Tax | $27,699.22 |
| Exemption Status | | | Half Tax | |

| Amounts Paid | | | Tax Percentages | |
|---|---|---|---|---|
| Tax Paid | $27,699.22 | | Primary Tax | 49.320% |
| Interest Paid | $4,062.45 | | Secondary Tax | 48.850% |
| Fees Paid | $0.00 | | Flood Tax | 1.343% |
| | | | Special District Tax | 0.490% |
| Total Paid | $31,761.67 | | | |

| Special District Taxes | | | | |
|---|---|---|---|---|
| District | Name | Percentage | Tax | Tax Paid |
| 30002 | WEST-MEC | 100.000% | $136.06 | $136.06 |

# EXHIBIT E

Fw:

From: **Shane Baldwin** (shane@silverleafcompanies.com)
Sent: Tue 11/30/10 4:22 PM
To: joniboulware@hotmail.com

    2 attachments
    image001.jpg (1.8 KB) , UNANIMOUS CONSENT OF PARTICIPANTS TO ACTION _AZ_.pdf (1334.2
    KB)

We are selling some of the AZ apartments and paying the loan. Call me when
you get this.