IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| JONI R BOULWARE and THE JONI R. BOULWARE TRUST,<br><br>    Plaintiffs,<br><br><br><br><br><br>    vs.<br><br><br>DWIGHT SHANE BALDWIN, an individual; MARK STAPLES, an individual; SILVERLEAF FINANCIAL, LLC, a Utah limited liability company; SILVERLEAF VENTURES, LLC, a Utah limited liability company; SILVERLEAF FINANCIAL 5, LLC, a Utah limited liability company; SILVERLEAF FINANCIAL 17, LLC, a Utah limited liability company; and 1333 BON VIEW CORPORATION, a California corporation,<br><br>    Defendants. | MEMORANDUM DECISION AND ORDER ON DEFENDANTS' PARTIAL MOTION TO DISMISS AND TO STRIKE JURY DEMAND AND PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br><br><br><br>Case No. 2:11-CV-762 TS |

This matter is before the Court on Defendants' Partial Motion to Dismiss and to Strike Jury Demand and Plaintiffs' Motion for Partial Summary Judgment.

I.  BACKGROUND

This case arises out of Plaintiffs Joni R. Boulware and the Joni R. Boulware Trust's ("the Trust") investment in two entities: SilverLeaf Financial 5 ("SF5") and SilverLeaf Financial 17 ("SF17").  SF5 is an entity managed by Defendant SilverLeaf Financial, the manager of which was Defendant SilverLeaf Ventures, which was in turn managed by Defendant Shane Baldwin. SF17 has the same structure, but was ultimately managed by Defendant Mark Staples.  The Trust claims that it was defrauded during its relationship with both entities.  The following facts are taken from the Trust's Complaint.

A.     THE TRUST AND SF5

SF5 was formed to purchase loans secured by real property located in Illinois, Arizona, Ohio, and Indiana from Marshall and Isley Bank ("M&I Bank").  After acquiring the loans, SF5 would seek to add value to the loans by selling them, working out new terms with borrowers, attracting new tenants and/or foreclosing on the real property securing the loans.

The managers of SF5 sought out investors such as the Trust to contribute approximately 57% of the price of the loans.  The Trust was offered a 7.4079% interest in the loans in exchange for an investment of $500,000.  The Trust accepted the offer, and the parties entered into the Loan Participation Agreement for SF5.

The Agreement stated that the interest owned by any participant in the investment was "of equal rank and pari passu with the participation interests of all other Participants in the Loans, and no . . . interest shall have preference or priority over any other . . . interest."[1]  Each

_____

[1]Docket No. 2 Ex. A, at 4.

participation interest would be payable on a "pari passu basis with all other participation interests sold by [SF5] and with [SF5's] own ownership interests in the Loans."[2]  The Agreement further provided that the participants were first to receive from SF5 a return of their initial investment, paid out based on the relative ownership interests in the loans, after the costs and expenses arising out of the loans had been dealt with.  After the participants initial investments were returned, the participants were to share in the profits, with 30% going to SF5 and the remaining 70% shared pro rata among the participants.

The managers represented to the Trust that SF5 would contribute the remainder of the purchase price of the loans.  SF5 borrowed the necessary funds from Lincolnshire Associates II, Ltd. ("Lincolnshire"), using the loans SF5 planned to acquire as collateral.  Lincolnshire required SF5 to use loan proceeds to pay off Lincolnshire before making any distributions to investors. SF5 borrowed $3,188,750.00 from Lincolnshire.

Among the loans acquired by SF5 were the Martin and Parry Loans.  Between the time SF5 acquired and sold the Martin Loan, the borrower paid $118,431.778 of interest.  No distribution was made to the Trust from those proceeds.  However, SF5 did cause distributions of the Martin Loan proceeds to be made to Bon View Corporation ("BVC"), another investor in SF5, and to SF5 itself.  On June 10, 2010, SF5 sold the Martin Loan.  SF5 made no distributions to the Trust from the sale of the Martin Loan.

The Parry Loans were secured by vacant parcels and apartment complexes in Arizona. On February 13, 2010, SF5 obtained deeds to all of those properties.  A portion of the proceeds

[2]*Id.* at 11.

3

from those properties was used to pay down the Lincolnshire Loan, without the Trust's

knowledge.  During this time, SF5 failed to pay property taxes on many of the Parry Loans

properties, and substantial interest and fees accrued as a result.  On November 30, 2010, Baldwin

notified the Trust that SF5 would be selling some of the property associated with the Parry Loans

in order to pay off the Lincolnshire Loan.  Baldwin did not disclose that the properties would be

sold to BVC, that the sale would include all of the Parry Loans properties, or that a warranty deed

had already been signed conveying the property to BVC.

On December 8, 2010, Baldwin proposed two options for paying the Trust the

distribution amount it was owed, which totaled at least $353,444.68.  The Trust could either

receive a payment of $353,444.68 and keep its 7.4079% interest in the remaining assets, or it

could leave the proceeds in SF5 in exchange for a 25% interest in a new partnership.  The Trust

elected to receive the outstanding proceeds.

On December 9, 2010, Staples emailed the Trust, explaining that distributions had not

been made "at the partnership level" because proceeds had been used to make tenant

improvements and pay property taxes.[3]

On or around December 10, 2010, the Trust learned that SF5 had been using proceeds

from the loans to pay down the Lincolnshire Loan and had made distributions to BVC.  At the

same time, SF5 informed the Trust that the Parry Loan Properties needed to be sold to pay off the

Lincolnshire Loan, or else Lincolnshire would foreclose on the loans SF5 had purchased.  SF5

thus required the Trust to sign a form consenting to the sale of the Parry Loans properties to a

---

[3]Docket No. 2, at 11.

4

company owned by BVC.  The Trust objected to the low purchase price to be paid by BVC and to the lack of time it would have to review the deal.  The Trust therefore asked for time to have an attorney review the transaction, but Defendant Staples objected, telling the Trust he had to close the deal "now."[4]

Staples represented to the Trust that it would receive all the distributions it was owed from the Martin Loan plus 6% interest until paid and all distributions from the Parry Loans in January 2011.  Staples also promised that the trust would receive detailed monthly reports and quarterly reports from that point on.  The Trust then signed the consent form.

SF5 did not pay the Trust in January 2011.  At the end of that month, the Trust contacted Staples about the payments.  Staples responded that the payments were coming soon.  This scenario repeated itself in February.  Finally, on March 2, 2011, having still received no payment from SF5, the Trust composed a demand letter and sent it to SF5.  To this date, the Trust has received no distributions.

B. THE TRUST AND SF17

On March 25, 2010, SF17 was created through the Silverleaf entities.  On March 29, 2010, Silverleaf Financial approached the Trust about investing in SF17.  The Trust indicated that it might be interested, but did not immediately invest.  Baldwin then called Boulware to ask if the Trust was interested, and Boulware responded that she was still considering the matter on behalf of the trust.  Baldwin responded that the only reason the Trust was being given the opportunity was because another investor had been forced to back out at the last minute and that

---

[4]*Id.* at 12.

if the Trust would not invest Baldwin would do so with his own funds.  Baldwin also stated that

SF5 was preparing to make a distribution to the Trust that month.  Boulware responded that the

Trust would be willing to invest $250,000, but had no interest in becoming involved in a deal

that would be leveraged.  Baldwin assured Boulware that SF17 would not be leveraged, and

Boulware then tentatively agreed to invest.

On April 5, 2010, the trust was provided with a Confidential Private Placement

Memorandum ("PPM").  The PPM stated that SF17's sole purpose was to purchase one loan

from M&I Bank ("the Florida Loan").  The Florida Loan was in the amount of $4,102,780, and

was in default at the time.  The loan was secured by 80 units of the Quality Suites Condo Hotel in

Orlando, Florida.  The purchase price for the loan was to be $2,059,596.

On April 6, the Trust inquired after the proceeds from SF5, and also again asked if SF17

would be leveraged.  Baldwin called the Trust to respond to those concerns.  Baldwin stated that

he had spoken with M&I Bank earlier that day and had learned that one of the guarantors—Anil

Valbh—of the Florida Loan had made a payoff offer of $2,700,000, which could be completed by

the end of April, 2010.  However, Baldwin stated that the bank had agreed to honor its offer to

SF17 to purchase the loan at $2,059,596.  Thus, SF17 stood to gain a quick profit of roughly

$600,000.  Based on this quick profit, Baldwin asked the Trust to invest $500,000 instead of

$250,000.  The Trust agreed, and wired $500,000 to SF17.

On April 14, 2010, M&I Bank assigned the Florida Loan to SF17.  On April 19, 2010,

SF17 transferred the Florida Loan to Cobalt Workout Partners ("Cobalt").  On May 17, 2010,

Cobalt transferred the loan to ITI Ventures LP ("ITI").  ITI began foreclosing on the loan on

6

November 1, 2010.  These transaction were not disclosed to the Trust, and no distributions were made to the Trust.  On July 19, 2010, Boulware emailed Baldwin for information about the Florida Loan.  Baldwin responded indicating that SF17 was working on a sale of the loan. Several months went by with no distributions from SF17.  Eventually, the Trust sent its March 2011 demand letter.

Boulware, conducting her own investigation of the Florida Loan, discovered that it had been transferred to Cobalt and then ITI.  She contacted Staples, demanding an explanation. Baldwin called Boulware and explained that, though the Florida Loan had been transferred to Cobalt, SF17 had retained a "residual interest" in the loan.  Baldwin also represented that Cobalt and ITI were alter egos.

The Trust responded by demanding copies of the agreement between Cobalt and SF17 showing that SF17 had retained a residual interest.  Baldwin responded that he would have to look for a copy.  Boulware then contacted Jeff Carter, the CFO if ITI.  Carter informed Boulware that when it purchased the Florida Loan, there was no retained interest, and that Cobalt and ITI were in no way affiliated.  Carter also stated that Baldwin had contacted him that day and informed him that an investor might be interested in investing $500,000 in the Florida Loan.  The Trust then received a voice mail from Baldwin indicating that he had not actually invested the Trust's money in the Florida Loan but that the Trust could buy into the loan that ITI now owned. Carter again called Boulware and informed her that Baldwin had stated that the Trust had originally signed up for the Florida Loan, but Baldwin had decided to sell that loan and had thus

contacted the Trust about moving the money into another investment.  Baldwin never had such a

discussion with the Trust.

In April 2011, Boulware had a conversation with Valbh, in which he stated that he had

never made a payoff offer on the Florida Loan to M&I Bank.

In May of 2011, the Trust drafted a Complaint and provided a copy to Defendants.  After

receiving the draft copy, Defendants began negotiating with the Trust for a settlement.  The

negotiations were successful, and the parties signed an agreement on August 8, 2011.

Defendants subsequently failed to perform their obligations under the agreement, and this suit

was filed.

Defendants now move to dismiss several of the Trust's causes of action.  The Trust has

moved for partial summary judgment on its claim that Defendants have breached the settlement

agreement between the parties.

## II.  MOTION TO DISMISS

A.      STANDARD OF REVIEW

In considering a motion to dismiss under Rule 12(b)(6), all well-pleaded factual

allegations, as distinguished from conclusory allegations, are accepted as true and viewed in the

light most favorable to Plaintiffs as the nonmoving party.[5]  Plaintiffs must provide "enough facts

to state a claim to relief that is plausible on its face"[6] and the court is not required to accept

---

[5]*Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002).

[6]*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"conclusory allegations without supporting factual averments."[7]  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."[8]  The Supreme Court has explained that a plaintiff must "nudge[ ][his] claims across the line from conceivable to plausible" to survive a motion to dismiss.[9]  As the Tenth Circuit stated:

> [T]he mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims.[10]

The Supreme Court provided greater explanation of the standard set out in *Twombly* in *Ashcroft v. Iqbal*.[11]  In *Iqbal*, the Court reiterated that while Fed. R. Civ. P. 8 does not require detailed factual allegations, it nonetheless requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."[12]  "A pleading that offers 'labels and conclusions'

---

[7]*Cory v. Allstate Ins.*, 583 F.3d 1240, 1244 (10th Cir. 2009).

[8]*Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991).

[9]*Twombly*, 550 U.S. at 570.

[10]*The Ridge at Red Hawk, LLC  v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original).

[11]129 S. Ct. 1937 (2009).

[12]*Id*. at 1949 (citing *Twombly*, 550 U.S. at 555).

or 'a formulaic recitation of the elements of a cause of action will not do.'"[13]  "Nor does a

complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"[14]

The Court in *Iqbal* stated:

> Two working principles underlie our decision in *Twombly*.  First, the tenet
> that a court must accept as true all of the allegations contained in a complaint is
> inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause
> of action, supported by mere conclusory statements, do not suffice.  Rule 8 marks
> a notable and generous departure from the hyper-technical, code-pleading regime
> of a prior era, but it does not unlock the doors of discovery for a plaintiff armed
> with nothing more than conclusions.  Second, only a complaint that states a
> plausible claim for relief survives a motion to dismiss.  Determining whether a
> complaint states a plausible claim for relief will . . . be a context-specific task that
> requires the reviewing court to draw on its judicial experience and common sense.
> But where the well-pleaded facts do not permit the court to infer more than the
> mere possibility of misconduct, the complaint has alleged—but it has not
> show[n]—that the pleader is entitled to relief.
> In keeping with these principles a court considering a motion to dismiss
> can choose to begin by identifying pleadings that, because they are no more than
> conclusions, are not entitled to the assumption of truth.  While legal conclusions
> can provide the framework of a complaint, they must be supported by factual
> allegations.  When there are well-pleaded factual allegations, a court should
> assume their veracity and then determine whether they plausibly give rise to an
> entitlement to relief.[15]

B.     DISCUSSION

Defendants move to dismiss the Trust's (1) federal securities fraud; (2) state securities

fraud; (3) common law fraud and fraudulent non-disclosure; and (4) RICO claims.   Defendants

also ask the Court to strike the Trust's jury demand.  Each argument will be considered in turn.

---

[13]*Id*. (quoting *Twombly*, 550 U.S. at 555).

[14]*Id*. (quoting *Twombly*, 550 U.S. at 557).

[15]*Id*. at 1949-50 (alteration in original) (internal quotation marks and citations omitted).

1.  FEDERAL SECURITIES FRAUD

Defendant moves to dismiss the Trust's second, sixth, and seventh causes of action,

which are brought under Section 10(b) of the 1934 Securities Exchange Act.  That provision

makes it "unlawful for any person, directly or indirectly . . . to use or employ, in connection with

the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in

contravention of such rules and regulations as the [SEC] may prescribe."[16]  In its regulation

interpreting § 10(b), the SEC makes it unlawful for

> any person, directly or indirectly, by the use of any means or instrumentality of
> interstate commerce, or of the mails or of any facility of any national securities
> exchange:
>> (a) To employ any device, scheme, or artifice to defraud,
>> (b) To make any untrue statement of a material fact or to omit to state a
>> material fact necessary in order to make the statements made, in the light
>> of the circumstances under which they were made, not misleading, or
>> (c) To engage in any act, practice, or course of business which
>> operates or would operate as a fraud or deceit upon any person, in
>> connection with the purchase or sale of any security.[17]

When pleading a cause of action under rule 10(b), a plaintiff is required to comply with

the heightened pleading standards set by Fed. R. Civ. P. 9(b) as well as the Private Securities

Litigation Reform Act.[18]

---

[16] 15 U.S.C. § 78(j).

[17] 17 C.F.R. § 240.10b-5.

[18] *See Blackmore/Cannon Dev. Co., LLC v. U.S. Bancorp*, 2010 WL 1816275, at *4 (D.
Utah May 3, 2010) ("The Private Securities Litigation Reform Act of 1995, along with Rule 9(b),
mandate that plaintiffs alleging securities fraud violations are subject to heightened pleading
standards.  In addition to Rule 9(b)'s particularity requirement, securities fraud allegations must
meet two additional burdens.").

Rule 9(b) requires that, in a complaint alleging fraud, "the circumstances constituting fraud or mistake [] be stated with particularity."  The Tenth Circuit has held that Rule 9 is properly read to require a complaint alleging fraud to "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof."[19]

> Under the Private Securities Litigation Reform Act of 1995 (PSLRA),

> in order to overcome a motion to dismiss, a complaint must specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.  Further, it is not enough for a plaintiff to allege generally that the defendant acted with scienter, as permitted under Fed. R. Civ. P. 9(b).  The plaintiff must, with respect to each act or omission alleged . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.[20]

> The term "scienter" has been defined by the Supreme Court of the United States as "a mental state embracing intent to deceive, manipulate, or defraud."  The Supreme Court has further elaborated on the meaning of the term by stating: "The words 'manipulative or deceptive' used in conjunction with 'device or contrivance' strongly suggest that § 10(b) was intended to proscribe knowing or intentional misconduct."[21]

In order to prove scienter by inference, the inference must be

> more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations.  A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent

---

[19]*Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000).

[20]*In re Level 3 Commc'n, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012) (internal quotation marks and citations omitted).

[21]*City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1258 (10th Cir. 2001) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12, 197 (1976)).

and at least as compelling as any opposing inference one could draw from the facts alleged.[22]

Defendants contend that the Trust has failed to comply with the heightened pleading standards imposed by Rule 9 and the PSLRA for each of its 10(b) causes of action.  Defendants further contend that the alleged misstatements contained therein were not made "in connection with the purchase or sale of a security."  Finally, as a defense to all claims, Defendants argue that, under the "bespeaks caution" doctrine, Defendants' representations about the risks of investing absolved them of liability for the investments' failures.

As a threshold matter, the Court will first consider the whether the shares of SF5 and Sf17 are properly described as securities.  The Court will then proceed to analyze the sufficiency of the challenged causes of action.

### a.    Definition of Security

"A preliminary task in every 10b-5 case is to find some 'security' that was the object of the activities in question."[23]  The statutory definition of security includes "any . . . stock."[24]  However, the Supreme Court has "reject[ed] . . . any suggestion that a [transaction] evidenced by the sale of shares called 'stock,' must be considered a security transaction simply because the statutory definition of a security includes the words 'any . . . stock.'"[25]  Therefore, the proper test is whether the transaction in question is

---

[22]*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

[23]*Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 91 (5th Cir. 1975).

[24]15 U.S.C. § 78c (a)(10)

[25]*United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 848 (1975) .

13

an investment in a common venture premised on a reasonable expectation of
profits to be derived from the entrepreneurial or managerial efforts of others.  By
profits, the Court has meant either capital appreciation resulting from the
development of the initial investment . . . or a participation in earnings resulting
from the use of investors' funds . . . . In such cases the investor is attracted solely
by the prospects of a return on his investment.  By contrast, when a purchaser is
motivated by a desire to use or consume the item purchased . . . the securities laws
do not apply.[26]

Here it is clear that the Trust was motivated to purchase shares of SF5 and SF17 solely by the

prospect of a return on the investment, and not by any desire to "use or consume" the shares.

Additionally, the Trust relied on the management efforts of the Defendants to generate that

return.  Accordingly, the Court finds that the shares of SF5 and SF17 purchased by the trust are

securities.

> a.      *Second Cause of Action*

The Trust's second cause of action alleges that Defendant Baldwin, on April 6, 2010,

"told the Trust that he had spoken to M&I Bank . . . who had informed him that the borrower

made a payoff bid of $2,700,000 that could be finalized by the end of the [sic] April 2010, and

that because of this fact SF17 would make a fast approximately $600,000.00 profit."[27]  The Trust

has therefore identified the contents of the statement, who made it, and the time at which it was

made, with particularity.  The Trust has also alleged facts demonstrating the consequences of the

misrepresentation—that it relied on the misrepresentation because it doubled its investment as a

result.

---

[26]*Forman*, 421 U.S. at 852 (internal quotation marks and citations omitted).

[27]Docket No. 2, at 29.

The Trust alleges that this statement was false because "the borrower never had the opportunity to submit a payoff offer."[28]  This allegation is based on a conversation Boulware had with the supposed offeror.  The Trust has therefore alleged facts showing why the statement was misleading.

The Trust alleges that Baldwin acted with scienter because (1) he "used precise amounts in his misrepresentations, i.e.,  $2,700,000.00 and $600,000.00, which demonstrate that Baldwin put some thought into the lie before he told it to the Trust; and (2) after he got the money he did not invest it as promised, and lied to the Trust about it."[29]  These allegations, taken as true, create a strong inference that Baldwin acted with an intent to deceive when he represented to the Trust that a payoff offer had been made.

In light of the foregoing, the Court finds that the Trust's second cause of action has satisfied the requirements of Rule 9 and the PSLRA.

Defendants argue that the alleged misrepresentations addressed by the second cause of action occurred after the Trust had invested in SF17.  The Complaint, however, alleges that Baldwin stated that a payoff offer had been made to induce the Trust to invest.  All of the Trust's well pleaded factual allegations are to be accepted as true on a motion to dismiss.  Though Defendants refer to other alleged misstatements identified in the Complaint that were made after the Trust had invested, those misstatements are not involved in the Trust's second cause of action.  Accordingly, the Court will reject Defendants' argument on this point.

---

[28]*Id.*

[29]*Id.* at 30.

b.      *Sixth Cause of Action*

The Trust's sixth cause of action alleges that "[t]hroughout SF5, Silverleaf Financial,

Silverleaf Ventures and Baldwin concealed the existence or terms of the Lincolnshire Loan."[30]

As a threshold matter, the Court notes that when pleading a 10(b) claim a plaintiff is

required to identify *the party* who made (or failed to make) the misleading statement.  Entities do

not make statements.  Therefore, although people may make statements on behalf of an entity, if

such is the case, the person who made the statement on behalf of the entity must be identified if

fraud is alleged.[31]  The same is true for omissions—while a person's omission may be imputed to

an entity, a complaint alleging a fraudulent omission must identify the omitter.  Accordingly, the

Trust's contention that Silverleaf Financial and Silverleaf Ventures failed to disclose material

information cannot support a 10(b) claim.

As for Baldwin, the Trust has identified the contents of the omission (disclosure of the

Lincolnshire Loan), the person who failed to disclose (Baldwin), the time during which the

material information was omitted (during the relationship between the Trust and SF5), and the

consequences of the omission (proceeds that belonged to the Trust going to pay the Lincolnshire

Loan).

The Trust has further alleged that Baldwin acted with scienter because, at the time the

Trust subscribed to SF5, Baldwin knew that the SF5 documents promised one payout scheme

---

[30]*Id.* at 38.

[31]*See Koch*, 667 F.3d at 1237 ("Rule 9(b)'s purpose is to afford defendant fair notice of
plaintiff's claims and the factual ground upon which [they] are based.") (quotation marks and
citation omitted).

while the Lincolnshire Loan documents required another, therefore indicating that Baldwin kept information about the Lincolnshire Loan hidden in order to increase the likelihood that the Trust would invest.  The fact that Baldwin knew about the Lincolnshire Loan and its consequences for SF5 investors creates a strong inference that he intended to deceive the Trust by not revealing those terms.

Finally, the Trust has indicated why the omission was misleading—without knowing about the Lincolnshire Loan, the Trust thought that it would be getting proceeds according to the process set out in the Loan Participation Agreement.

Accepting the Trust's allegations as true and making all reasonable inferences in the Trust's favor, the Court finds that the pleading requirements are satisfied here.

This omission of factual matter was clearly made in connection with the sale of a security because it concerns the terms of a loan that was used to partially finance the purchase of a security in which the Trust was participating.  In light of the foregoing, the Court finds that this claim survives Defendants' Motion to Dismiss.

c.      *Seventh Cause of Action*

The Trust's seventh cause of action alleges the following: (1) that Defendant Staples "advised the Trust that there had been no distributions because of tenant improvements and the payment of property taxes"[32]; (2) that this statement was false when made because Defendants had made distributions to other entities and had failed to pay property taxes; (3) that the Trust

---

[32]Docket No. 2, at 41.

relied on the statement by foregoing its right to proceeds; and (4) that Staples acted with scienter because

> he was desperate to keep the Trust's investment and its proceeds, as evidence by the fact that: (a) Staples proposed a partnership arrangement that would leave the Trust's money in SF5; (b) Staples promised to give the trust 6% interest if the Trust would allow SF5 to keep the money; (c) Staples giving his personal guarantee that all of the Trust's concerns would be resolved; and (d) failing to ever provide the Trust with documents detailing his actions.[33]

Defendant Staples has argued that because this alleged misstatement occurred after the trust invested in SF5, the statement was not made in connection with the purchase or sale of a security. The security here is shares of SF5. Though Staples's statements concerned dealings with SF5 assets, they were not made in connection with the purchase or sale of SF5 shares. Accordingly, 10(b) has no applicability to this alleged fraudulent statement. The Court will therefore dismiss the Trust's federal securities fraud claim based on this alleged misstatement.

> d.    *Bespeaks Caution Doctrine*

As a defense to all of the Trust's claims, Defendant has invoked the "bespeaks caution" doctrine. That doctrine

> provides a mechanism by which a court can rule as a matter of law (typically in a motion to dismiss for failure to state a cause of action or a motion for summary judgment) that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud. The doctrine can protect a defendant against a securities fraud claim.[34]

---

[33] *Id.* at 41-42.

[34] *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1120 (10th Cir. 1997).

By definition, the bespeaks caution doctrine applies only to affirmative, forward-looking statements.  Because several of the allegedly misleading statements referred to then-present factual conditions, or implied background factual assumptions a reasonable investor would regard the speaker as believing to be true, the "bespeaks caution" doctrine would be of no assistance to defendants as to those statements.[35]

As to the second cause of action—the alleged misstatement about a payoff offer—the statement refers to a then-present factual condition, and therefore the bespeaks caution doctrine cannot apply.  Furthermore, under the same reasoning, the doctrine cannot apply to a non-disclosure, and thus is not relevant to the sixth cause of action.  The seventh cause of action is also based on an alleged representation that addresses a present condition—other investors have not been paid, and the proceeds have been used for property taxes.  Accordingly, the bespeaks caution doctrine is not applicable to any of the Trust's federal securities fraud claims.

## 2. STATE SECURITIES FRAUD

In these claims, the Trust essentially realleges its second and sixth causes of action under Utah state law—that Defendants' concealment of the Lincolnshire Loan and representation that a payoff offer had been made on SF17 constitute a violation of Utah's securities fraud statute—Utah Code Ann. § 61-1-1.  Because the Utah Supreme Court defines "security" with reference to the federal case law,[36] the Court finds that the shares of SF5 and SF17 are

---

[35]*Id.* at 1123.

[36]*See Payable Accounting Corp. v. McKinley*, 667 P.2d 15, 17 (Utah 1983) ("The meaning of the term "security" as used in § 61-1-13(12) has not been previously addressed by this Court. However, we are not without substantial guidance in the area. Section 61-1-13(12) is taken from the [federal securities statutes].  Because most state blue sky laws and the federal securities acts are similar, states frequently rely on federal case law in interpreting state security acts.").

"securities."  In contending that the Trust's state law claims fail,  Defendants rely on the same arguments they advance against the federal claims.  Accordingly, the Court will deny dismissal for the same reasons as above.

 3.  FRAUD

  Defendants have moved to dismiss the Trust's fraud based claims as found in the fourth, fifth, and eleventh causes of action.  Defendants contend that the Trust has failed to satisfy Rule 9 and has not alleged sufficient evidence to support any of its fraud claims.

  Under Utah law, to bring a claim sounding in fraud, a party must allege (1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage.[37]  As with any claim alleging fraud, the Trust must comply with Rule 9(b)'s heightened pleading standard.

  Each fraud based claim will be considered in turn.

---

[37] *Gold Standard, Inc. v. Getty Oil Co.*, 915 P.2d 1060, 1066-67 (Utah 1996) (citing *Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 800 (Utah 1991)).

a.     *Fourth Cause of Action*

The Trust's fourth cause of action is based on Defendant Baldwin's statement that a payoff offer had been made on the Florida Loan.  As noted above, the Court finds that this claim meets the requirements of Rule 9.

Furthermore, the Court finds that the cause of action is well pleaded.  The Trust has alleged, with supporting facts, that Baldwin made a statement, which he knew was untrue, and which the Trust relied on in deciding to invest.  Because Baldwin's statement was made during SF17's solicitation for the Trust's business, it is easily inferred that Baldwin intended the Trust to rely on the statement in deciding to invest in SF17.  Finally, the Trust did invest, and has never seen any proceeds (despite promises of a quick $600,000) or had its principal returned.  Based on these allegations, the Court finds that the fourth cause of action survives dismissal.

b.     *Fifth Cause of Action*

The Trust has alleged that Baldwin fraudulently represented he was working on a sale of the Florida Loan when, in fact, the loan had been sold three months earlier.  In response to an inquiry from the Trust about the status of SF17's investment in the Florida Loan, Baldwin responded in an email dated July 19, 2010:

> There is [sic] no financial updates on the Florida deal.  We are working on a definitive agreement with him now.  He has been reluctant to sign a deal until he knows he has the money.  I have spoken to his funding source and he has given me the date of Aug. 11th as the date they will have the money to close.  The borrower is pretty weird, but has been very upfront about what he is trying to do. I will get you all the other information over the next couple of days.[38]

---

[38]Docket No. 2, at 35.

The trust alleges that this statement was untrue because the loan had actually been sold to Cobalt three months earlier.  The Trust further alleges that it relied on this statement to its detriment because it was thereby deterred from taking action to protect its interests.  Taken as true, these allegations would make out a claim for fraud.  Furthermore, these allegations satisfy Rule 9 in that they identify the contents of the misstatement, who said it, when and where it was said, and what the effect was.  Accordingly,  the Court finds that the fifth cause of action does not warrant dismissal.

        *c.*     *Eleventh Cause of Action*

This cause of action is based on Defendant Staples's representation, in an email written December 9, 2010, that there had been no distribution from SF5 because the proceeds had been used for tenant improvements and property taxes.  The Trust alleges that this statement was misleading because property taxes were at that point unpaid on nearly all of the property related to the Parry Loans, and that distributions had in fact been made to other participants in SF5.  While this claim could not be the basis for a federal securities fraud claim because it was not made in connection with the purchase or sale of a security, it can provide grounds for a common-law fraud claim if adequately pleaded.

The Court finds that this claim has been pleaded with sufficient particularity to satisfy the requirements of Rule 9.  The Trust has identified the contents of the misstatement, who said it, when it was said, and what the misstatement caused the Trust to do.

Furthermore, this claim is well pleaded because the Trust's allegations would establish fraud.  The Trust has alleged that Defendant Staples knowingly made this false representation

22

with the intent to deceive.  The Trust also alleges that it relied on this statement to its detriment because it was deterred by the statement from taking action to protect its interests.  Fraud is therefore established by the allegations.

### 4.  FRAUDULENT NONDISCLOSURE

Defendants have also moved to dismiss the Trust's common law fraudulent nondisclosure claims.  The Trust contends that Defendants fraudulently failed to disclose (1) the existence of the Lincolnshire Loan and (2) that proceeds were being distributed to BVC.  Defendants respond that the Trust has not complied with Rule 9, and has not shown the elements of fraud.

To prevail on a claim for fraudulent nondisclosure under Utah law, "the plaintiff must show (1) that the nondisclosed information is material, (2) that the nondisclosed information is known to the party failing to disclose, and (3) that there is a legal duty to communicate."[39] "Whether a duty exists is strictly a question of law; it grows out of the relationship between the parties, and the duties created by that relationship."[40]

Each fraudulent nondisclosure claim will be considered in turn.

> ### a.    Ninth Cause of Action

This claim is based on Defendants' alleged failure to disclose the existence of the Lincolnshire Loan.  As noted above, the Court finds that this claim is pleaded with sufficient particularity to satisfy Rule 9.

---

[39] *Mitchell v. Christensen*, 31 P.3d 572, 574 (Utah 2001).

[40] *Moore v. Smith*, 158 P.3d 562, 572 (Utah 2007).

The Court further finds that this claim survives dismissal. The information would clearly be material to the Trust as it would affect its ability to realize a return on its investment. The Trust has alleged that Defendants knew that the Lincolnshire Loan existed. Defendants have not contended that they did not have a duty to communicate. Accordingly, the Court finds that this claim survives dismissal.

              b.      *Tenth Cause of Action*

This claim is based on Defendants' alleged failure to disclose that distributions had been made to BVC from the SF5 proceeds. The Trust has alleged that both Baldwin and Staples knew of the payments to BVC and did not disclose them to the Trust over the course of the relationship between the Trust and SF5. The Trust has therefore identified that people who should have made the disclosure, what its contents would have been, and the time period during which the disclosure should have been made. Accordingly, the Court finds that Rule 9 has been satisfied.

The Court further finds that the Trust's BVC non-disclosure claim is sufficient to survive dismissal. The Trust has alleged that both Staples and Baldwin knew that distributions were made to BVC and that the agreement required payments to be made to all participants pari passu. That information was clearly material to the Trust because a reasonable investor would want to know if another participant was getting paid while the investor was not. As above, Defendants have not argued that they did not have a legal duty to communicate. Accordingly, the Court finds that this claim has been properly pleaded.

5.  RICO

Defendants have argued (1) that the PSLRA preempts a RICO claim in this case and (2) even if it wasn't preempted, the Trust's RICO claim is not sufficiently plead.  The Trust does not address any of Defendants' arguments, or make any arguments regarding its RICO claim in its opposition.  The Trust therefore appears to have abandoned the claim.

In any event, it is clear that the Trust's  RICO claim is preempted by the PSLRA.  "The PSLRA amended RICO to provide that 'no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of [RICO].'"[41]  The Tenth Circuit has agreed with other circuits that a claim that is based on securities fraud is barred by the PSLRA.[42]  This is the case even where a plaintiff argues that the underlying acts do not make out a claim for securities fraud under PSLRA.  In *Bixler v. Foster*, plaintiffs had alleged mail and wire fraud, bank fraud, extortion, obstruction of justice and racketeering, but claimed the facts giving rise to their claim did not make out a PSLRA claim. The Court rejected this argument, noting that the alleged fraudulent acts were "undertaken in connection with the purchase of a security" and thus could not "support a civil RICO claim after the enactment of the PSLRA."[43]

Accordingly, the Court will dismiss the Trust's RICO claim.

---

[41]*Bixler v. Foster*, 596 F.3d 751, 759 (10th Cir. 2010).

[42]*Id.* at 759-60.

[43]*Id.* at 760.

6.  JURY DEMAND

Defendants ask the Court to find that the Trust is foreclosed from requesting a jury trial

by the language of the Loan Purchase Agreement ("LPA") that the Trust signed in connection

with its investment in SF5.  The LPA states

> Participant and lender hereby agree not to elect a trial by jury of any issue triable
> of right by jury, and waive any right to trial by jury fully to the extent that any
> such right shall now or hereafter exist with regard to this agreement, the loan
> documents, or any claim, counterclaim or other action arising in connection
> therewith.  This waiver of right to trial by jury is given knowingly and voluntarily
> by the participant and lender and is intended to encompass individually each
> instance and each issue as to which the right to a trial by jury would otherwise
> accrue.[44]

Defendants recognize that some of the Trust's claims do not necessarily arise under the LPA.

However, Defendants contend that "based upon the clear and knowing waiver of any right to a

jury related to the LPA, Plaintiffs' claims which arise in connection with the LPA should be

bifurcated from these proceedings and tried to the Court."[45] The Trust does not respond to any of

Defendants' arguments on this point.

The Trust does not allege breach of the LPA in any of the claims Defendants contest.

However, the Trust's securities fraud and common law fraud claims arguably arise "in

connection" with the LPA because they are based on an interaction between the parties that was

structured by the LPA.  Because the Trust has not disputed that this provision of the LPA could

---

[44]Docket No 2 Ex. A, at 13.

[45]Docket No. 22, at 28.

include its related claims, the Court finds that a jury trial is precluded on those viable claims relating to SF5.

### III.  PARTIAL SUMMARY JUDGMENT

In this Motion, the Trust moves for summary judgment on its claim that Defendants have breached the settlement agreement executed by the parties in August of 2011.  Defendants respond that the agreement contains a provision which renders the contract null and void if Defendants fail to make the initial payment.  In its reply, the Trust claims that the provision was subsequently modified by mutual agreement between the parties so that the agreement would not be voided by a failure of Defendants to pay the initial amount.[46]  The Court asked Defendants to respond in a surreply to the argument that the provision was modified.  Defendants' surreply confirmed that the provision had in fact been modified, so that the settlement agreement was not voided by Defendants' failure to make the initial payment.[47]  The Court therefore finds that the settlement agreement is still viable.

Defendants also argue that a dispute of material fact exists as to the terms of the agreement because there is a discrepancy between the amount specified as "the remainder of the settlement amount" in the settlement agreement and the amount identified in the accompanying

---

[46]Defendants have also argued that, if the Court grants their motion to dismiss on the federal claims in this suit, the Court should decline to exercise supplemental jurisdiction over the remaining state law claims.  Because the Court will deny the motion to dismiss on some of the federal claims, this argument is moot.

[47]Defendants present a second argument in their surreply that by seeking to enforce the settlement agreement the Trust lost its right to pursue other claims.  This argument goes beyond the clear limits the Court set for the surreply, and therefore will not be discussed here.

promissory note.  In response, the Trust claims that this is simply a typographical error.  It is

clear that the figure listed on the promissory note accurately calculates the amount remaining

after the initial payment (interest included), whereas the settlement agreement does not.  The total

settlement amount was $1,523,609.73.  The initial payment was to be for $1,325,000.  The

remainder would thus be $198,609.73.  Adding 35 days of interest, as provided in the settlement

agreement, brings the total to $201,506.12—the amount specified in the promissory note.

However, the settlement agreement states that the remainder is $184,178.78.  Accordingly, it is

clear that the discrepancy is a typographical error and the parties intended the remainder of the

settlement amount to be $201,506.12.

Defendants have made no other arguments concerning the Trust's summary judgment

motion. The Court will therefore grant summary judgment in favor of the Trust.

### IV.  CONCLUSION

It is therefore

ORDERED that Defendants' Partial Motion to Dismiss and to Strike Jury Demand

(Docket No. 21) is GRANTED IN PART AND DENIED IN PART.  It is further

ORDERED that Plaintiffs' Motion for Partial Summary Judgment (Docket No. 34) is

GRANTED.

DATED   April 23, 2012.

BY THE COURT:

_____

TED STEWART
United States District Judge

28